83,515-03

IN THE COURT OF CRIMINAL APPEALS OF TEXAS CLERK'S SUMMARY SHEET FOR POSTCONVICTION APPLICATIONS FOR WRIT OF HABEAS CORPUS UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07 AND 11.071

# VOLUME II OF III

**Ex Parte: Richard Anthony Herod**          Trial Court Writ No. 10CR0325-83-2

### Application for Writ of Habeas Corpus
#### From 10th District Court District Court of Galveston County

**Applicant's Name: Richard Anthony Herod**

**Offense: Aggravated Sexual Assault with Two(2) Enhancements**

**Cause Number: 10CR0325**

**Plea: Not Guilty**

**Sentence: Ninety-Nine (99) Years TDCJ**

**Trial Date: June 12, 2012**

**Judge's Name: David E. Garner**

**Appeal Number: 14-12-00646-CR**

RECEIVED IN
COURT OF CRIMINAL APPEALS

**Citation to Opinion: N/A**

**Hearing Held: No**

AUG 26 2019

**Findings & Conclusions Filed:  Yes**

Deana Williamson, Clerk

**Recommendation:  Deny**

**Judge's Name: Kerry Neves**

**Name of Habeas Counsel if Applicant is Represented: Jonathan Landers**

I certify that all applicable requirements of Texas Rule of Appellate Procedure 73.4 have been complied with in this habeas proceeding, including the requirement to serve on all the parties in the case any objections, motions, affidavits, exhibits, proposed findings of fact and conclusions of law, findings of fact and conclusions of law, and any other orders entered or pleadings filed in the habeas case.

_____
Signature of District Clerk or Clerk's Representative

08/21/2019
_____
Date Signed

BEST COPY AVAILABLE

# POST CONVICTION HABEAS CORPUS
## (ARTICLE 11.07, V.A.C.C.P. )

10CR0325-83-2– Court No. 10th District Court

PETITIONER:  Richard Anthony Herod TDC# 1795915
ADDRESS:     Coffield Unit, 2661 FM 2054
             Tennessee Colony, Texas 75884

             C/O Jonathan Landers, Attorney
             917 Franklin Street, Suite 300
             Houston, Texas 77002

FROM:        John D. Kinard, District Clerk
             600 59th Street, Ste. 4001
             Galveston, Texas 77551-2338

JUDGE:       Kerry Neves –10th District Court

ATTORNEY FOR PETITIONER:                ATTORNEY FOR STATE:

Jonathan Landers                        Jack Roady
917 Franklin Street, Suite 300          District Attorney
Houston, Texas 77002                    600 59th Street, Ste. 1001
                                        Galveston, Texas 77551-2338

## I N D E X

|  | Page |
|---|---|
| **VOLUME I OF III** | |
| Petition for Writ of Habeas Corpus | 1 |
| Appendix | 20 |
| Memorandum Supporting Application for Writ of Habeas Corpus | 77 |
| Notice to Petitioner of Filing | 135 |
| Waiver of Service by District Attorney | 136 |
| Answer to Application for Post-Conviction Writ of Habeas Corpus | 137 |
| Order Requesting Designation of Issues | 146 |
| Transmittal Letter to Court of Appeals | 148 |
| Amended Order Requesting Designation of Issues | 149 |
| Correspondence from Clerk | 151 |
| Motion and Order Requesting Extension of Time | 152 |
| Correspondence from Clerk | 155 |
| Correspondence from the Court of Appeals | 156 |
| First Supplemental Answer | 160 |

**VOLUME II OF III**

State's Motion for Leave to Exceed Word Limitation 236

Order Granting Leave to Exceed Word Limitation 239

Applicant's Request for a Hearing 240

Applicant's Notice of Reply Briefing 247

Affidavit of Bruce Budowle 252

Trial Court Second Motion and Order for Extension of Time 257

Correspondence to Court of Criminal Appeals 261

Herod's Reply to the State's First Supplemental Answer 262

Transmittal Letter from Court of Criminal Appeals 335

State's Amended First Supplemental Answer 336

State's Motion for Leave to Exceed Word Limitation Imposed by Rule 73 416

Correspondence from Trial Court 419

Correspondence from Trial Court 423

Trial Court Third Motion-Request for Extension of Time and Order 428

Transmittal Letter to Court of Criminal Appeals 433

Correspondence from Court of Criminal Appeals 434

Applicant's Request for a Hearing 438

**VOLUME III OF III**

State's Response to Applicant's Request for Hearing 446

Order Denying Applicant's Request for Hearing 453

Memorandum Regarding Proper Harm Analysis 454

Findings of Fact and Conclusions of Law Without Evidentiary Hearing on Application for Writ of Habeas Corpus 460

Docket Sheet 508

Indictment (Challenged Conviction) 513

Judgment and Sentence (Challenged Conviction) 515

Opinion (Challenged Conviction) 522

Mandate (Challenged Conviction) 537

Docket Sheet (Challenged Conviction) 538

Clerks Certificate 560

Filed: 9/18/2018 11:15 AM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 27596529
By: Alytha Green-Pickney
9/18/2018 2:45 PM

## CAUSE NOS. 10CR0325-83-2 & 10CR0326-83-2

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT OF |
| | § | GALVESTON COUNTY, TEXAS |
| RICHARD ANTHONY HEROD, | § | |
| Applicant | § | 10TH JUDICIAL DISTRICT |

### STATE'S MOTION FOR LEAVE TO EXCEED WORD LIMITATION IMPOSED BY RULE 73 OF TEXAS RULES OF APPELLATE PROCEDURE

The State of Texas, by and through the undersigned Assistant Criminal District Attorney, respectfully requests that this Court grant leave to exceed the word limitation imposed by Rule 73 of the Texas Rules of Appellate Procedure in the above-numbered application for writ of habeas corpus would show the following in support thereof:

### I.

On March 2, 2018, the applicant filed applications for writ of habeas corpus, cause numbers 10CR0325-83-2 and 10CR0326-83-2, which presented allegations seeking habeas relief based upon a denial of due process from false evidence and *Brady* violations, new scientific evidence pursuant to Article 11.073 of the Code of Criminal Procedure, and ineffective assistance of counsel. On March 14, 2018, this Court entered a timely order designating issues which needed resolution. On April 19, 2018, this Court entered an additional order designating issues.

### II.

Rule 73.3 of the Texas Rules of Appellate Procedure requires, in pertinent part, that any response by the State "must comply with length, typeface, and certificate of

236

compliance requirements set out by rule 73.1(d)...." Rule 73.1(d) requires that a computer-generated memorandum not exceed 15,000 words.

## III.

In its original answer, the State requested the designation of issues which needed resolution based upon the need for an evaluation of the evidence presented during the applicant's original trial in the context of the habeas allegations and evidence. After fully evaluating the trial record and habeas evidence, the State has prepared a first supplemental answer which thoroughly responds to the habeas allegations.

However, the comprehensive summary of the trial evidence and the responses to the habeas allegations contained in the State's first supplemental answer exceed the 15,000 word limit imposed by Rule 73 of the Texas Rules of Appellate Procedure.[1] The State respectfully submits that exceeding the word limitations is necessary to sufficiently respond to the instant habeas allegations. The instant habeas allegations are fact-intensive and require an in-depth review and development of the trial evidence as well as detailed materiality analyses.

## V.

In light of the nature of the allegations and the need to comprehensively evaluate the trial evidence, the State respectfully requests that this Court grant leave to exceed the word limitation imposed by Rule 73 of the Texas Rules of Appellate Procedure.

---

[1] The word count from the computer program used to prepare the State's First Supplemental Answer reflects that the document contains 15,563 words.

2

237

## V.

Service was accomplished by sending via certified mail a true and correct copy of this instrument to:

> Jonathon Landers
> 917 Franklin, Suite 300
> Houston, Texas 77002

Respectfully submitted,

JACK ROADY
Criminal District Attorney

*/s/ Baldwin Chin*
BALDWIN CHIN
Assistant Criminal District Attorney
600 59th Street, Suite 1001
Galveston, Texas 77551
(409) 766-2452
FAX: (409) 765-3132
SBOT # 00783823

3

238

Filed: 9/18/2018 11:15 AM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 27596529
By: Alytha Green-Pickney
9/18/2018 2:45 PM

## Cause Nos. 10CR0325-83-2 & 10CR0326-83-2

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT OF** |
| | § | **GALVESTON COUNTY, TEXAS** |
| **RICHARD ANTHONY HEROD,** Applicant | § | **10TH JUDICIAL DISTRICT** |

### STATE'S PROPOSED ORDER GRANTING LEAVE TO EXCEED WORD LIMITATION IMPOSED BY RULE 73 OF TEXAS RULES OF APPELLATE PROCEDURE

Having reviewed the original application for writ of habeas corpus and the supporting memorandum as well as the State's answers, this Court hereby GRANTS the State's request for leave to exceed the word limitation imposed by Rule 73 of the Texas Rules of Appellate Procedure.

By the following signature, the Court adopts the State's Proposed Order Granting Leave To Exceed Word Limitation Imposed By Rule 73 Of Texas Rules Of Appellate Procedure in Cause Numbers 10CR0325-83-2 and 10CR0326-83-2.

Signed on this the _1st_ day of _OCT._, 2018.

_____
Judge Presiding
10th Judicial District Court
Galveston County, Texas

10CR0325-83-2
DCORDER
Order
1687881

4

Filed: 9/24/2018 10:28 AM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 27738717
By: Alytha Green-Pickney
9/24/2018 11:23 AM

No. 10CR0325-83-2

| EX PARTE | § | IN THE 10th JUDICIAL |
|---|---|---|
| | § | |
| | § | |
| RICHARD ANTHONY HEROD | § | DISTRICT COURT |
| | § | |
| | § | |
| | § | GALVESTON COUNTY, TEXAS |

### APPLICANTS REQUEST FOR A HEARING

Applicant Richard Herod requests this Court, pursuant to Texas Code of Criminal Procedure art. 11.07, § 3(d), to set an evidentiary hearing date to resolve the factual issues material to the legality of the Applicant's confinement. Specifically, a hearing is necessary to resolve the following factual disputes between the parties:

### I. A HEARING IS NECESSARY TO DETERMINE WHETHER THE DNA EVIDENCE PRESENTED AT TRIAL WAS FALSE OR MISLEADING.

At Herod's trial the prosecution presented expert testimony that Richard Herod could not be excluded from DNA evidence found at the scene of the crime. We now know that Richard Herod is excluded from all DNA evidence found at the scene. This fact is confirmed by the State's current expert, Andrew McWhorter: "The reason that the **conclusion of Richard Herod not being excluded as a possible contributor changed to the conclusion that Herod was excluded as a**

240

**possible contributor** was because the DNA mixture interpretation protocols changed on August 10, 2015, and subsequently on March 18, 2016." *See* State's Supplemental Answer, Appendix A at 7 (emphasis added). Based on these facts Herod argues that his conviction was tainted by false or misleading DNA evidence. *See* Herod's Memorandum at 28-36. Herod's claim is based upon the recent DPS crime lab report which states: "Richard Herod is excluded as a contributor to this profile." *Id.*

It certainly appears that the evidence presented at Herod's trial was false or created a false impression. In May of 2011 the DPS crime lab made the following finding: "Richard Herod cannot be excluded as a contributor to the profile . . ." *See* Herod's Memorandum, Appendix 2, at 2. At trial, the prosecution's DNA expert testified that "Richard Herod cannot be excluded as a contributor of the profile at eight of the 16 locations." 7 RR at 225. The expert then confirmed that Richard Herod could not be excluded from the DNA in question:

> Q. Okay. Was that the only, the body of the T-shirt the only time that you found that you could not exclude Richard Herod's DNA?
>
> A. That is correct.

*Id.* at 226. Later, the expert would affirm that "'cannot be excluded' [is] the strongest language you could use in a mixture case." *Id.* at 245.

241

Although the State accepts the truth: "DNA results excluded the applicant as a contributor to all biological samples collected from the physical evidence, including the white shirt, recovered from the Gallagher residence," the State argues the testimony presented at trial was not false or misleading. *See* State's Supplemental Answer, at 22.[1] The State's argument appears to be that because the DPS analyst obtained an incorrect result in 2011 based upon flawed science, her testimony was not false. *See* State's Supplemental Answer, at 23-26. The state argues that although the analyst's testimony was wrong (Herod *is* excluded from all DNA left at the scene of the crime) her testimony was not false or misleading because she was simply relying on the former DPS protocols.

Herod's Due Process and Due Course of Law claims hinge upon whether or not the DNA evidence presented at his trial was false or misleading. This Court should hold hearing to determine whether or not DPS analyst Clare Browder's testimony, that Herod could not be excluded as a contributor to DNA evidence found at the scene, was false or misleading.

---

[1] In its answer to Herod's claim II (arguing that he is entitled to relief pursuant to Art. 11.073) the state accepts that the new DNA report contradicts the DNA testimony offered at Herod's trial. *See* State's Supplemental Answer, at 53-58; Tex. C. Crim. P. art. 11.073 (a)(2) (explaining that the article only applies to scientific evidence that "contradicts scientific evidence relied on by the state at trial.").

II.    **A HEARING IS NECESSARY TO DETERMINE WHETHER THE STATE WITHHELD EVIDENCE SHOWING HEROD WAS NOT AT THE SCENE OF THE ROBBERY, AND TO DETERMINE WHETHER THE STATE WITHHELD FAVORABLE IMPEACHMENT EVIDENCE.**

Herod also alleges that his right to Due Process was violated because the State withheld evidence showing that he was excluded as a contributor to all DNA found at the scene, and withheld evidence that the Scientific Working Group on DNA Analysis Methods had made recommendations to make DNA interpretation more reliable, recommendations that were not followed by DPS.    See Herod's Memorandum at 36-39, Appendix 6.    Specifically, Herod has presented evidence showing that DPS was aware that there was a "lack of consensus in the forensic DNA testing community" concerning the reliability of the DNA interpretation techniques used by DPS in Herod's case.    *Id.*    Further, as far back as 2005, DPS was aware that "there [was] variation among laboratories in Texas and nationwide, including differences in standards for calculation of CPI that could be considered scientifically acceptable."    *See* Herod's Memorandum, Appendix 6, Appendix page 29.

In short, DPS was aware that it might be using scientifically unacceptable techniques as far back as 2005, but did not make corrections until 2015.    Once the problems were corrected, it became clear that Herod was actually excluded from all DNA found at the scene of the robbery.    *Id.*

243

The State responds that although DPS was aware of certain guidelines published in 2010 (prior to trial) suggesting that DPS was using improper techniques in evaluating DNA mixture evidence, and although nobody from DPS or the prosecution team turned over this information, the information was not actually favorable to the defense. *See* State's Supplemental Answer, at 43-50. The State argues that the guidelines in question, eventually adopted by DPS, were only recommendations and "suggested best practices" and therefore were not favorable to the defense team. *Id.* at 44.

The State accepts that members of the prosecution team were aware of this evidence, and that the evidence was not turned over to the defense, but the state disputes that the evidence was favorable to the defense.

A hearing is necessary to determine whether the withheld evidence was favorable to the defense.

**III.    A HEARING IS NECESSARY TO DETERMINE WHETHER TRIAL COUNSEL LABORED UNDER AN ACTUAL CONFLICT OF INTEREST.**

Herod has presented this Court with evidence that his trial attorney was laboring under an actual conflict of interest by representing both Herod, and his co-defendant in another case, George Evan Sanford. *See* Herod's Memorandum at 50-55, Appendix 9. Although the State does not specifically dispute the factual basis

of this claim, or the existence of a conflict of interest, the State does generally deny "all allegations raised in the instant habeas application. . . ." *See* State's Supplemental Answer, at 18.

A hearing is necessary to soldify the factual basis of trial counsel's conflict of interest.

## IV.   CONCLUSION

The Applicant request this Court set a hearing date so that the factual issues in question can be resolved and to assist this Court making a finding of fact or in approving the findings of the person designated to make them.

Respectfully Submitted,

/s/
Jonathan D. Landers
Texas Bar No. 24070101
917 Franklin St., Suite 300
Houston, Texas 77002
Telephone (713) 685-5000
Facsimile (713) 513-5505
Email: JLanders.Law@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this motion was provided to the Assistant District Attorney handling this case via the e-filing system and by email, on September 21, 2018.

/s/ _____

Jonathan D. Landers

Filed: 1/24/2019 3:50 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 30648967
By: Tracy Petermann
1/24/2019 4:26 PM

No. 10CR0325-83-2

| | | |
|---|---|---|
| EX PARTE | § | IN THE 10th JUDICIAL |
| | § | |
| | § | |
| RICHARD ANTHONY HEROD | § | DISTRICT COURT |
| | § | |
| | § | |
| | § | GALVESTON COUNTY, TEXAS |

### APPLICANTS NOTICE OF REPLY BRIEFING

Applicant Richard Herod gives notice of his intent to file a reply brief to the State's Supplemental Answer within the next 30 days. This briefing will incorporate the findings of world-renowned DNA expert, Dr. Bruce Budowle, who recently provided an opinion on this case at the request of the District Attorney's Office. *See* Appendix, Affidavit of Dr. Budowle. Dr. Budowle's affidavit establishes that the analysist in his case improperly relied upon "suspect-driven bias" which resulted in the false DNA evidence presented at Herod's trial. The affidavit establishes the following:

1. For over a decade Texas' forensic crime laboratories have faced challenges when dealing with DNA mixture evidence. *Id.* at para. 7.

2. In 2011, when "[t]he Texas Department of Public Safety Regional Crime Laboratory in Houston (DPS) originally issued results" in this case "DPS applied its mixture interpretation protocols which were approved and

adopted by DPS in 1999 and remained in effect until August 2015." DPS originally found "Richard Herod could not be excluded as a possible contributor to the DNA profile at 7 of 15 STR locations." *Id.* at para. 8.

3. On March 18, 2016, DPS implemented new DNA mixture interpretation guidelines, which, when applied to Herod's case, created "some notable differences in the interpretation of who may or may not have been potential contributors of the mixture from item 3 (B). . ." Those differences included Herod being excluded as a contributor to all DNA. *Id.* at para. 9.

4. At the time of Herod's trial most labs, like the Texas' labs, "employed an interpretation and statistical analysis method for mixture evidence known as the Combined Probability of Inclusion (CPI)." Although this method was valid, "[o]ne must be aware of the limitations of any method to apply it correctly." "Most laboratories using the CPI did not appreciate this limitation . . ." *Id.* at para. 10.

5. Mistakes were made in Herod's case, even based upon the 2011 methods. For example, the analyst in Herod's case "provided three different CPI calculations for the same mixture profile," but "[o]nly one CPI can be generated for a mixture profile." *Id.* at para. 11. The DNA analysist who

248

testified at Herod's trial created three profiles because she was laboring under a "suspect-driven bias." *Id.* at para. 11.

6. The Analyst at Herod's trial began by assuming that Herod was a contributor to the DNA profile in question. *Id.* at para. 12. But this caused problems with the interpretation. This is why she had to conclude the mixture included DNA from 4 contributors. If only three contributors were involved, Herod had to be excluded. *Id.*

7. Had the Analyst properly evaluated the evidence (by not employing suspect-driven bias) she would have concluded only three people contributed to the mixture, and Herod would have been excluded even using the 2011 interpretation techniques. *Id.* at para. 13. "Assuming the most likely explanation for the data is a three-person mixture, the interpretations can change and did change." *Id.*

8. The analyst who generated the new, 2017, report properly assumed three contributors, and using the updated software found "Richard Herod is excluded as a potential contributor." *Id.* at para. 14.

9. Amazingly, "Richard Herod should have been excluded even considering four contributors." *Id.* at para. 15.

10. The DPS analysist at Herod's trial was improperly employing a "suspect-driven bias." *Id.* at para. 16. This was "the root cause for the initial interpretation in this case," and brought about by "a misunderstanding of how to approach the evidentiary data versus the known data." *Id.* This approach "was based on a common misunderstanding of the application of the CPI methodology by many practitioners in the field, not only in Texas but nationwide." *Id.*

11. Eventually "DPS self-corrected its protocol and implemented a more robust approach regarding how to interpret DNA mixture evidence." *Id.* at para. 4. The change in the protocol "led to a different interpretation that excluded Richard Herod in the 2017 report." *Id.*

Before this Court the parties have disagreed about whether the DNA evidence at Herod's trial was false, whether the withheld evidence was favorable, and whether Herod should have identified the false evidence sooner. Each of these topics is addressed by Dr. Bedowle, and Herod's upcoming briefing will explain that Dr. Bedowle's affidavit further solidifies his claims for relief.

Respectfully Submitted,


_____/s/_____
Jonathan D. Landers

250

Texas Bar No. 24070101
917 Franklin St., Suite 300
Houston, Texas 77002
Telephone (713) 685-5000
Email: JLanders.Law@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this motion was provided to the Assistant

District Attorney handling this case via the e-filing system and by email, on January

24, 2019.

/s/ _____

Jonathan D. Landers

Filed: 1/24/2019 3:50 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 30648967
By: Tracy Petermann
1/24/2019 4:26 PM

# Appendix: Affidavit of Bruce Budowle

Cause Nos. 10CR0325-83-2 & 10CR0326-83-2

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 10TH JUDICIAL** |
| | § | **DISTRICT COURT OF** |
| **RICHARD ANTHONY HEROD,**<br>Applicant | | |
| | § | **GALVESTON COUNTY, TEXAS** |

## AFFIDAVIT OF BRUCE BUDOWLE

**THE STATE OF TEXAS**
**COUNTY OF GALVESTON**

1. My name is Bruce Budowle. I am Director of the Center for Human Identification and Professor and Vice Chair in the Department of Microbiology, Immunology, and Genetics at the University of North Texas Health Science Center at Fort Worth Texas. I am also a member of the Texas Forensic Science Commission appointed by Governor Greg Abbott.

2. I was previously employed for 26 years at the Federal Bureau of Investigation's Laboratory Division where I was involved in the research, development, and validation of numerous DNA methods. I led the team that developed DNA typing capabilities at the FBI Laboratory in Quantico, Virginia. I ended my tenure at the FBI as Senior Scientist in the Laboratory Division.

3. I have extensive experience in all aspects of forensic DNA analyses, including analyses of low-level samples, mixture analyses, population genetics, statistical interpretations, STR markers, SNP markers, and mitochondrial DNA.

4. I have authored or co-authored more than 630 scientific articles predominately encompassing all aspects of forensic genetics.

5. I have been qualified as an expert in well over 300 cases in state, federal, and international courts in various aspects of forensic DNA analyses including quality assurance, methodology, validation, molecular biology, population genetics, and statistics.

6. I continue to have an active role in casework and research, development, validation, and implementation of forensic genetic methods to increase capabilities for human identification among other applications. My qualifications are summarized in my curriculum vitae (*See* **Exhibit A**).

7. I was asked by the Galveston County Criminal District Attorney to provide this affidavit to explain the challenges in mixture interpretation that the forensic science community, and in particular Texas forensic crime laboratories, have experienced for more than a decade with respect to the interpretation of DNA mixture evidence and how it may have impacted the different conclusions in this case (case number L2H-201861) .

8. For background, the DNA mixture in question was derived from item 3 (B) which is a white shirt. Reference profiles were obtained from two victims (Alissia Gallagher and Ronald Gallagher) and the suspect (Richard Herod). The Texas Department of Public Safety Regional Crime Laboratory in Houston (DPS) originally issued results from an autosomal Short Tandem Repeat (STR) DNA analysis in a report dated May 11, 2011. DPS concluded that: (1) Richard Herod could not be excluded as a possible contributor to the DNA profile at 7 of 15 STR locations, (2) Alissia Gallagher could not be excluded as a possible contributor to the DNA profile at 7 of 15 STR locations, and (3) Ronald Gallagher could not be excluded as a possible contributor to the DNA profile at 13 of 15 STR locations. DPS applied its mixture interpretation protocols which were approved and adopted by DPS in 1999 and remained in effect until August 2015.

9. On February 9, 2017, DPS issued a new report detailing the findings of a reanalysis of the evidence using a different method of mixture interpretation of which guidelines were implemented by DPS on March 18, 2016. The report concluded for item 3 (B), now labeled item 7-03, that (1) Ronald Gallagher could not be excluded as a possible contributor to this DNA profile, (2) it was inconclusive whether Alissia Gallagher was a contributor to this DNA profile, and (3) Richard Herod was excluded as a contributor to this DNA profile. Thus, there were some notable differences in the interpretation of who may or may not have been potential contributors of the mixture from item 3 (B) between the 2011 and 2017 reports.

10. Historically, most laboratories in the United States, including those in Texas, employed an interpretation and statistical analysis method for mixture evidence known as the Combined Probability of Inclusion (CPI). A DNA mixture refers to an evidentiary sample containing at least two contributors. The CPI is a valid statistical method conveying the portion of the population that cannot be excluded as a potential contributor of the mixture. The CPI was used to interpret the mixture evidence in the 2011 report. One must be aware of the limitations of any method to apply it correctly. The primary requirement of using the CPI is that it can only be applied to genetic markers (or loci) in which it is highly unlikely that allele drop out has occurred (i.e. there are no missing data). Most laboratories using the CPI did not appreciate this limitation and selected loci for the CPI calculation relying on the known reference profile(s) of person(s) of interest. An approach that uses the known reference profile(s) to drive the interpretation of the evidentiary data is commonly referred to as "suspect-driven bias" and should be avoided.

11. In this case, the DPS analyst provided three different CPI calculations for the same mixture profile from item 3 (B) in the 2011 report – one for each of the victims (Alissia Gallagher and Ronald Gallagher) and one associated with the suspect (Richard Herod). Only one CPI can be generated for a mixture profile. The generation of three CPIs

indicates that the DPS analyst was aware of the possibility of allele drop out as different loci were selected for each CPI statistic. Calculating three CPIs is an indication of "suspect-driven bias" (using reference profiles to select loci for statistical calculations).

12. Annotation on the item 3 (B) electropherogram (i.e. the print out of the DNA profile) indicates that the DPS analyst assumed there were four contributors to the mixture. The likely explanation for deriving four contributors is that the DPS analyst used the data from the known reference samples to drive the mixture interpretation. As an example, the STR locus TH01 displayed 5 alleles. If one were to assume that Richard Herod, Alissia Gallagher and Ronald Gallagher were in fact contributors, their combined DNA profiles explain 4 of the 5 alleles observed. Thus, the one remaining allele (allele 8) would have had to come from another (unknown) person. Instead, the DPS analyst should have evaluated the mixture prior to referring to the reference samples of the victims and suspect and determined the most plausible explanation of the number of contributors.

13. My interpretation of the mixture profile is that the most plausible explanation is the mixture is comprised of three individuals (not four). There is always some uncertainty in estimating the number of contributors and one cannot state with 100% certainty that there are three contributors to the mixture. However, the data in this case clearly show the most likely explanation is a three-person mixture. Assuming the most likely explanation for the data is a three-person mixture, the interpretations can change and did change.

14. In the 2017 report the DPS analyst ran the analysis using a probabilistic genotyping software - STRmix. This software is a valid and reliable tool to assist the analyst in mixture interpretation. Use of STRmix requires that the analyst state the number of contributors to the mixture. In the re-analysis, the DPS analyst assumed there were three contributors (not four as in the 2011 report), which is consistent with my manual review of the DNA mixture profile. Under the three-person scenario, the manual and STRmix approaches both support the conclusion that Richard Herod is excluded as a potential contributor.

15. Indeed, Richard Herod should have been excluded even considering four contributors. At the D3S1358 locus Richard Herod carries a 13 allele which was not detected in the mixture and at the D19S433 locus Richard Herod carries a 13 allele which was not detected in the mixture. These two markers support the exclusion of Richard Herod even under a four-person scenario.

16. The approach to mixture interpretation used by the DPS analyst in the 2011 analysis in this case represents a common historical misunderstanding regarding how to interpret DNA mixtures. A core principal of interpretation using the CPI statistic is that the analyst must perform an *a priori* evaluation of the data before comparing it with a known reference profile. While "suspect-driven bias" is a component of the root cause for the initial interpretation in this case, the use of this approach should not be interpreted as an intentional attempt by the analyst to implicate a suspect in any given situation but rather a misunderstanding of how to approach the evidentiary data versus the known data. This suspect-driven approach (using the reference profile data to guide decision-making) was

based on a common misunderstanding of the application of the CPI methodology by many practitioners in the field, not only in Texas but nationwide.

17. It is true that a protocol change by DPS led to a different interpretation that excluded Richard Herod in the 2017 report. As forensic scientists became more aware of the limitations and proper application of the CPI method, DPS self-corrected its protocol and implemented a more robust approach regarding how to interpret DNA mixture evidence. The self-correction by DPS is one example of a broader evolution among forensic DNA laboratories nationwide with respect to DNA mixture interpretation.

18. I have read the above statement and find it to be true and correct to the best of my knowledge. I am signing this affidavit voluntarily. I have not been coerced or threatened in any way to sign this affidavit, nor has any promise of any nature been made in exchange for my execution of this affidavit.

Bruce Budowle
Director, Center for Human Identification
Professor, Department Microbiology, Immunology, and Genetics
University of North Texas Health Science Center
Fort Worth, Texas 76107
Email: bruce.budowle@unthsc.edu
Tel: 817-735-2979
January 10, 2019

10CR0325-83-2
DCMOT
Motion
1783429

TRIAL COURT CAUSE NOS. 10CR0325-83-2 & 10CR0326-83-2

| EX PARTE | § | IN THE DISTRICT COURT OF |
| | § | GALVESTON COUNTY, TEXAS |
| RICHARD ANTHONY HEROD, Applicant | § | 10TH JUDICIAL DISTRICT |

## TRIAL COURT'S SECOND MOTION/REQUEST FOR EXTENSION OF TIME

The 10th Judicial District Court of Galveston County, Texas, moves the Honorable Court of Criminal Appeals to grant a second extension of time to resolve the designated issues and to complete its factual investigation concerning the above-numbered application for writ of habeas corpus in accordance with Texas Rules of Appellate Procedure 73.5 and would show the following in support thereof:

### I.

On March 2, 2018, the applicant, through his habeas counsel Jonathan Landers, filed an application for writ of habeas corpus, cause numbers 10CR0325-83-2 and 10CR0326-83-2, which challenged his convictions and sentences in cause numbers 10CR0325 and 10CR0326 based upon allegations which included due process (*Brady* and false evidence) violations and Article 11.073 of the Code of Criminal Procedure, claims of ineffective assistance of counsel and conflicted counsel, and the State was served with this habeas application. The basis of the Due Process claims and the Article 11.073 claim was a DNA reinterpretation in which DPS concludes that Applicant Herod was excluded

257

as a contributor to all DNA evidence found at the scene. At trial, DPS had concluded Herod could not be excluded from one piece of DNA evidence.

On March 12, 2018, the State filed an original answer in cause numbers 10CR0325-83-2 and 10CR0326-83-2. On March 14, 2018, the trial court timely signed orders designating issues which need resolution in cause numbers 10CR0325-83-2 and 10CR0326-83-2. On April 19, 2018, the trial court signed amended orders designating issues which need resolution in cause numbers 10CR0325-83-2 and 10CR0326-83-2.

On August 10, 2018, this Court requested an extension of time to complete factual investigation and enter findings of fact. Particularly, this Court expressed the need to review all the documents filed from the habeas proceeding along with the complete trial record. On August 29, 2018, the Court of Criminal Appeals granted this Court's request for an extension of time and allowed until February 25, 2019, to forward the habeas transcript to the Court of Criminal Appeals.

On September 18, 2018, the State filed a supplement answer arguing, in part, that the DNA testimony at trial was not false. In response, the Applicant filed a motion requesting a hearing on September 21, 2018.

On January 10, 2019, renowned DNA expert Dr. Bruce Budowle provided the parties with his opinion on the case, and on January 24, 2019, the applicant's habeas counsel filed a document entitled "Notice of Reply Briefing" wherein he requested thirty (30) days to provide briefing based upon a recently-obtained affidavit from Dr. Bruce

2

Budowle. This Court granted the applicant's habeas counsel the requested thirty-day period to provide briefing based upon the recently-obtained affidavit. This Court expects that the State will request a reasonable period to respond to any briefing filed by the applicant's habeas counsel.

## II.

Although the Court of Criminal Appeals graciously granted until February 25, 2019, to forward the habeas transcript, the applicant has requested additional time to further develop the habeas record. The requested thirty-day period for the applicant's additional briefing concludes on February 25, 2019[1]. However, additional time is needed to allow for any response from the State as well as for this Court to review the additional documentation – determining whether an evidentiary hearing is necessary – before entering any findings of fact.

## III.

THEREFORE, this Court needs a second extension of time of ninety (90) days from February 25, 2019, the date by which this Court was subsequently required to complete its factual investigation, enter findings of fact, and transmit the habeas record to the Court of Criminal Appeals. The attorneys for the applicant and the State have concurred with this Court's request for an additional extension of ninety (90) days.

---

[1] The actual date runs on Saturday, February 23, 2019. Pursuant to Rule 4.1(b) of the Texas Rules of Appellate Procedure, the thirty-day period officially runs on Monday, February 25, 2019.

## IV.

WHEREFORE, PREMISES CONSIDERED, this Court respectfully requests that the Court of Criminal Appeals allow until Monday, May 27, 2019,[2] for this Court to fully resolve all designated factual issues and enter findings of fact in cause numbers 10CR0325-83-2 and 10CR0326-83-2.

SIGNED this 21ST day of FEB., 2019.

HONORABLE KERRY L. NEVES
PRESIDING JUDGE, 10TH DISTRICT COURT
GALVESTON COUNTY, TEXAS

**AGREED AS TO FORM AND SUBSTANCE:**

Jack Roady
District Attorney
Galveston County, Texas
TBN 24027780
600 59th Street, Suite 1001
Galveston, Texas 77551
409-766-2355 (phone)
Jack.Roady@co.galveston.tx.us (email)

Jonathan Landers
Attorney for Richard Herod
TBN 24070101
917 Franklin Street
Suite 300
Houston, Texas 77002
713-685-5000 (phone)
JLanders.law@gmail.com (email)

[2] The actual ninety-day period would run on Sunday, May 26, 2019. However, pursuant to TRAP 4.1(b), the ninety-day period officially runs on Monday May 27, 2019.

4



**John D. Kinard**
**DISTRICT CLERK**
**GALVESTON COUNTY, TEXAS**

Galveston Office
600 59th Street, RM 4409
Galveston, TX 77551-2388
Phone(409)766-2424
Fax (409)766-2292

League City Office
174 Calder Rd.
League City, TX 77573
Phone (281)316-8729
Fax (281) 316-8740

2/21/2019

Abel Acosta, Clerk
Court of Criminal Appeals
Supreme Court Building
P.O. Box 12308 Capitol Station
Austin, Texas 78711

10CR0325−83−2
DCCORR
Correspondence
1783611

**IN RE: Ex Parte: Richard Anthony Herod**
**CASE NUMBER– 10CR0325-83-2      WR-83,515-03**
**CASE NUMBER–10CR0326–83-2      WR-83,515-04**
**10th District Court**

Dear Mr. Acosta:

Enclosed please find the Trial Court's Second Motion/Request for Extension of Time and Order Granting on a Post- Conviction Habeas Corpus in the above styled and numbered causes. Please acknowledge receipt of this correspondence on the enclosed copy of this letter and return to my office.

Sincerely,
**JOHN D. KINARD**
**DISTRICT CLERK**
**GALVESTON COUNTY, TEXAS**

By: /s/ Terrie Kahla

Enclosures

cc:      Richard Anthony Herod, Applicant
         C/O Jonathan Landers, Attorney
         917 Franklin Street, Suite 300
         Houston, Texas 77002

         Honorable Jack Roady, District Attorney
         600 59th Street, Suite 1001
         Galveston, Texas 77551
            *600 59th, Room 4001, Galveston County Justice Center, Galveston, Texas 77551-2388*

                    *Phone (409) 766-2424 Fax (409) 766-2292*

261

Filed: 3/1/2019 2:51 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 31611277
By: Alytha Green-Pickney
3/1/2019 4:48 PM

No. 10-CR-0325-83-2

| | | |
|---|---|---|
| EX PARTE | § | IN THE 10th JUDICIAL |
| | § | |
| | § | |
| Richard Anthony Herod | § | DISTRICT COURT |
| | § | |
| | § | |
| | § | GALVESTON COUNTY, TEXAS |

## HEROD'S REPLY TO THE STATE'S FIRST SUPPLEMENTAL ANSWER

Richard Herold offers this reply with supporting evidence showing that the testimony of DPS analysist Clare Browder at his trial was false and that the Texas Department of Public Safety was aware at the time of trial that the CPI mixture analysis used in this case was unreliable science. These facts are established by the affidavit of world-renowned DNA expert Dr. Bruce Budowle and further established by Herod's expert Dr. Robert Collins. *See* Appendix 1, 2. Herod is hopeful the District Attorney will admit that the evidence presented at his trial was false and acknowledge that the evidence suppressed by DPS was favorable to the defense. If the District Attorney refuses to do so a hearing will be necessary. *See* Applicant's Request for a Hearing. A hearing is also necessary to determine whether trial counsel labored under an actual conflict of interest. *Id.*

## I. RICHARD HEROD'S RIGHT TO DUE PROCESS WAS VIOLATED BECAUSE THE JURY WAS PRESENTED FALSE DNA EVIDENCE.

Herod has established multiple Due Process violations related to the DNA evidence presented at his trial. Herod's right to due process of law was violated by the prosecution's reliance upon false DNA evidence. *See* Memorandum at 28-36. A *Brady* violation occurred because the state failed to disclose that (1) Herod was

03/1/19 gave copy to clerk amp

excluded as a contributor to all DNA evidence found at the scene and (2) that there were recognized and well-established problems with the DNA mixture interpretation protocol which was used in this case. *Id.* at 36-40. It is clear that false evidence was presented at Herod's trial because DPS analyst Clare Browder testified that Richard Herod could not be excluded as a contributor to DNA found at the scene, and upon reinterpretation **"Richard Herod is excluded as a contributor to this profile."** *See* 7 RR at 225-26, 229, 245; Memorandum Appendix 1.

However, the District Attorney argues that Clare Browder's testimony was not false. *See* State's Supplemental Answer at 20-26. The District Attorney argues that her testimony did not give the jury a false impression. *Id.* The affidavit of Dr. Bruce Bedowle discredits the state's prior arguments, and Herod is hopeful the District Attorney will now agree, at a minimum, that false evidence was presented at his trial.

Related to the *Brady* suppression of evidence claim, the District Attorney accepts that the prosecution team failed to turn over information discrediting the DNA statistical method used by DPS analyst Clare Browder, but argues the suppressed evidence was not favorable to the defense. This argument is discredited by Dr. Bedowle, and an additional affidavit provided by Dr. Collins establishes that, by the time of Herod's trial in 2012, DPS knew that using the CPI method in cases like Herod's would often lead to false results. *See* Appendix 2. Indeed, a review of the affidavits submitted by Dr. Bedowle and Dr. Collins not only refutes the assertions of Andrew McWhorter (which were relied upon by the District Attorney), but also call into question his ability to serve as an expert in any case.

**A.    Dr. Bedowle's affidavit undercuts the District Attorney's argument and proves Clare Browder's testimony was false.**

Although "[t]he State agrees that the TDPSCL 2017 DNA results excluded the applicant as a contributor to all biological samples collected from the physical evidence, including the white shirt, recovered from the Gallagher residence" the State refuses to admit the testimony presented at trial was false. *See* State's Supplemental Answer at 22. The State's argument is based upon DPS Technical Leader Andrew McWhorter's affidavit and his theory that the DNA evidence presented at trial was not false because Analyst Browder was properly applying the DNA mixture interpretation protocols in place in 2011. *Id.* at 22-26. For example, the state argues:

> McWhorter's affidavit reflected that, if the former DNA mixture protocols which were in effect in 2011 were presently utilized to evaluate the DNA profile from the "body" portions of the white shirt, the results would be the same as those obtained by Browder in 2011.
>
> . . .
>
> It is uncontested that Browder's trial testimony - that the applicant was not excluded as a contributor to DNA on the white shirt - was based upon the TDPSCL's former DNA mixture protocols in effect in May of 2011.

*Id.* at 24. This argument is based upon McWhorter's false conclusion that "[t]he DNA results which were obtained using the TDPS Crime Laboratory's former (pre-2015) mixture interpretation protocols would produce the same results if those same protocols were utilized today to interpret the DNA mixture profile from the original 2011 DNA testing." *Id.* at Appendix A.

264

Dr. Bruce Bedowle was "asked by the Galveston County Criminal District Attorney to provide [an] affadivit to explain the challenges in mixture interpretation that the forensic science community, and in particular Texas forensic crime laboratories, have experienced for more than a decade with respect to the interpretation of DNA mixture evidence and how it may have impacted the different conclusions in this case (case number L2H-201861)." Appendix 1, at n.7. His affidavit establishes that it was not simply a change in statistics which caused the error in Herod's case, instead it was a common error known as "suspect-driven bias." *Id.* Dr. Bedowle also establishes that Browder testified falsely when she claimed "[t]here's no difficulty with the statistics. I calculate statistics based on at what location is the known sample included in this profile." 7 RR at 232.

After noting that Herod "could not be excluded as a possible contributor to the DNA profile" in 2011, but now "was excluded as a contributor," Dr. Bedowle goes on to explain why the results changed.  In the past most laboratories, including DPS, used "an interpretation and statistical analysis method for mixture evidence known as the Combined Probability of Inclusion (CPI)." *See* Appendix at 1, at n.10.  And although "CPI is a valid statistical method . . . [o]ne must be aware of the limitation of any method to apply it correctly." *Id.* Dr. Bedowle explains that "[m]ost laboratories using the CPI did not appreciate this limitation and selected loci for the CPI calculation relying on the known reference profile(s) of person(s) of interest." This technique "is commonly referred to as 'suspect-driven bias' and should be avoided." *Id.*

Herod was included because Claire Browder did not appreciate the problems caused by suspect-driven bias.  The error began when Browder "provided three different CPI calculations for the same mixture profile from [the shirt]." *Id.* at

n.11. "Only one CPI can be generated for a mixture profile. The generation of three CPIs indicates that *the DPS analyst was aware of the possibility of allele drop out* as different loci were selected for each CPI statistic. Calculating three CPIs is an indication of 'suspect-driven bias' (using reference profiles to select loci for statistical calculations)." *Id.*

Also, Browder "assumed there were four contributors to the mixture." *Id.* at n.12. This was likely done because Browder "used the data from the known reference samples to drive the mixture interpretation." *Id.* In other words, Analysist Browder made improper assumptions about the DNA mixture for the purpose of including the "suspect," Herod, in the DNA mixture. *Id.* Applying the scientifically valid technique, Browder "should have evaluated the mixture prior to referring to the reference samples of the victims and suspect and determined the most plausible explanation of the number of contributors." *Id.*

Dr. Bedowle's unbiased "interpretation of the mixture profile is that the most plausible explanation is the mixture is comprised of three individuals (not four)." *Id.* at n.13. "[T]he data in this case clearly show the most likely explanation is a three-person mixture. Assuming the most likely explanation for the data is a three-person mixture, the interpretations can change and did change." *Id.* The error in Herod's case was not simply the application of the CPI method, which has been discarded, but more importantly Clare Browder's improper application of the CPI method.

The DPS analyst who created the 2017 report correctly assumed there were three contributors to the DNA interpretation. *Id.* at n.14. She also used the new STRmix software to run the analysis. *Id.* "Under the three-person scenario, the

manual and STRmix approaches both support the conclusion that Richard Herod is excluded as a potential contributor." *Id.* It was not simply the change in the mixture interpretation protocol which affected the results, it was actually Clare Browder's assumption that four people were included in the mixture, an assumption that was the result of suspect-driven bias.[1] Clare Browder was not following the scientific method, instead, she established a conclusion (Herod could not be excluded) and made any assumption necessary to prove her conclusion was correct.

Amazingly, Dr. Bedowle's affidavit explains that even assuming four contributors Herod should have been excluded:

> Indeed, Richard Herod should have been excluded even considering four contributors. At the D3S1358 locus Richard Herod carries a 13 allele which was not detected in the mixture and at the D19S433 locus Richard Herod carries a 13 allele which was not detected in the mixture. These two markers support the exclusion of Richard Herod even under a four-person scenario.

*Id.* at n.15. Not only did Claire Browder make improper assumptions, she went on to improperly interpret the data after making the improper assumptions.

Clare Browder simply misapplied the science, and as a result found that Herod could not be excluded from the DNA mixture. Regardless of the software used to create the statistics in this case, Herod should have been excluded as a contributor to all DNA left at the scene. Ms. Browder's testimony that Herod could not be excluded was therefore false and mislead the jury. 7 RR at 225. Her

---

[1] A review of the worksheets offered into evidence at trial show that Browder assumed three people contributed to each DNA mixture with the exception of the one falsely testified about at trial. *See* Appendix 3.

discussion of the statistics associated with his DNA not being excluded was false and misleading. *Id.* Her testimony that there was an additional unknown person in the mixture was false and misleading. *Id.* Her assertion that she knew whose DNA profiles were present on the shirt was false and misleading. *Id.* at 229. Her testimony that "[t]here's no difficulty with the statistics" was false, she simply did not appreciate the difficulties with the statistics. *Id.* at 232, 236. She did not appreciate the scientific method and instead labored under a suspect-driven bias. Her refusal to admit the relevance of low statistical correlation mislead the jury. *See, e.g.* at 237. She also specifically misled the jury by testifying she was not laboring under a suspect driven bias:

> It doesn't change the separation of the mixture. The mixture is separated to determine possible allele combinations before it's ever compared to a profile. The separation of the mixture is not based on a comparison to the known samples. It would be the same regardless.

*Id.* at 238. The jury was further misled when Browder affirmed that the "cannot be excluded" language was the strongest language she could use in this case. *Id.* at 245. In reality, the strongest language she could have used would have been that Herod was excluded from all DNA samples recovered from the scene.

The District Attorney has previously argued that Browder's testimony was not false because she was merely properly applying the 2011 mixture interpretation techniques. However, Dr. Bedowle makes clear that Browder misapplied the CPI method, that she was laboring under a "suspect-driven bias," and as a result made incorrect assumptions that were necessary if Herod was to be included as a potential contributor to the DNA mixture in question. Dr. Collin's echoes Dr. Budowle's findings: "Not only did Clare Browder improperly use a CPI approach

in the analysis, she somehow improperly combined its use (which produces one statistic) with a method that produces a statistic for each individual included in the mixture. She improperly used CPI in the analysis even though she followed DPS protocols. In addition, she used the CPI approach incorrectly." *See* Appendix 2 at n.29.

The District Attorney has a duty to correct the false trial testimony and to accept that the DNA evidence entered against Herod was false. *See, e.g., Duggan v. State,* 778 S.W.2d 465, 468–69 (Tex. Crim. App. 1989) ("The duty to correct known false evidence is not only a prosecutorial ethic, but a constitutional requirement."). There is no doubt that Herod was convicted based upon false testimony.[2]

## B.    The District Attorney's materiality argument misapplies the law and omits relevant evidence.

The effect of the false DNA evidence at Herod's trial cannot be overstated. "There is a considerable aura to DNA evidence. Because of this aura it is vital that weak evidence is correctly represented as weak or not presented at all." Buckleton, J. and Curran, J. (2008) <u>A discussion of the merits of random man not excluded and likelihood ratios</u>. Forensic Sci. Int. Genet. 2: 343-348. The aura surrounding the DNA evidence in Herod's case was present at the scene, and the prosecution presented the evidence as the strongest evidence available in a DNA mixture case.

---

[2] It should be noted that the District Attorney argues (without citing precedent) that the false evidence framework cannot be applied to cases where a forensic result changed "due to an evolution in science or protocol." *See* State's Supplemental Answer at 26. That argument's factual basis has been disproved because *in addition to* the evolution of the science, Browder simply messed up the interpretation to begin with. In any event, the Court of Criminal Appeals recently applied the false evidence framework to a case in which changes to the forensic science involved. *Ex parte Chaney,* 563 S.W.3d 239, 265 (Tex. Crim. App. 2018).

In reality, the jury should have learned that Herod was excluded as a contributor to every piece of evidence tested in this case.

The District Attorney correctly identifies the materiality standard: "False evidence is material when 'there is a 'reasonable likelihood'' that [the false evidence] affected the judgment of the jury.'" *Ex parte Chaney*, 563 S.W.3d at 263–64. To meet this burden Herod need only establish that the use of the false DNA evidence at his trial was reasonably likely to influence the jury, and he need only establish this fact by a preponderance of the evidence. *Ex Parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014). The District Attorney identifies this standard, but then goes on to argue sufficiency of the evidence. *See* State's Supplemental Answer at 27-41. The Supreme Court has recognized, in a related matter, that materiality review "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles v. Whitley*, 514 U.S. 419, 434–35 (1995).

In making its materiality argument the District Attorney ignores all of the relevant defensive evidence. When discussing Ms. Gallagher's testimony, no mention is made of her statements to the SANE nurse that there had been no penetration, or that despite her claims of a violent assault, which included being choked, there was no bruising on her neck. 7 RR at 147, 151-54, 159. The State ignores the "fake cry" documented in the nurse's report. *Id.* And there is no mention of Ms. Gallagher's trial testimony that she lied to the police in her sworn statement. *Id.* at 238-39.

270

Ronnie Gallagher's status as a rapist and drug dealer who was on probation during his testimony is also omitted from the State's materiality argument, as is the fact that Gallagher did not name Herod as one of the robbers when interviewed by police at the scene. 7 RR 8-20, 65. Also omitted is Gallagher's previous altercation with Herod, which shows his potential bias. *Id.* at 74-75; 123-24.

The prosecution spends 3 pages detailing Holly Kelly's testimony, but ignores that Kelly was testifying in exchange for receiving favorable plea deals on her pending charges. 8 RR at 6-10. Also omitted was that Kelly had lied to Herod about being married (she was but never told Herod), about whether or not she had Herod's name listed on their child's birth certificate (she did not), and that Kelly's testimony establishing that Herod did not drink any alcohol on the night in question contradicted that of Ms. Gallagher's that the man who assaulted her smelled of alcohol. *Id.* at 51, 55, 61-62, 92.

Nor does the state mention that there were two phones found in Herod's truck, one for him and one for Kelly, and that Herod did not eat the SIM card for the phone allegedly used to call Ms. Gallagher the day after the robbery. *See* Memorandum at 12-13, 44-50.

The District Attorney omits any discussion of the three witnesses who testified that Herod had been at his parent's house watching the college national championship game when the robbery took place, and the testimony that his alleged co-defendant, Nick Salinas, was at home with his family when the alleged robbery took place. 8 RR 198-245; 9 RR at 6-30. Of course, Nick Salinas was never even charged with being involved in this crime.

271

The State also ignores that Herod's DNA expert completely failed to correct the false testimony about Herod not be excluded from the DNA found on the white shirt. *See* State's Supplemental Answer at 36-38. Dr. Ketchum made the same mistakes that Clair Browder did: she assumed there were at least four people included in the relevant DNA mixture. 8 RR at 152. She did not believe that the DNA report was inaccurate. *Id.* at 177-78. She agreed that Richard Herod "cannot be excluded." *Id.* And, of course, even had Dr. Ketchum established the truth her testimony would have been deeply questioned when it was revealed that her business had been assigned an F by the BBB, that her lab was not accredited, and that she had personally met a Big Foot. *Id.* at 172-75. Dr. Ketchum's testimony simply failed to correct the false DNA evidence presented to Herod's jury.

The District Attorney also attempts to argue that the false DNA evidence was not an important part of the prosecution's case. *See* State's Supplemental Answer at 35. This is as false as the DNA evidence presented at trial. The prosecution's opening statement told the jury "that this defendant's DNA profile was present" on the blindfold used during the robbery. 6 RR at 95. The prosecution's initial closing statement reminded the jurors that Clare Browder had testified that Herod could not be excluded as a contributor to the DNA discovered on the white shirt. 9 RR at 51. In his final closing the prosecutor went on a long speech highliting the DNA evidence:

> You did hear from not one DNA expert but two DNA experts, and I want to talk about the difference between the two. Clare Browder, the DPS DNA analyst, said the way this works is we got known profiles, we got known swabs from each of the Gallaghers, we got a search warrant to get a known swab from the defendant. Those are knowns. They are full profiles. The only time that we can say that somebody's DNA is there is a full known profile. What they do is they compare

that to mixtures. Now, a mixture is a batch of DNA that you compare the knowns to. And when they did that, they found that Alissia Gallagher's DNA could not be excluded. And Ms. Browder testified that words are important. You just can't just say it's a match. That's not scientifically accurate. You've got to say -- in a mixture you can never say it's a match. You have to say "cannot be excluded." We know Alissia Gallagher's DNA cannot be excluded, we know Ronald Gallagher's DNA cannot be excluded, and **we know the defendant's DNA could not be excluded. And that's as much as you can ever say about DNA. The rest are statistics.** The Caucasians, the Hispanic males, African-American males, that's not saying they're one and the other. That's just saying those are the statistics. And that's what we know. **And DNA is better than a fingerprint. It's your genetic fingerprint. And the defendant's DNA is absolutely right there on that blindfold.**

*Id.* at 80 (emphasis added).

The prosecution then discounted Dr. Ketchum's testimony before once again telling the jury "[t]he defendant's genetic fingerprint is absolutely on that blindfold." *Id.* at 81.

Taking into account the contested state of the evidence, and considering all of the evidence, including the arguments of counsel, it is obvious that there is a reasonable likelihood that the false evidence affected the judgement of the jury. Indeed, when we consider that Herod had an alibi and that *he is excluded from all DNA left at the scene,* it is likely he would have been found not guilty had Clare Browder not testified falsely. The false evidence in this case not only falsely inculpated Herod, but it denied him additional exculpatory evidence.

273

## C.    The Brady line of cases also establishes a Due Process Violation.

The prosecution team failed to turn over that (1) Richard Herod was excluded as a contributor to all DNA evidence found at the scene and (2) failed to turn over that there were indeed difficulties with interpreting mixture DNA evidence at the time of Herod's trial. The District Attorney does not dispute that the prosecution team had evidence of both of these facts, but instead argues that the evidence in question is not favorable to the defense and not material. *See* State's Supplemental Answer at 43-53.

To establish a *Brady* claim the suppressed evidence "at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999). Clearly, the fact that Herod was excluded as a contributor to all DNA evidence found at the scene is favorable exculpatory evidence, and in this case, it is also impeachment evidence because Clare Browder testified that Herod could not be excluded as a contributor to the relevant DNA mixture.

The suppressed evidence calling into question DPS's mixture interpretation protocol is also favorable to the defense. First it must be remembered that Clare Browder was adamant at trial that there was no difficulty or concerns related to her analysis of the DNA mixture in question. Clare Browder testified that, in regards to DNA mixture samples, "[t]here's no difficulty with the statistics. I calculate statistics based on at what location is the known sample included in this profile." 7 RR at 232. She testified that she didn't "see any problem with sharing of the alleles based on the actual statistical calculation." *Id.* at 236. She falsely testified

that the way she applied the CPI technique did not effect the outcome of the case: "It doesn't change the separation of the mixture. The mixture is separated to determine possible allele combinations before it's ever compared to a profile. The separation of the mixture is not based on a comparison to the known samples. It would be the same regardless." *Id.* at 238. The favorable evidence suppressed in regards to this testimony is that DPS employees were aware at the time of trial that there was great disagreement in the forensic DNA community about the validity of the mixture interpretation techniques used by DPS.

Herod has provided the Court with a letter from the Texas Forensic Science Commision which explains that "[c]hanges in mixture interpretation have occurred primarily over the last 5-10 years and were prompted by several factors, including but not limited to mixture interpretation guidance issued in 2010 by the Scientific Working Group on DNA Analysis ('SWGDAM')." *See* Memorandum Ex. 6. That letter explains the "DNA community has been aware of substantial variance in mixture interpretation among laboratories since at least 2005 when the National Institute of Standards and Technology ('NIST') first described the issue in an international study called MIX05." *Id.* Further, as early as 2010 DPS had itself began implementing the changes recommended by SWGDAM. *Id.* Yet, no one from the prosecution team ever notified the defense that DPS was looking into changing their DNA mixture interpretations at the time of Herod's trial, instead, the DPS analyst repeatedly explained there was no question her interpretations were correct.

The District Attorney accepts that DPS was well aware of the potential problems with their interpretation technique but argues that this evidence was not favorable because "[t]he SWGDAM recommendations are merely 'suggested best

practices' for laboratories to consider. . ." *See* State's Supplemental Answer at 44. Clearly it would have been favorable for Herod to notify the jury that DPS was not using the suggested best practices from the leading stakeholders in the DNA community. Indeed, the state's argument is hardly worth mentioning. The fact that there "were differences of opinions between laboratories" about the proper analytical techniques was itself favorable evidence not disclosed to the defense. *See* State's Supplemental Answer at 47, Exhibit A (McWhorter's affidavit). Instead of being presented with infallible DNA evidence linking Herod to the scene, the jury should have learned that the leaders in DNA interpretation believed DPS was not using their "suggested best practices."

Dr. Bedowle's affidavit bolster's Herod's argument. He discusses "the challenges in mixture interpretation" that have been "experienced for more than a decade. . ." He explains that most Texas' laboratories did not appreciated the limitations of the CPI method. *See* Appendix A. He explains that not only did Clare Browder operated under a suspect driven bias, but also her mistakes were common in laboratories "not only in Texas but Nationwide." *Id.* The fallible nature of DNA evidence is a far cry from what the jury was presented in this case. The jury was told "DNA is better than a fingerprint." 9 RR at 80.

Dr. Collins affidavit further establishes a *Brady* violation. *See* Appendix 3. He explains that in the late '90's and early 2000's the majority of DNA analysis focused on single DNA profile testing. *Id.* at n.9. By 2007, however, the analysis of DNA mixtures was becoming more commonplace, and "[p]ressure mounted on Congress and the National Academy of Sciences to take action." *Id.* at n. 11. Eventually, the National Academy of Sciences formed a working group called SWGDAM (which included Dr. John Butler) to provide guidance regarding DNA

testing. *Id.* at n.14. In 2010 SWGDAM released its guidelines, which the District Attorney and McWhorter discount as merely best practices. *Id.* at n.14.

What McWhorter does not mention to this Court is that the SWGDAM guidelines were implemented by the leading DNA accreditation group, which required all labs to implement the SWGDAM guidelines prior to 2015. *Id.* at n.15-17. By February of 2010, DPS knew it had 5 years to implement these guidelines. *Id.* at n.17-18. McWhorter also claims that the DPS adopted the SWGDAM guidelines in 2015 based in part on Dr. John Butler's book which provided them with clear instruction, but Dr. Collins notes that Dr. Butler was the leading force behind the 2010 guidelines in the first place, and Dr. Butler spent the years after 2010 spreading the word about the necessary changes in DNA mixture interpretation. *Id.* at n.19. Indeed, by the end of 2011, a majority of labs had already made changes based upon the SWGDAM guidelines. *Id.* at 20. And by 2013, "Texas DPS lab was one of only a few DNA labs that were resisting the change." *Id.* at n.22.

Also, in 2013 (around the time of Herod's trial) Dr. Butler headed up a national study called MIX13, which tested the accuracy of DNA labs across the nation. *Id.* at n.22-25. In a test of 108 labs around the country involving a 3 person mixture (like the one in Herod's case), 76 labs, all using the CPI technique, improperly *included* a suspect who should have been excluded. *Id.* Dr. Collins explains that McWhorter "understates the importance and prominence of SWGDAM" and omits that the SWGDAM guidelines were requirements for any lab that wished to remain accredited past 2015. *Id.* at 31.

The District Attorney's argument, that the suppressed evidence showing the unreliability of the CPI technique is not favorable to the defense, is based solely upon McWhorter's self-serving and misleading affidavit, which as Dr. Collin's points out, fails to even mention the CPI technique. *Id.* at 32. The affidavits of Doctors Bedowle and Collins refute the state's argument that the suppressed evidence was not favorable to the defense.

The same arguments raised *supra* concerning materiality of the false evidence claim apply to the prejudice argument for this *Brady* claim. There is little doubt that the false DNA evidence and the failure of the prosecution team to admit the difficulties in DNA mixture interpretation effected the outcome of Mr. Herod's case.

## II.    HEROD IS ENTITLED TO RELIEF PURSUANT TO ARTICLE 11.073.

The District Attorney and Herod agree that he meets the requirements of article 11.073 § (b)(1), but the District Attorney disagrees that "had the scientific evidence been presented at trial, on the preponderance of the evidence [Herod] would not have been convicted." *See* Tex. C. Crim. P. art. 11.073 (b)(2). The cornerstone of the State's argument is the idea that "DNA evidence provided a weak forensic connection between the applicant and the white shirt." *See* State's Supplemental Answer at 55-56. This idea is based upon the relatively low statistical correlation testified to by Browder. However, the District Attorney ignores that Clare Browder refused to admit that the statistics mattered.

During her testimony, immediately after giving the statistics Browder testified that Herod's DNA had shown up at eight of the sixteen locations she had reviewed, which was the "[s]ame as Alissia Gallagher." 7 RR at 225. The

implication is clear: we know Alissia's DNA should be on the blindfold (she was present at the scene), and Alissia and Herod both had the same amount of DNA present. Of course, we now know that Alissia Gallagher herself cannot be included as a contributor the DNA included on the white shirt. *See* Memorandum Appendix 1. Browder's trial testimony was false in relation to both Herod and Alissia Gallagher.

On cross-examination Ms. Browder went out of her way to discount the statistics in question. *Id.* at 228-230. She doubled down that she knew "what DNA profiles [she] obtained from" the various items. *Id.* at 229. She testified that despite the statistics "DNA profiles are unique to a person. Your DNA profile is unique to you; and excluding identical twins every person's DNA is different." *Id.* at 230. She explained "[t]here's no difficulty with the statistics. I calculate statistics based on at what location is the known sample included in this profile." *Id.* at 232. She disagreed that a larger number (such as 1 in a billion) would be "more precise that you're onto the right individual." *Id.* at 232. Dr. Browder explained the statistics don't even matter, what really matters is the inclusion:

> The statistics are only calculated based on an inclusion. The statistics give weight to an inclusion of a known sample into a profile. That inclusion has to be made before I can calculate the statistics. So I don't see any problem with sharing of the alleles based on the actual statistical calculation.

*Id.* at 236. When asked again about the importance of the low number in this case she replied "I don't determine what the significance of the weight is. I can only report out the statistical calculation." *Id.* at 237. And, of course, she finished up by confirming that "cannot be excluded" is the "strongest language you could use in a mixture." *Id.* at 245.

The point is clear: the statistics don't matter and we know Herod was at the scene because Clare Browder had used the strongest language she could use. And the prosecution effectively used Browder's false testimony in closing by using the testimony as firm proof that Herod was present at the scene of the robbery. 9 RR at 50-51, 79, 81. At trial the prosecution built up Browder's testimony and told the jury "DNA is better than a fingerprint. It's your genetic fingerprint. And the defendant's DNA is absolutely right there on that blindfold." *Id.* at 80. But now the prosecution wants us to be believe the DNA evidence was weak and not important. In reality the District Attorney appears willing to make whatever arguments are necessary to keep an innocent man in prison, regardless of whether they are supported by the record.

Like the *Chaney* case, the false scientific evidence in Herod's case was the "linchpin of the State's case" and "[t]he State's case would have been incredibly weakened had [Herod's] newly available scientific evidence been presented at his trial." *Ex parte Chaney*, 563 S.W.3d at 262. Instead of providing the state with proof that Herod was at the scene, truthful testimony would have provided additional evidence (in addition to his alibi) that he was not at the scene, and instead some unknown person was present.

Another recent Court of Criminal Appeals decision proves that Herod is entitled to relief. *See ex parte Kussmaul*, 548 S.W.3d 606 (Tex. Crim. App. 2018). In *Kussmaul*, the Court of Criminal Appeals found that the applicants had met 11.073's harm standard based upon recently tested DNA evidence in spite of overwhelming and uncontradicted evidence of guilt presented at trial. *Id.* The new evidence showed that all four co-defendant's were excluded as contributors to DNA mixtures found at the scene. *Id.* Importantly, in that case, the jury was never

told that the four defendants could not be excluded as contributors to the DNA mixtures in question, which makes the false testimony in Herod's case even more harmful than that in Kussmaul's. *Id.* In *Kussmaul* the Court of Criminal Appeals found harm in spite of the following evidence presented at trial: three co-defendants confessed and testified that they and Kussmaul had raped and murdered the complainant, witnesses corroborated that the co-defendants had been with the complainant just before the murder, there was other forensic evidence corroborating the testimony of the codefendants, the codefendants had led the authorities to the location where the bodies had been found, there was partial corroboration concerning the weapon used in the murder, (like Herod's case) there was some evidence that Kussmaul's truck had been used in the crime,[3] the physical evidence matched the description of the crime as given by the three co-defendants, and finally a jail house informant explained that Kussmaul had confessed his involvement in the crime. *Id.*at 608-615.

In spite of the overwhelming evidence of guilt the Court of Criminal Appeals had little difficulty finding that the defendants were all entitled to relief based upon new DNA evidence showing they were excluded from all DNA mixtures found at the scene. *Id.* at 635-36. The Court noted, that in addition to excluding the defendants, the new DNA evidence inculpated another unknown person. *Id.* The same result is present in Herod's case: Herod is now excluded as a contributor the DNA on the white shirt used as a blindfold, but an unknown person is now proven to have contributed to DNA to the mixture. *See* Memorandum

---

[3] Herod drove a diesel truck and Mr. Gallagher said her heard a diesel truck leaving the scene of the crime. The corroboration in Kussmaul's case included its sound, looks, and a leaky transmission. *Id.* at 614.

Appendix 1. Indeed, the Court of Criminal Appeals quickly dispensed with the State's arguments against a finding of harm in *Kussmaul* despite the much stronger evidence presented against Kussmaul at trial.

This Court should find that Herod has proven by a preponderance of the evidence that he would not have been found guilty if the newly available DNA evidence had been presented at his trial.

### III. HEROD'S COUNSEL WAS INEFFECTIVE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS FOR FAILING TO IMPEACH DETECTIVE ROBLES BY SHOWING HEROD DID NOT EAT THE RELEVANT SIM CARD.

Applicant Herod relies upon his previous briefing related to this claim. *See* Memorandum at 44-50.

### IV. HEROD'S RIGHT TO DUE PROCESS AND RIGHT TO COUNSEL WERE VIOLATED BECAUSE HIS TRIAL COUNSEL HAD AN ACTUAL CONFLICT OF INTEREST THAT ADVERSELY IMPACTED HIS CASE.

The District Attorney does not dispute the merits of this claim but argues that the claim was denied on its merits in Herod's previous habeas action. *See* State's Supplemental Answer at 60-62. The District Attorney argues that because this issue was considered on its merits and denied by the Court of Criminal Appeals it need not be reconsidered at this time. *Id.* The District Attorney ignores that this claim was not considered on its merits.

It is true that the Court of Criminal Appeals denied without written order Herod's previous application which included this claim, but the District Attorney ignores that the denial was "on the findings of the trial court without a hearing." *See* Appendix 4 (post card). And reviewing the findings of the trial court shows

that no mention was made of a conflict of interest claim. *See* Appendix 4 (findings).

The Court of Criminal Appeals tells us that "regardless of the label given to a previous disposition, we will look to the substance of that disposition to determine whether a subsequent writ is barred by § 4. A disposition is related to the merits if it decides the merits or makes a determination that the merits of the applicant's claims can never be decided." *Ex parte Torres*, 943 S.W.2d 469, 474 (Tex. Crim. App. 1997). The issue at hand has never been decided on its merits, or even discussed, by any court. The Court of Criminal Appeals previous denial of relief was based upon the findings of the trial court, which made no mention of the conflict claim. "Because [the Court] disposed of some of Applicant's claims for reasons unrelated to the merits, there was no final disposition of Applicant's initial writ and § 4 does not bar raising those claims in a subsequent writ." *Id.* This Court should consider the merits of this claim.

<div align="center">**PRAYER**</div>

Applicant Herod therefore prays that the trial court recommend relief be granted and that the Court of Criminal Appeals order that his conviction and sentence be set aside and that his case be returned to the trial court for a disposition in accordance with the laws of the United States of America and the State of Texas.

/s/ Jonathan Landers
Jonathan D. Landers
TBN 24070101

283

917 Franklin, Suite 300
Houston, Texas 77002
Phone: 713.685.5000
Fax: 713.513.5505
Email: jlanders.law@gmail.com
**Attorney for Applicant Herod**

### CERTIFICATE OF SERVICE

This filing was served on all parties of interest via the e-file system on 3/1/2019.

/s/ Jonathan Landers

Jonathan D. Landers

### CERTIFICATE OF COMPLIANCE

I, Jonathan Landers, certify that this memorandum contains 6,393 words, not including the appendices, exhibits, cover page, and this certificate of compliance, according to the word count function of Microsoft Word.

/s/ Jonathan Landers
Jonathan D. Landers

## APPENDIX TABLE OF CONTENTS

Appendix 1: Affidavit of Bruce Budowle – 1

Appendix 2: Affidavit of Dr. Robert Collins – 6

Appendix 3: Electropherograms – 20

Appendix 4: Prior Findings and CCA Ruling – 37

Appendix 5: Resume of Dr. Collins – 43

Appendix 1: Affidavit of Bruce Budowle

Cause Nos. 10CR0325-83-2 & 10CR0326-83-2

| EX PARTE | § | IN THE 10TH JUDICIAL |
|---|---|---|
| | § | DISTRICT COURT OF |
| RICHARD ANTHONY HEROD, Applicant | | |
| | § | GALVESTON COUNTY, TEXAS |

## AFFIDAVIT OF BRUCE BUDOWLE

THE STATE OF TEXAS
COUNTY OF GALVESTON

1. My name is Bruce Budowle. I am Director of the Center for Human Identification and Professor and Vice Chair in the Department of Microbiology, Immunology, and Genetics at the University of North Texas Health Science Center at Fort Worth Texas. I am also a member of the Texas Forensic Science Commission appointed by Governor Greg Abbott.

2. I was previously employed for 26 years at the Federal Bureau of Investigation's Laboratory Division where I was involved in the research, development, and validation of numerous DNA methods. I led the team that developed DNA typing capabilities at the FBI Laboratory in Quantico, Virginia. I ended my tenure at the FBI as Senior Scientist in the Laboratory Division.

3. I have extensive experience in all aspects of forensic DNA analyses, including analyses of low-level samples, mixture analyses, population genetics, statistical interpretations, STR markers, SNP markers, and mitochondrial DNA.

4. I have authored or co-authored more than 630 scientific articles predominately encompassing all aspects of forensic genetics.

5. I have been qualified as an expert in well over 300 cases in state, federal, and international courts in various aspects of forensic DNA analyses including quality assurance, methodology, validation, molecular biology, population genetics, and statistics.

6. I continue to have an active role in casework and research, development, validation, and implementation of forensic genetic methods to increase capabilities for human identification among other applications. My qualifications are summarized in my curriculum vitae (See **Exhibit A**).

287

7. I was asked by the Galveston County Criminal District Attorney to provide this affidavit to explain the challenges in mixture interpretation that the forensic science community, and in particular Texas forensic crime laboratories, have experienced for more than a decade with respect to the interpretation of DNA mixture evidence and how it may have impacted the different conclusions in this case (case number L2H-201861) .

8. For background, the DNA mixture in question was derived from item 3 (B) which is a white shirt. Reference profiles were obtained from two victims (Alissia Gallagher and Ronald Gallagher) and the suspect (Richard Herod). The Texas Department of Public Safety Regional Crime Laboratory in Houston (DPS) originally issued results from an autosomal Short Tandem Repeat (STR) DNA analysis in a report dated May 11, 2011. DPS concluded that: (1) Richard Herod could not be excluded as a possible contributor to the DNA profile at 7 of 15 STR locations, (2) Alissia Gallagher could not be excluded as a possible contributor to the DNA profile at 7 of 15 STR locations, and (3) Ronald Gallagher could not be excluded as a possible contributor to the DNA profile at 13 of 15 STR locations. DPS applied its mixture interpretation protocols which were approved and adopted by DPS in 1999 and remained in effect until August 2015.

9. On February 9, 2017, DPS issued a new report detailing the findings of a reanalysis of the evidence using a different method of mixture interpretation of which guidelines were implemented by DPS on March 18, 2016. The report concluded for item 3 (B), now labeled item 7-03, that (1) Ronald Gallagher could not be excluded as a possible contributor to this DNA profile, (2) it was inconclusive whether Alissia Gallagher was a contributor to this DNA profile, and (3) Richard Herod was excluded as a contributor to this DNA profile. Thus, there were some notable differences in the interpretation of who may or may not have been potential contributors of the mixture from item 3 (B) between the 2011 and 2017 reports.

10. Historically, most laboratories in the United States, including those in Texas, employed an interpretation and statistical analysis method for mixture evidence known as the Combined Probability of Inclusion (CPI). A DNA mixture refers to an evidentiary sample containing at least two contributors. The CPI is a valid statistical method conveying the portion of the population that cannot be excluded as a potential contributor of the mixture. The CPI was used to interpret the mixture evidence in the 2011 report. One must be aware of the limitations of any method to apply it correctly. The primary requirement of using the CPI is that it can only be applied to genetic markers (or loci) in which it is highly unlikely that allele drop out has occurred (i.e. there are no missing data). Most laboratories using the CPI did not appreciate this limitation and selected loci for the CPI calculation relying on the known reference profile(s) of person(s) of interest. An approach that uses the known reference profile(s) to drive the interpretation of the evidentiary data is commonly referred to as "suspect-driven bias" and should be avoided.

11. In this case, the DPS analyst provided three different CPI calculations for the same mixture profile from item 3 (B) in the 2011 report – one for each of the victims (Alissia Gallagher and Ronald Gallagher) and one associated with the suspect (Richard Herod). Only one CPI can be generated for a mixture profile. The generation of three CPIs

indicates that the DPS analyst was aware of the possibility of allele drop out as different loci were selected for each CPI statistic. Calculating three CPIs is an indication of "suspect-driven bias" (using reference profiles to select loci for statistical calculations).

12. Annotation on the item 3 (B) electropherogram (i.e. the print out of the DNA profile) indicates that the DPS analyst assumed there were four contributors to the mixture. The likely explanation for deriving four contributors is that the DPS analyst used the data from the known reference samples to drive the mixture interpretation. As an example, the STR locus TH01 displayed 5 alleles. If one were to assume that Richard Herod, Alissia Gallagher and Ronald Gallagher were in fact contributors, their combined DNA profiles explain 4 of the 5 alleles observed. Thus, the one remaining allele (allele 8) would have had to come from another (unknown) person. Instead, the DPS analyst should have evaluated the mixture prior to referring to the reference samples of the victims and suspect and determined the most plausible explanation of the number of contributors.

13. My interpretation of the mixture profile is that the most plausible explanation is the mixture is comprised of three individuals (not four). There is always some uncertainty in estimating the number of contributors and one cannot state with 100% certainty that there are three contributors to the mixture. However, the data in this case clearly show the most likely explanation is a three-person mixture. Assuming the most likely explanation for the data is a three-person mixture, the interpretations can change and did change.

14. In the 2017 report the DPS analyst ran the analysis using a probabilistic genotyping software - STRmix. This software is a valid and reliable tool to assist the analyst in mixture interpretation. Use of STRmix requires that the analyst state the number of contributors to the mixture. In the re-analysis, the DPS analyst assumed there were three contributors (not four as in the 2011 report), which is consistent with my manual review of the DNA mixture profile. Under the three-person scenario, the manual and STRmix approaches both support the conclusion that Richard Herod is excluded as a potential contributor.

15. Indeed, Richard Herod should have been excluded even considering four contributors. At the D3S1358 locus Richard Herod carries a 13 allele which was not detected in the mixture and at the D19S433 locus Richard Herod carries a 13 allele which was not detected in the mixture. These two markers support the exclusion of Richard Herod even under a four-person scenario.

16. The approach to mixture interpretation used by the DPS analyst in the 2011 analysis in this case represents a common historical misunderstanding regarding how to interpret DNA mixtures. A core principal of interpretation using the CPI statistic is that the analyst must perform an *a priori* evaluation of the data before comparing it with a known reference profile. While "suspect-driven bias" is a component of the root cause for the initial interpretation in this case, the use of this approach should not be interpreted as an intentional attempt by the analyst to implicate a suspect in any given situation but rather a misunderstanding of how to approach the evidentiary data versus the known data. This suspect-driven approach (using the reference profile data to guide decision-making) was

289

based on a common misunderstanding of the application of the CPI methodology by many practitioners in the field, not only in Texas but nationwide.

17. It is true that a protocol change by DPS led to a different interpretation that excluded Richard Herod in the 2017 report. As forensic scientists became more aware of the limitations and proper application of the CPI method, DPS self-corrected its protocol and implemented a more robust approach regarding how to interpret DNA mixture evidence. The self-correction by DPS is one example of a broader evolution among forensic DNA laboratories nationwide with respect to DNA mixture interpretation.

18. I have read the above statement and find it to be true and correct to the best of my knowledge. I am signing this affidavit voluntarily. I have not been coerced or threatened in any way to sign this affidavit, nor has any promise of any nature been made in exchange for my execution of this affidavit.

*Bruce Budowle*

Bruce Budowle
Director, Center for Human Identification
Professor, Department Microbiology, Immunology, and Genetics
University of North Texas Health Science Center
Fort Worth, Texas 76107
Email: bruce.budowle@unthsc.edu
Tel: 817-735-2979
January 10, 2019

Appendix 2: Affidavit of Dr. Robert Collins

Cause Nos. IOCR0325-83-2 & IOCR0326-83-2

EX PARTE                                §        IN THE 10TH JUDICIAL

                                        §        DISTRICT COURT OF

RICHARD ANTHONY HEROD,
       Applicant                        §        GALVESTON COUNTY, TEXAS

### AFFIDAVIT OF ROBERT COLLINS

THE STATE OF TEXAS
COUNTY OF GALVESTON

1.  My name is Dr. Robert Collins. I am Science and DNA consultant/expert witness based in Houston, Texas. I am retained or appointed in felony cases across Texas when the State has collected DNA evidence. I obtain the raw data and documentation generated by the crime laboratory and verify the conclusions made by the lab are supported. I end up testifying in less than 20% of these cases.

2.  I have a B.S. in Genetics, *cum laude*, from Texas A&M University and a Ph.D. in Molecular and Human Genetics from Baylor College of Medicine (BCM). Much of the technology used in the Human Genome Project was developed in our department at BCM. A large amount of the sequencing done on the Human Genome Project was done at BCM also. The technology and methods developed for use in the Human Genome Project are the same as used in the STR-DNA analysis done by crime laboratories. I have extensive knowledge of these technologies and methods.

3.  My publications in peer-reviewed scientific journals have been cited by researchers over 1000 times. For five years at BCM, I developed clinical tests for rare genetic diseases under strict FDA guidelines. I have extensive experience all aspects developing, validating, and writing protocols of scientific tests. This also gave me wide-ranging experience in analyzing data to identify problems in scientific processes. I have taken over 20 National Institute of Justice courses on DNA analysis and other forensic methods.

4.  I was asked by the attorney for Richard Herod to address and explain the issues brought forth in this case by providing this affidavit to the court. The main issue is the improper use of an interpretation and statistical method called the Combined Probability of Inclusion (CPI). The STR-DNA DNA profiling method currently used creates a different type of data than the methods used in the 1980's and 1990's. CPI was suitable for use with this type of data and improperly retained for use in STR-DNA analysis. Using CPI has never been a valid method for the analysis of STR-DNA data.

5.  The Human Genome Project was largely completed by 2001 and the entire 3 billion base pair DNA sequence was published in 2003. Suddenly, the thousands of the PCR thermocyclers and DNA analyzers being used on the project were dumped on the market. It had been an expensive proposition to open a DNA lab but was now easily affordable. DNA labs sprang up in the unused rooms of police stations and various other places around the country with little scientific guidance.

292

6.  The National Institute of Standards and Technology (NIST) is a government agency charged with setting and developing measurement science, standards and technology in the U.S. This includes the standards used in DNA profiling by crime labs and other agencies involved in human identification. The scientists at NIST have worked tirelessly for over 15 years to develop and teach proper methods of DNA analysis.

7.  Dr. John Butler is one of this group of NIST scientists. Dr. Butler is the author of the book cited by Andrew McWhorter in paragraph 10 of his affidavit. He states that Dr. Butler's book "provided the clear instruction needed to implement the new DNA mixture protocols." Mr. McWhorter, like myself, considers Dr. Butler a leading authority on proper DNA mixture analysis.

8.  On April 27, 2015, Dr. Butler and his colleagues at NIST gave presentations at the 42nd Annual Symposium of the American Society of Crime Lab Directors on the past, present, and future of DNA mixture analysis. Since Dr. Butler is highly respected by Mr. McWhorter and myself, I will corroborate the history of DNA mixture analysis by using he and his colleague's slides. The title and acknowledgement slides of these presentations are shown below.





9.  In the years 1997-2000, a study of DNA casework found that 93.3% of the cases analyzed contained single DNA profiles. Only 6.7% of the cases involved mixtures with only 0.3% having two or more contributors. As shown, the 2-person mixtures that were able to be analyzed either had obvious major and minor profiles or a reference profile, such as the victim's, was subtracted leaving the suspect's profile.



293

10. The slide below illustrates the problem with using CPI analysis. This is an example of a two-person mixture generated using STR-DNA technology. The data produced by the technology before STR-DNA testing would be just a series of four bars or spots. There was no way to tell which two alleles were from the same person. However, the STR-DNA data in the case below clearly shows two separate people, AB and CD. The possible allele combinations of the two persons, using CPI, are given under the unrestricted heading (analysis method is not restricted by the visual evidence seen using the peak heights). Using CPI, all six allele combinations shown are equally probable. The data obviously shows that the two people in the mixture are AB and CD. However, if CPI analysis is used, people that are AC, AD, BC, and BD are also included. In other words, these four people would still be included in the pool of suspects even though they are obviously excluded by the data. Restricting the analysis so that peak height data is used gives the correct analysis. <u>The CPI analysis method is wrong because it has the potential to falsely include innocent suspects.</u> This is the reason the mixture review commission was established and the reason this case is before the Court.



The dotted line in the figure above is the stochastic threshold or the second threshold discussed by Mr. McWhorter in his affidavit. This is a separate issue apart from the use of CPI. When an allele peak is below this line, it indicates that some data may be missing. The use of a stochastic threshold is not specific to the CPI method, it is an important data threshold in all DNA analysis methods. Ignoring this threshold when using any method is bad science. The use of CPI in mixture analysis and the use of peaks below threshold are two separate incorrect actions by the DPS laboratory in this case.

11. By 2007, the number of mixtures analyzed with 2 or more contributors has increased significantly along with mixtures of 3 or contributors. Pressure mounted on Congress and the National Academy of Sciences to take action.

> **Overall Summary 2007-2008**
>
> - ~40-50% of samples from all types of cases are single source
> - ~30-40% of samples from all types of cases are mixtures of at least two contributors
> - ~5-15% of samples from all types of cases are mixtures of at least three contributors

**294**

12. The number of mixtures that were being incorrectly analyzed led to a famous quote by a pioneer in the use of DNA for identification, Dr. Peter Gill in 2005.



13. In 2006, the International Society of Forensic Genetics (ISFG) formed a DNA Commission to make recommendations on mixture interpretation. Recommendations 1 through 5 promote the use of the likelihood ratio statistical method over RMNE (another name for CPI). Recommendations 6 through 9 are specific rules that should be followed for all analysis methods. No. 8 clearly states that scientifically, no statistical interpretation should be performed on alleles below threshold.



### ISFG Recommendations on Mixture Interpretation

http://www.isfg.org/Publication;Gill2006

1. The likelihood ratio (LR) is the preferred statistical method for mixtures over RMNE

2. Scientists should be trained in and use LRs

3. Methods to calculate LRs of mixtures are cited

4. Follow Clayton et al. (1998) guidelines when deducing component genotypes

5. Prosecution determines $H_p$ and defense determines $H_d$ and multiple propositions may be evaluated

6. When minor alleles are the same size as stutters of major alleles, then they are indistinguishable

7. Allele dropout to explain evidence can only be used with low signal data

8. No statistical interpretation should be performed on alleles below threshold

9. Stochastic effects limit usefulness of heterozygote balance and mixture proportion estimates with low level DNA

Gill *et al.* (2006) DNA Commission of the International Society of Forensic Genetics: Recommendations on the interpretation of mixtures. *Forensic Sci. Int.* 160: 90-101

14. Many countries around the world had similar problems and concerns with genetic testing. These countries were for anxiously waiting for scientific guidance. The ISFG mixture recommendations prompted swift responses in the UK, Germany, Europol, and New Zealand/Australia. The United States responded by having the nations leading science authority, the National Academy of Sciences (NAS), form a Scientific Working Group on DNA Analysis Methods (SWGDAM) in 2007. Dr. John Butler of NIST was appointed to head the working group whose goal was make national standards to use in DNA analysis. SWGDAM released DNA Interpretation Guidelines in 2010.

---

### Responses to ISFG DNA Commission Mixture Recommendations

- **UK Response**
  - Gill et al. (2008) *FSI Genetics* 2(1): 76–82

- **German Stain Commission**
  - Schneider et al. (2006) *Rechtsmedizin* 16:401–404 (German version)
  - Schneider et al. (2009) *Int. J. Legal Med.* 123: 1–5 (English version)

- **ENFSI Policy Statement**
  - Morling et al. (2007) *FSI Genetics* 1(3):291–292

- **New Zealand/Australia Support Statement**
  - Stringer et al. (2009) *FSI Genetics* 3(2):144–145



- **SWGDAM** – Interpretation Guidelines
  - Approved Jan 2010 and released April 2010 on FBI website

---

15. When first published, the SWGDAM interpretation guidelines were indeed, guidelines, that DNA laboratories did not have to immediately adopt. However, the laboratory accreditation was also changed in 2009 following the recommendations of a separate report by the NAS addressing current problems with DNA labs nationally. Up until then, there was no single specific entity responsible for accreditation nationally. However, the American Society of Crime Lab Directors (ASCLD) had started a section responsible for lab accreditation in 1980 (ASCLD/LAB) that was the largest and most recognized in the U.S. In Texas, the DPS was responsible for accrediting DNA labs and the DPS had a long-time reciprocal agreement with ASCLD to recognize the accreditation of each other's labs.

16. The next few slides (with the dark background) are from a 2010 presentation by Mike Grubb, the chairperson of the ASCLD/LAB accreditation arm of ASCLD. They describe the changes made to the accreditation process in 2009 and the progress that had been made in the new accreditation process by February 2010. ASCLD/LAB now required that DNA labs adopt the SWGDAM guidelines and meet ISO 17025 standards (not discussed) in order to be accredited.

17. All ASCLD/LAB accredited DNA labs prior to 2010 were accredited under the Legacy program described below. The Texas DPS lab's reciprocal accreditation was under the Legacy Program. The last 5-year ASCLD/LAB accreditation cycle began when the Legacy Program ended. Therefore, the DPS lab would no longer be accredited by ASCLD/LAB after that date in 2015 unless they adopted the standards the rest of the country had already adopted. Work done at the DPS lab would not be recognized in other states or countries. The Legacy Program lacked the regulatory and scientific guidance that was now given by SWGDAM and the NAS report. This lack of guidance resulted in requirements of which only some were considered essential while others were considered important or desirable.



18. Below is a breakdown of the accredited ASCLD/LAB labs in February of 2010. At this time, 100 of the DNA labs in the U.S. have already been accredited into ASCLD/LAB's International Program. The DPS DNA lab now has five years to adopt the new standards or it will lose its accreditation. It will no longer have the authority, recognized nationally, to accredit itself as it has since 1999. There are currently 275 labs, including the DPS lab, that are still in the Legacy Proram. These labs will be required to adopt the new standards over the next five years as their accreditation cycle ends. They can choose to not adopt the standards but will not be accredited.




19. The SWGDAM Guidelines were published in early 2010. Dr. Butler and his colleagues at NIST immediately began an intensive educational program to teach and implement the SWGDAM Guidelines. Over the next three years, they held workshops across the country that were also available online. Dr. Butler documented the process and gathered information at the workshops to track the progress of the initiative. These workshops, along with these slide presentations, are available at the NIST website. The remaining slides in this document are Dr. Butler's.



20. At an October 2011 workshop, 61% of the respondents said changes had already been made in their labs based on the guidelines. Another 23% reported their labs were working on changes. Only 5% said their labs had made no changes. By April of 2012, 89% reported changes were already made with 5% working on it. Only 4% reported no changes. The DPS lab did not make the interpretation changes until over 3 years later.





21. By 2013, NIST and other agencies had spent 3 years implementing the changes recommended by the SWGDAM Guidelines in labs across the U.S. Dr. Butler then headed up a national study by NIST, named MIX13, to measure the success of their educational efforts.

> ### MIX 13 – NIST Interlaboratory Study on Mixture Interpretation - **Goals**
>
> - (1) To evaluate the current "lay of the land" regarding STR mixture interpretation across the community.
>
> - (2) To measure consistency in mixture interpretation across the U.S. after the publication of the 2010 SWGDAM guidelines.
>
> - (3) To learn where future training and research could help improve mixture interpretation and reporting.

22. Over 108 laboratories in 46 states (including Texas) participated in the MIX13 study. There are several DNA labs in Texas that had already made the changes and were ASCLD/LAB accredited under the new program. The Texas DPS lab was one of only a few DNA labs that were resisting the change. It is unknown what the lab thought would happen in 2015, but the changes would be made if the Texas DPS lab wanted to stay in business.



MIX13 Participants from **108 Laboratories**
**46 states** had at least one lab participate

23. The MIX13 study presented labs with scenarios and the raw data needed to interpret the mixtures found in 5 separate cases. Each case presented specific problems to test the analyst's knowledge. Case 5 most closely resembles this case (Richard Herod).

## Purpose of MIX13 Cases

| | Challenge provided to study responses |
|---|---|
| Case 1 | ~1:1 mixture (2-person) |
| Case 2 | **Low template** profile with potential dropout (3-person) |
| Case 3 | Potential **relative** involved (3-person) |
| Case 4 | Minor component (2-person) |
| Case 5 | Complex mixture (>3-person) with **# of contributors**; inclusion/exclusion issues |

According to German Stain Commission (2009) mixture types: 1 = A, 2 = C, 3 = ?, 4 = B, 5 = ?

24. The scenario for case five is below. The case has 3 suspects but only suspects A and B are included in the mixture. Suspect C is not included. The analysts are given the data produced from the evidence and the profiles of everyone involved. The analysts must determine if each person is included, excluded, or the data is inconclusive.



### Scenario

- Evidence: Ski mask recovered at a bank robbery.

- A number of gang-related robberies have targeted several banks in the city. The robberies have typically involved 2-3 perpetrators. A ski mask was recovered in a trash can one block away from the latest bank robbery and is submitted for DNA testing.

- A confidential informant has implicated two suspects in at least three of the armed robberies. Police have obtained buccal swab references from the two suspects identified from the CI, and another known accomplice of the suspects.

### Case 05 – 3 Suspects

| Individual | |
|---|---|
| Suspect 5A | Included |
| Suspect 5B | Included |
| Suspect 5C | Not in the mixture |

25. Below are the results found by the labs for Suspect C who was not in the mix and should have been excluded. Only 7 of 108 labs correctly excluded Suspect C from the mixture. Twenty-five labs were inconclusive about including Suspect C. However, 76 labs included Suspect C using CPI and provided statistics. Their reasons given are described as all over the road. Richard Herod's case is similar in that CPI was used to falsely include Richard Herod in a mixture.

## MIX13 Case 5 Outcomes with Suspect C
### (whose genotypes were not present in the mixture)

| # Labs | Report Conclusions | Reasons given |
|---|---|---|
| 7 | Exclude Suspect C | detailed genotype checks (ID+); TrueAllele negative LR (ID+); assumed major/minor and suspects did not fit (ID+); 4 of 18 labs noted Penta E missing allele 15 (PP16HS) |
| 3 | Inconclusive with C only (A & B included) | All these labs used PP16HS |
| 22 | Inconclusive for A, B, and C | |
| 76 | Include & provide CPI statistics | All over the road... |

### Range of CPI stats for Caucasian population:
FBI allele frequencies: 1 in 9 (Labs 12 & 54) to 1 in 344,000 (Lab 107)

26. Dr. Butler summarized the issues with Case 5 and the use of CPI in the slides below. As I stated in paragraph 10, CPI has the potential to falsely include innocent suspects as it did in Case 5. CPI was inappropriately adopted for use by forensic labs (including the Texas DPS lab) in the early 2000's. The solution to this problem has been simple at any time since, STOP! using CPI on complex mixtures.

### Summary of Issues

- Use of CPI has significant limitations when it comes to complex mixtures because this approach delivers information regarding the presence of alleles rather than specific suspect genotypes

- A CPI approach has the potential to falsely include innocent suspects as demonstrated in MIX13 Case 5

- The U.S. forensic DNA community adopted CPI for simplicity in 1990s and early 2000s when 2-person mixtures were common and have now inappropriately extrapolated the approach to more complex mixtures

### What Needs to Be Done

- STOP! using CPI on complex mixtures, such as MIX13 Case 5
  - it is better to declare a result inconclusive than to potentially falsely include an innocent person (you are more likely to have false inclusions with a low stat as the power to exclude has been reduced when loci are removed)
- Set a complexity threshold to aid in determining when to not interpret a mixture
- Adopt a probabilistic genotyping approach (will involve software) after validation studies with complex mixtures

27. Mr. McWhorter's affidavit recognizes the FBI's Quality Assurance Standards were mandatory and were implemented in the lab. The literature review requirement of these standards is below. The scientific literature in 2011 about DNA interpretation was articles promoting and explaining the new mixture interpretation methods. None stated that CPI could be properly used in mixtures. However, DPS protocols stated CPI was proper. The problem was compounded by the DPS also refusing to use a stochastic threshold in their analysis while the literature recommended it. For DPS analyst Clare Browder, it was totally unclear as to what was proper, so she did what the job expected of her. She looked at Richard Herod's DNA profile and found a way to include in the mixture by mixing analysis methods.

> ## Revised Quality Assurance Standard Requirement for Literature Review
> **Quality Assurance Standards for Forensic DNA Testing Laboratories**
> (effective July 1, 2009)
>
> **5.1.3.2.** The laboratory shall have a program approved by the technical leader for the annual review of scientific literature that documents the analysts' ongoing reading of scientific literature. The laboratory shall maintain or have physical or electronic access to a collection of current books, reviewed journals, or other literature applicable to DNA analysis.
>
> http://www.fbi.gov/hq/lab/fsc/backissue/oct2008/standards/2008_10_standards01b.htm

28. Disregarding the proper methods of DNA analysis and proceeding by using the suspect's profile is accurately described as a "suspect-driven bias" approach by Dr. Budowle in his affidavit. This phenomenon was noted in a 2009 paper describing the Texas sharpshooter fallacy. Dr. Butler explains the "suspect-driven bias" approach this is not the proper way to proceed in this case.

> ## How not to handle this result
>
> - "To heck with the analytical and stochastic thresholds", **I am just going to see if the suspect profile(s) can fit into the mixture allele pattern observed** – and then if an allele is not present in the evidentiary sample try to explain it with possible allele dropout due to stochastic effects
>
> - This is what Bill Thompson calls "painting the target around the arrow (matching profile)..."
>
> Thompson, W.C. (2009) Painting the target around the matching profile: the Texas sharpshooter fallacy in forensic DNA interpretation. *Law, Probability and Risk* 8: 257-276

29. Dr. Budowle is a distinguished scientist and respected member of the Texas Forensic Science Commission (TFSC). I completely agree with Dr. Budowle's analysis of the interpretation done by the DPS analyst in paragraphs 11-16 of his affidavit. Not only did Clare Browder improperly use a CPI approach in the analysis, she somehow improperly combined its use (which produces one statistic) with a method that produces a statistic for each individual included in the mixture. She improperly used CPI in the analysis even though she followed DPS protocols. In addition, she used the CPI approach incorrectly. Dr. Budowle points out that not only is Mr. Herod excluded if the analysis is done properly based on 3 contributors, he would also be excluded if the analyst would have correctly done the analysis using the mistaken 4 contributor assumption that she did use.

30. Dr. Budowle's explanation of events weakens in paragraph 17. However, Dr. Budowle is a member of the TFSC which regulates and accredits DNA labs in Texas and must be diplomatic in the statements he makes. He also is a research collaborator with the DPS lab and must work with them regularly. His criticism of the continued use of CPI by the DPS lab is certainly not harsh enough. That they refused to institute the second threshold until 5 years after the SWGDAM guidelines in 2010 makes the continued use of CPI even more egregious.

31. It is important to look at the affidavit of Andrew McWhorter from the DPS lab in the proper historical context. In paragraph 2 he understates the importance and prominence of SWGDAM. SWGDAM members were appointed by the National Academy of Sciences at the behest of the U.S. Congress. The statement that no laboratory is required to adopt these guidelines is disingenuous at best. All U.S. DNA labs were required to adopt the guidelines by the end of their final Legacy Program accreditation period or they would not be accredited. In paragraph 4, while the DPS lab is considering ways to implement the guidelines during 2011-2014, the rest of the country is implementing the guidelines. By 2013, most labs in the U.S. had adopted the SWGDAM guidelines.

32. Paragraphs 6-8 of Mr. McWhorter's affidavit concerns a second systemic problem. The DPS lab did not implement the use of a second "stochastic threshold" that was required by SWGDAM. The reason this case was reviewed and forwarded to the Court is the improper use of CPI. Mr. McWhorter's affidavit does not mention CPI a single time. Instead, he attempts to justify the DPS lab's actions in not using a stochastic threshold. The word stochastic means "by chance" or "randomly determined." DNA alleles below this line are scientifically suspect and cannot be treated the same as the confirmed alleles above the line.

33. In paragraph 9 he states the dual threshold recommendation was adopted by the DPS lab on August 10, 2015. Dr. Budowle describes this as the DPS "self-corrected its protocol" in paragraph 17 of his affidavit. Here is the background on this. In 2015, the Texas Legislature met and put the TFSC in charge of DNA lab accreditation in Texas beginning September 1, 2015. After that date, the DPS lab could no longer accredit itself and must adopt SWGDAM guidelines or not be accredited. The guidelines were adopted by the DPS lab only 21 days before the TSFC took over.

34. In paragraph 10, Mr. McWhorter states that another reason the interpretation guidelines were changed was the publication of Dr. Butler's book in 2014. As shown in this document, Dr. Butler had worked tirelessly since 2007 to develop the guidelines and educate laboratories around the country in their proper use. He did not take the time to write this book until after these responsibilities were met. A vast majority of the labs in the U.S. had already adopted the guidelines with DR. Butler's guidance before the book was published.

303

35. In paragraphs 11 -14, Mr. McWhorter states that when the DPS lab finally did use a proper analysis method that was backed by science, Richard Herod was excluded from the profile found on the evidence. He also states that the protocols used in 2011 would produce the same results today. This is incorrect. Dr. Budowle clearly states that Mr. Herod was excluded when the analysis was done both the proper way with 3 assumed contributors and with the improperly assumed 4 contributors like the DPS analyst had done. If DPS protocols at that time would include Mr. Herod in the evidence profile obtained, all cases analyzed by the DPS lab during that time should be reviewed.

36. In conclusion, Richard Herod's DNA profile was not found on the evidence in question. The DPS crime lab has had serious problems for years which has resulted in this case being returned to this Court. In my experience, jurors give undue weight to DNA evidence and this evidence would figure prominently in the jury's verdict.

37. I have read the above statement and find it to be true and correct to the best of my knowledge. I am signing this affidavit voluntarily. I have not been coerced or threatened in any way to sign this affidavit.

Dr. Robert Collins
Collins Forensic Consulting
3920-6 West Alabama Street
Houston, TX 77027
Email: robertcollinsphd@gmail.com
Phone: 832-767-2129
February 28, 2019

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

My commission expires _10 - 25 - 2022_



LUIZ TAVARES
Notary Public
STATE OF TEXAS
My Comm. Exp. 10-25-22
Notary ID # 13177347-3

304

# Appendix 3: Electropherograms



Project: 050311CSB 

GeneMapper® ID-X 1.2











DEFENDANT'S
EXHIBIT







Project: 050311CSB

GeneMapper® ID-X 1.2









**AB Applied Biosystems**
GeneMapper® ID-X 1.2

Project: 050311CSB 









**AB Applied Biosystems**
GeneMapper® ID-X 1.2

Project: 050311CSB2  CRB

C. 10sec

| Sample File | Sample Name | Panel | SQ |
|---|---|---|---|

H12_C546_L2H201861_4D1_BREAST_SWABS_2011-05-03.2.fsa    C546_L2H201861_4D1_BREAST_SWABS    Identifiler_v1X



Peaks: 11 14 15 | 30 33.2 | 10 11 | 10 11

H12_C546_L2H201861_4D1_BREAST_SWABS_2011-05-03.2.fsa    C546_L2H201861_4D1_BREAST_SWABS    Identifiler_v1X



Peaks: 15 16 17 | 7 9.3 | 9 12 11 | 9 12 11 | 19 23 24

H12_C546_L2H201861_4D1_BREAST_SWABS_2011-05-03.2.fsa    C546_L2H201861_4D1_BREAST_SWABS    Identifiler_v1X



Peaks: 14 15 | 14 16 | 8 11 | 12 13 17

H12_C546_L2H201861_4D1_BREAST_SWABS_2011-05-03.2.fsa    C546_L2H201861_4D1_BREAST_SWABS    Identifiler_v1X



Peaks: X | 7 | 12 14 | 19 21 | 25

**AB Applied Biosystems**

GeneMapper® ID-X 1.2

Project: 050311CSB2  CSB

Mixture see DB    @ .10sec

| Sample File | | Sample Name | Panel | SQ |
|---|---|---|---|---|
| H12_C546_L2H201861_4D1_BREAST_SWABS_2011-05-03.2.fsa | | C546_L2H201861_4D1_BREAST_SWABS | Identifiler_v1X | |

105    175  30, 33.2  245  11,11  315  10,11  385

280    10,11    10,11

11,15
11,14
14,15
15,15
11,11
14,14

| 11 403 | 15 425 |
| 14 320 | 79% |
75%

| 30 505 |
| 33.2 471 |
98%
30, 33.2
30, x

| 10 209 | 39% |
| 11 541 |
10,10
10,11

| 10 339 | 68% |
| 11 496 |
10,10
10,11

---

| H12_C546_L2H201861_4D1_BREAST_SWABS_2011-05-03.2.fsa | | C546_L2H201861_4D1_BREAST_SWABS | | Identifiler_v1X | |

105  17,17  175  9.3,9.3  245  9,9  315  23,24  385

420    15,16
15,17 (68%)    9,9    9,12    11,12    19,23
9,12 (45%)    19,23

| 15 290 | 87% |
| 16 251 |
| 17 502 |
15,16
16,17 (84%)

| 7 382 | 46% |
| 9.3 831 | 68% |
7,7
7,9.3

| 9 500 |
| 12 315 |
12,12
9,12

| 9 485 |
| 11 212 | 98% |
| 12 216 |
11,12
9,11 (79%)
9,9

| 19 326 | 70% |
| 23 247 | 87% |
| 24 216 |
19,19
19,24 (37%)

---

| H12_C546_L2H201861_4D1_BREAST_SWABS_2011-05-03.2.fsa | | C546_L2H201861_4D1_BREAST_SWABS | | Identifiler_v1X | |

105  15,15  175  14,16  245  11,11  315  12,17  385

370    14,15    16,16    8,11    17,17
12,13

| 14 342 | 49% |
| 15 702 |
15,15
14,14
14,15

| 14 392 | 63% |
| 16 735 |
14,16
14,14
16,16

| 8 228 | 39% |
| 11 591 |
8,11
11,11
8,8

| 12 133 | 65% |
| 13 205 | 61% |
| 17 337 |
12,17 (99%)
13,13

A. Gallagher (v) - included

R. Gallagher (v) - included at 3 of 16

R. Herod (s) - excluded



**Applied Biosystems**

eMapper® ID-X 1.2

Project: 050311CSB2 CSB

@ 10sec

| le File | Sample Name | Panel | SQ |
|---|---|---|---|
| C546_L2H201861_4D1_BREAST_SWABS_2011-05-03.2.fsa | C546_L2H201861_4D1_BREAST_SWABS | Identifiler_v1X | |

XX









Mixture see TH0) = 75%.    CSB    @ 10 SC

A. Gallagher (v) - included at 3 of 16
R. Gallagher (v) - included at 8 of 16
R. Herod (s) - excluded



Project: 050511CSB2  CSB

@ 10sec

| Sample File | Sample Name | Panel | SQ |
|---|---|---|---|
| C543 L2H201861 3A SHIRT WEARER5-5-11-2-09 PM.fsa | C543 L2H201861 3A SHIRT WEARER | Identifiler_v1X | |

XY  105      12,13  175        245        315        385
140            12,14
0              13,14                    INC

X
249        12
137    A).
Y
275    13    80).
108    63).
14
172    13,13
13,X
XY        14,14
XX        12,12







**Applied Biosystems**
neMapper® ID-X 1.2

Project: 050511GSB2   CMB

@ 10 sec

| Sample File | Sample Name | Panel | SQ |
|---|---|---|---|
| C544 L2H201861 3B SHIRT BODY5-5-11-2-44 PM.fsa | C544 L2H201861 3B SHIRT BODY | Identifiler_v1X | |

A. Gallagher(a) - included at 8 of 16

R. Gallagher (v) - included at 14 of 16

R. Herod (s) - included at 8 of 16

~~Unknown individual~~ - included

# Appendix 4: Prior Findings and CCA Ruling

JUN 17 2015

Cause Nos. 10CR0325-83-1 & 10CR0326-83-1    JUN 18  AM 10: 52

| EX PARTE: | § | IN THE DISTRICT COURT OF |
| | | DISTRICT CLERK |
| | § | GALVESTON COUNTY, TEXAS |
| RICHARD ANTHONY HEROD | § | 10TH JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW WITHOUT EVIDENTIARY HEARING ON APPLICATION FOR WRIT OF HABEAS CORPUS

This Trial Court finds that there is no necessity for a fact finding hearing because there is ample evidence from the State's answer, the State's supplemental answer, Counsels' affidavits (attached), and the Trial Court's record to rule on the relief sought.

This Trial Court finds that the representations contained in the State's Answer, State's Supplemental Answer, and said affidavits are correct and credible. This Trial Court finds Applicant hasn't shown his trial attorney or appellate attorney were ineffective. This Trial Court finds the outcome of the proceedings wouldn't have been different but for counsel's alleged errors.

Moreover, the Trial Court finds that there are no controverted previously unresolved facts or issues exist which would entitle Applicant to relief and that Applicant's claims have no legal merit.

This Trial Court recommends relief be denied.

10-CR-0326-83-1
DCFIFCL
Findings of Fact and Conclusions of Law
1054365



113

## ʹORDER

1. The Trial Court orders the Clerk of this Court to file the State's Answer, the State's Supplemental Answer, Counsel's Affidavit, and this Finding and Order, and promptly transmit it with the Writ Transcript to the Clerk of the Court of Criminal Appeals, Austin, Texas.

2. The Clerk of this Court is further ordered to send a copy of this Finding and Order to the Applicant and the appellate section of the Galveston County Criminal District Attorney's Office.

Signed on this the _17^TH_ day of _JUNE_, 2015.

Judge Presiding

**114**

**324**

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS   FILE COPY
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

**8/5/2015**
**HEROD, RICHARD ANTHONY** Tr. Ct. No. 10-CR-0326-83-1    **WR-83,515-02**
This is to advise that the Court has denied without written order the application for
writ of habeas corpus on the findings of the trial court without a hearing.

Abel Acosta, Clerk

DISTRICT CLERK GALVESTON COUNTY
JOHN KINARD
600 59TH ST. SUITE 4001
GALVESTON, TX 77551
* DELIVERED VIA E-MAIL *

325

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS    FILE COPY
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

WR-83,515-02

**8/5/2015**
**HEROD, RICHARD ANTHONY ★ Tr. Ct. No. 10-CR-0326-83-1**
This is to advise that the Court has denied without written order the application for
writ of habeas corpus on the findings of the trial court without a hearing.

Abel Acosta, Clerk

RICHARD ANTHONY HEROD
COFFIELD UNIT - TDC # 1795915
2661 FM 2054
TENNESSEE COLONY, TX 75884

326

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS    FILE COPY
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

**8/5/2015**
**HEROD, RICHARD ANTHONY ☆ Tr. Ct. No. 10-CR-0326-83-1    WR-83,515-02**
This is to advise that the Court has denied without written order the application for writ of habeas corpus on the findings of the trial court without a hearing.

Abel Acosta, Clerk

DISTRICT ATTORNEY GALVESTON COUNTY
JACK ROADY
600 59TH STREET SUITE 1001
GALVESTON, TX 77551
* DELIVERED VIA E-MAIL *

327

Appendix 5: Resume of Dr. Collins

# Robert Collins, Ph.D.

## Collins Forensic Consulting
3920-6 West Alabama Street
Houston, TX 77027
713-401-4405
robertcollinsphd@gmail.com

## EDUCATION:

### PhD - Molecular & Human Genetics (June 2000)   Baylor College of Medicine (Houston, TX)

- Doctoral research begins as the polymerase chain reaction (PCR) is developed and used PCR to amplify DNA for many genetic applications including STRs.
- Identified and developed STR loci to map gene implicated in psoriasis-like skin disease in mice (Barlow SC, Collins RG, et al., 2003).
- Deleted genes in mice via targeted recombination to make models of human diseases.
- Generated first mouse with three linked genes individually targeted and deleted (Collins et al., 2001).
- Published seminal paper implicating cell adhesion molecules and macrophages in the initial development of atherosclerosis (Collins et al, 2000) with over 370 citations.
- Extensive use of PCR, sequencing, and STRs for genetic identification.

### BS – Genetics (*cum laude*) (May 1994)         Texas A&M University (College Station, TX)

- Performed undergraduate research in plant genetics using soy beans (*glycine max*).
- Mimicked drought conditions to induce genes in drought-resistant strain.
- Identified gene (*dehydrin*) expressed during drought conditions (Whitsitt MS, Collins RG, et al., 1997).

### MBA – Business Administration (in progress)      University of Houston (Houston, TX)

- Studies focused on management and quality control.
- Core classes completed, twelve hours of electives remaining to graduate.

### National Institute of Justice (NIJ) Training Certificates:

- Collecting DNA Evidence at Property Crime Scenes (2015)
- Testing of Body Fluids and Tissues for Forensic Analysts (2015)
- DNA Amplification for Forensic Analysts (2015)
- Forensic DNA for Officers of the Court (2015)
- Law 101: Legal Guide for the Forensic Expert (2015)
- Population Genetics and Statistics for Forensic Analysts (2015)
- STR Data Analysis and Interpretation for Forensic Analysts (2015)
- Communication Skills, Report Writing, and Courtroom Testimony for Forensic Analysts (2015)
- Advanced and Emerging DNA Techniques and Technologies (2017)
- Non-STR DNA Markers: SNPs, Y-STRs, LCN and mtDNA (2017)
- Expert Testimony Training for the Prosecutor and Scientist (2018)

329

**National Institute of Justice (NIJ) Fingerprint Analysis Certificates:**

- Friction Ridge Impressions
- IPTES Series: Fingerprint Image Complexity
- ASCLD Webinar Series: Latent Print Archival
- A Guide to Latent Print Testimony
- Fingerprint Identification: Reliability and Accuracy


# EXPERIENCE:

**Independent Forensic DNA Consultant**   **Robert Collins, Ph.D.**
June 2015 – present         Houston, TX

- Provide Forensic DNA and Serology consultation services and Expert Witness testimony to defense attorneys, prosecution, and law enforcement agencies.
- Perform complete review of Forensic DNA casework including bench notes, DNA data, mixture interpretations and statistical conclusions.
- Review of forensic laboratory protocols, SOPs, validation studies, proficiency tests, and accreditation.
- Review of clinical laboratory test results, protocols, validation, and QC of laboratory developed tests (LDT) as described by the FDA.
- Offer pre-trial and trial assistance.
- Present educational programs and DNA training for trial counsel and others in the legal system.


**Res. Assoc. – New Test Development**   **Baylor Medical Genetic Laboratories**
May 2010 – February 2015       Houston, TX

- Responsible for the research, development, and validation of laboratory developed tests (LDT) for rare genetic diseases as their causes are discovered by current research. Developed mass spectrometry based methods for measuring drugs used in treatment of diseases.
- Developed tests for early detection of genetic diseases with patient's biological body fluids including plasma, serum, urine, and cerebral spinal fluid without DNA sequence information.
- Responsible for all tests meeting College of American Pathologists (CAP), Clinical Laboratory Improvement Amendments (CLIA), and Food & Drug Administration (FDA) guidelines.
- Tests developed for Ultra Performance Liquid Chromatography (UPLC) separation followed by detection tandem mass spectrometry (MSMS). GC-MS and HPLC-MSMS also.
- Developed methods currently offered by Baylor Medical Genetics Laboratories include panels for pyrimidines (6 analytes), purines (7 analytes), autism related carnitine synthesis panel (3 analytes), bile acids (13 analytes), and phenylbutyrate metabolites (3 analytes).
- Performed audits of older clinical tests to implement new technologies (e.g. solid core columns) and best practices. Re-validate when necessary.
- Trained technicians in all aspects of performing and reporting the new tests accurately.

**Science Liaison**                                          **Aptia System Inc.**
September 2008 – April 2010                                  Houston, TX

- Communicated the scientific needs of customers to software designers.
- SharePoint-based software for cataloging cancer tissues, treatments, and outcomes.
- Interpreted the needs of scientists and presented findings to development team via conferences and PowerPoint presentations.
- NIH release of similar free software resulted in greatly decreased demand.

**General Manager**                                          **Astro City Scrap Metal**
July 2006 – August 2008                                      Houston, TX

- Oversaw daily operations of buying and selling non-ferrous scrap metal.
- Supervised 8 full-time employees.
- Used business principles learned in graduate business classes.

**Postdoctoral-Fellow/associate**                            **Baylor College of Medicine**
June 2000 – June 2006                                        Houston, TX

- Moved to Section of Leukocyte Biology after awarded Ph.D.
- Instructed and advised students, postdocs, and investigators on the use of genetic techniques in their research projects and grant proposals.
- Isolated unique white blood cell populations for DNA and RNA extraction.
- Characterized gene expression in neutrophils with DNA chip arrays.

## RESEARCH COURSES AND CERTIFICATIONS:

- NIH Certification in Bioethics
- NIH Course in "Protection of Human Research Subjects"
- NIH Grant Preparation Workshop 1998 and 2003 (2)
- BCM Pediatrics Fellows Day Grant Writing Workshop 2000-2006 (7)
- Blood Borne Pathogens
- Radiation Safety
- HIPAA
- BCM Fraud, Waste and Abuse Training

## HONORS AND AWARDS:

- 2002 Keystone Symposia Scholarship
- Honorable Mention - National Science Foundation Fellowship
- Graduated *cum laude* - Texas A & M University

## PUBLIC SERVICE:

- Volunteer Science Fair Judge, Houston Independent School District (HISD)
- Volunteer Science Fair Judge, Channelview Independent School District (CISD)
- Volunteer for Science Demonstrations to 5th, 8th, and 10th grade, HISD

331

- *Discovery Lab*, Academic and Scientific Program Development, The Bobby R. Alford Department of Otorhinolaryngology and Communicative Sciences, Baylor College of Medicine, Houston, Texas 77030

## INVITED ORAL PRESENTATIONS:

- Viable phenotype but impaired leukocyte rolling and peritoneal emigration in triple selectin (E, L, and P) null mice. *Keystone Symposium on "Inflammatory Paradigms and the Vasculature",* Feb. 23-28, 1999, Santa Fe, NM
- Chromosome engineering in mouse models of human disease. *Department of Physiology seminar, University of Virginia,* Charlottesville, VA, November 22, 1999.

## POSTER PRESENTATIONS:

1. Collins R., Jung U., Bullard D., Simon S., Hicks J., Smith C.W., Ley K., and Beaudet, A.L. Additional deletion of L-selectin rescues the pathologic dermal and pulmonary phenotype observed in E- and P-selectin deficient mice. Keystone Symposium on "Inflammatory Paradigms and the Vasculature", Feb. 23-28,1999, Santa Fe, NM

2. Manka DR, Collins R, Ley K, Beaudet AL, Sarembock IJ. Absence of P-Selectin but not ICAM-1 Markedly Attenuates Neointimal Growth after Arterial Injury in ApoE-Deficient Mice. 72nd Scientific Sessions, American Heart Association, Nov 7-10, 1999, Atlanta, GA

3. Dunne JL, Ballentyne CM, Collins RG, and Ley K. Role of $\beta_2$ integrins and ICAM-1 in cytokine-dependent adhesion. Biomedical Engineering Society Annual Conference, Oct. 4-7, 2001, Duke University, Rurham, NC

4. A. Saijo, J. Soltys, R.G. Collins, A.L. Beaudet, and C.M. Doerschuk. The role of Icam-1 and P- and E-selectins in murine alveolar macrophage and neutrophil recruitment into murine lungs after lethal irradiation and reconstitution of bone marrow. American Thoracic Society Annual Meeting, May 17-22, 2002, Atlanta, GA

5. I. Hashimoto, S.E. Richer, R.G. Collins, A.L. Beaudet, and C.M. Doerschuk. Icam-1 null mice have no defect in neutrophil recruitment induced by *E. coli* or *E. coli* lipopolysaccharide (LPS). American Thoracic Society Annual Meeting, May 17-22, 2002, Atlanta, GA

6. Robert G. Collins, Sarah E. Richer, Rebecca L. Robker, Claire M. Doerschuk, C. Wayne Smith, and Arthur L. Beaudet. ICAM-1 null mice phenotype differs from the previous ICAM-1 mutants. Keystone Symposium on "Molecular Mechanisms of Leukocyte Trafficking", April 9-14, 2002, Steamboat Springs, CO

## PEER REVIEWED PUBLICATIONS:

1. Whitsitt MS, Collins RG, and Mullet JE. Modulation of Dehydration Tolerance in Soybean Seedlings (Dehydrin Mat1 Is Induced by Dehydration but Not by Abscisic Acid). *Plant Physiology*. 1997 Jul; 114(3):917-925.

2. Collins RG, Velji R, Guevara NV, Hicks MJ, Chan L, and Beaudet AL.  P-selectin or intercellular adhesion molecule (ICAM)-1 deficiency substantially protects against atherosclerosis in apolipoprotein E-deficient mice.  *J Exp Med*. 2000 Jan 3; 191(1): 189-94.

3. Sweeney EA, Priestley GV, Nakamoto B, Collins RG, Beaudet AL, and Papayannopoulou T.  Mobilization of stem/progenitor cells by sulfated polysaccharides does not require selectin presence.  *Proc Natl Acad Sci USA*. 2000 Jun 6;97(12):6544-9.

4. Lawson JA, Burns AR, Farhood A, Lynn Bait M, Collins RG, Smith CW, and Jaeschke H.  Pathophysiologic importance of E- and P-selectin for neutrophils-induced liver injury during endotoxemia in mice.  *Hepatology*. 2000 Nov;32(5):990-8.

5. Manka D, Collins RG, Ley K, Beaudet AL, and Sarembock IJ.  Absence of P-selectin, but not intercellular adhesion molecule-1, attenuates neointimal growth after arterial injury in apolipoprotein E-deficient mice.  *Circulation*. 2001 Feb 20;103(7):1000-5.

6. Collins RG, Jung U, Ramirez M, Bullard DC, Hicks MJ, Smith CW, Ley K, and Beaudet AL.  Dermal and pulmonary inflammatory disease in E- and P-selectin double-null mice is reduced in triple-selectin-null mice.  *Blood*. 2001 Aug 1;98(3):727-35.

7. Li Y, Muruve DA, Collins RG, Lee SS, and Kubes P.   The role of selectins and integrins in adenovirus vector-induced neutrophil recruitment to the liver. *Eur.J.Immunol*. Dec 2002 32:3443-3452.

8. Barlow SC, Collins RG, Schoeb TR, and Bullard DC.  The Psoriasiform dermatitis susceptibility in Itgb2(tm1Bay) PL/J mice requires low-level CD18 expression and at least two additional loci for progression to severe disease. *Am J Pathol*. 2003 Jul;163(1):197-202.

9. Dunne JL, Collins RG, Beaudet AL, Ballantyne CM, and Ley K.  Mac-1, but not LFA-1, uses intercellular adhesion molecule-1 to mediate slow leukocyte rolling in TNF-alpha-induced inflammation.  *J.Immunol*. 2003 Dec. 171:6105-6111.

10. Robker RL, Collins RG, Beaudet AL, Merrsmann HJ, and Smith CW.  Leukocyte migration in adipose tissue of mice null for ICAM-1 and Mac-1 adhesion receptors. *Obesity Res*. 2004 Jun 12:936-940.

11. Tcharmtchi MH, Arias WM, Collins RG, Robker RL, Smith CW, Beaudet AL, Rivera CA, Suarez G, and Reyes, V. Increased hepatic injury in ICAM-1 deficient mice exposed to *listeria monocytogenes*. *Critical Care Medicine* 2004 December 32(Supplement):A130.

12. Garcia-Palacios V, Chung HY, Choi JC, Sarmasik A, Kurihara N, Lee JW, Galson DL, Collins R, and Roodman GD. Eosinophil chemotactic factor-L (ECF-L) enhances osteoclast formation by increasing in osteoclast precursors expression of LFA-1 and ICAM-1. *Annals of the New York Academy of Sciences.* 2006 May 1068(1):240-3.

13. Bullard DC, Hu X, Schoeb TR, Collins RG, Beaudet AL, Barnum SR. Intercellular adhesion molecule-1 expression is required on multiple cell types for the development of experimental autoimmune encephalitis. *J Immunol.* 2007 Jan 15:178(2):851-7.

14. Garcia-Palacios V, Chung HY, Choi JC, Sarmasik A, Kurihara N, Lee JW, Galson DL, Collins R, and Roodman GD. Eosinophil chemotactic factor-L (ECF-L) enhances osteoclast formation by increasing in osteoclast precursors expression of LFA-1 and ICAM-1. *Bone.* 2007 March 40(2):316-22.





**John D. Kinard**
**DISTRICT CLERK**
**GALVESTON COUNTY, TEXAS**

Galveston Office
600 59th Street, RM 4409
Galveston, TX 77551-2388
Phone(409)766-2424
Fax (409)766-2292

League City Office
174 Calder Rd.
League City, TX 77573
Phone (281)316-8729
Fax (281) 316-8740

2/21/2019

RECEIVED IN
COURT OF CRIMINAL APPEALS

FEB 28 2019

Abel Acosta, Clerk
Court of Criminal Appeals
Supreme Court Building
P.O. Box 12308 Capitol Station
Austin, Texas 78711

Deana Williamson, Clerk

**IN RE: Ex Parte: Richard Anthony Herod**
**CASE NUMBER-- 10CR0325-83-2**       **WR-83,515-03**
**CASE NUMBER--10CR0326--83-2**       **WR-83,515-04**
**10th District Court**

Dear Mr. Acosta:

Enclosed please find the Trial Court's Second Motion/Request for Extension of Time and Order Granting on a Post- Conviction Habeas Corpus in the above styled and numbered causes.  Please acknowledge receipt of this correspondence on the enclosed copy of this letter and return to my office.

Sincerely,
**JOHN D. KINARD**
**DISTRICT CLERK**
**GALVESTON COUNTY, TEXAS**

By: /s/ Terrie Kahla

Enclosures

cc:     Richard Anthony Herod, Applicant
        C/O Jonathan Landers, Attorney
        917 Franklin Street, Suite 300
        Houston, Texas 77002

        Honorable Jack Roady, District Attorney
        600 59th Street, Suite 1001
        Galveston, Texas 77551



*600 59th Street, Room 4001, Galveston County Justice Center, Galveston, Texas 77551-2388*

*Phone (409) 766-2424 Fax (409) 766-2292*



335

Filed: 4/29/2019 3:19 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 33149089
By: Alytha Green-Pickney
4/29/2019 3:54 PM

## Cause Nos. 10CR0325-83-2 & ~~10CR0326-83-2~~

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT OF** |
| | § | **GALVESTON COUNTY, TEXAS** |
| **RICHARD HEROD,** | § | **10TH JUDICIAL DISTRICT** |
| Applicant | | |

### STATE'S AMENDED FIRST SUPPLEMENTAL ANSWER TO APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS

COMES NOW, the State of Texas, by and through her Criminal District Attorney of Galveston County, Texas, and files this Amended First Supplemental Answer in response to the original habeas application in the instant cause.

### I.

The applicant is confined pursuant to the judgment and sentence of the 10th Judicial District Court of Galveston County, Texas, in which the applicant was convicted by a jury for the felony offenses of aggravated sexual assault in cause number 10CR0325 and of aggravated robbery in cause number 10CR0326, and the jury assessed the applicant's punishment, enhanced with two (2) prior convictions, at ninety-nine (99) years confinement in the Texas Department of Criminal Justice – Institutional Division in each case.

On October 22, 2013, the Fourteenth Court of Appeals delivered a memorandum opinion affirming the trial court's judgment in cause numbers 10CR0325 and 10CR0326. *Herod v. State*, Nos. 14-12-00646-CR & 14-12-00645-CR, 2013 WL

1

5760739 (Tex. App. – Houston [14th Dist.] October 22, 2013, pet. ref'd)(mem. op., not designated for publication).

On March 12, 2014, the Court of Criminal Appeals refused the applicant's petition for discretionary review.

The applicant's prior applications for writ of habeas corpus, cause numbers 10CR0325-83-1 and 10CR0326-83-1, were denied without written order on August 5, 2015.

## II.

### SUMMARY OF STATE'S TRIAL EVIDENCE AND DNA EVIDENCE

On January 7th, 2010, Alissia Gallagher (Alissia) and her husband Ronnie Gallagher (Ronnie) were spending the evening with their children in their residence at 2506 21st Avenue North, Texas City, Galveston County, Texas (V R.R. at 140-41, 150-52). During this period, Ronnie engaged in drug dealing activities by selling cocaine and codeine even though Alissia never personally witnessed this activity (V R.R. at 143-45). About 10 to 11 pm, a friend of Ronnie's came to the house and delivered two bottles of codeine which Ronnie had purchased (V R.R. at 151-52; VII R.R. at 17-19). Ronnie would combine the codeine with soda water and drink the liquid narcotic mixture (V R.R. at 151-52; VII R.R. at 18).

Around 11:30 p.m., Alissia and Ronnie heard the front door being kicked in and thought that police were conducting a raid as a result of Ronnie's drug-dealing activities

2

337

(V R.R. at 152-55, VII R.R. at 20-21, 24-25). Alissia soon realized that the police were not conducting a raid on her home when she encountered a "Mexican male" wearing a ski mask and gloves and brandishing a handgun in her living room (V R.R. at 153-59). The "Mexican" assailant pointed the gun at Alissia and instructed her to sit down (V R.R. at 156-59).

Another masked assailant wearing gloves and also brandishing a handgun went to Ronnie, took him into the bedroom, and demanded money (VII R.R. at 22-27). After handing over $500 in cash, Ronnie observed this assailant face-to-face and recognized him as an acquaintance named "Ricky D," based on his voice, body size and shape, and "real distinctive" blue eyes (VII R.R. at 28-38). The assailant then "zip tied" Ronnie's hands behind his back, took his wallet, and "blindfolded" him with a white shirt (VII R.R. at 38-40).

Alissia, who was with her daughter, asked the "Mexican" assailant if she could go see Ronnie, and, after receiving permission, she and her daughter moved to another room where Alissia observed Ronnie on the ground with his hands tied behind his back with "tie straps" and a white shirt covering his eyes (V R.R. at 159-61, 164). Alissia also observed a "white male" who was taller than the "Mexican" assailant and was wearing a ski mask and carrying a handgun (V R.R. at 164-65, 171). Alissia never took her eyes off of the "white" assailant and his blue eyes (V R.R. at 165). The "white" assailant pointed the gun at Alissia's daughter while instructing Alissia to get on the ground

3

338

before tying Alissia's hands with "tie straps" behind her back and walking her out of the room (V R.R. at 166-67, 171-73).

The "white" assailant took Alissia to the living room and threw her on a couch before choking her and demanding to know where the money was (V R.R. at 174-75, 177-78). After Alissia said she did not know about the money, the "white" assailant responded by telling Alissia that she was lying (V R.R. at 178). The "white" assailant pulled down Alissia's pants and underwear to her ankles (V R.R. at 178-79). The "white" assailant then inserted his gloved finger into Alissia's vagina while moaning and making "weird like" noises (V R.R. at 178-79). The "white" assailant also spread Alissia's buttocks and was looking "all the way from top to bottom" (V R.R. at 181-82). The "white" assailant then picked Alissia up "like a baby" and carried her towards the front door but decided to allow her to stand up in the hallway (V R.R. at 182-83). At Alissia's request, the "white" assailant pulled up Alissia's pants while she stood in the hallway (V R.R. at 183-84). The "white" assailant then threw Alissia on another couch and began searching through all her pockets, again asking where the money was (V R.R. at 184-85).

Ronnie was later taken by "Ricky D" to the garage where the blindfold came off his face (VII R.R. at 41-44). "Ricky D" responded by kicking Ronnie in the face (VII R.R. at 43-44). Ronnie saw for the first time the "Hispanic" assailant who later entered

4

the garage (VII R.R. at 44). Ronnie described this assailant as "Hispanic" based upon the skin color around his eyes and him speaking Spanish (VII R.R. at 44-45).

The "white" assailant then brought Alissia into the garage where Ronnie was and told her to ask Ronnie if he had given up all the money (V R.R. at 185-88). When Alissia complied with the "white" assailant's demand, Ronnie responded that there was no other money and he had given up everything (V R.R. at 188-89).

Then the "white" assailant brought Alissia back into her bedroom where the children were located and put her on the bed (V R.R. at 190-91). The "white" assailant briefly left the bedroom and soon returned with Ronnie's cell phone (V R.R. at 192). The "white" assailant began "going through" Ronnie's phone and asked Alissia for her phone number, which she provided (V R.R. at 192-93). The "white" assailant lifted up Alissia's shirt and began rubbing the handgun against her naked breasts (V R.R. at 194). The "white" assailant pointed the gun at Alissia's children and said that "if he seen [sic] a cop car or heard anything, that he would snipe them from a mile away" (V R.R. at 194). After Alissia's children responded that they would not call the police, the "white" assailant looked again into the closet and then left the room (V R.R. at 195).

When Alissia did not hear anything after a few minutes, she managed to slip out of the "tie straps" (V R.R. at 195-96). Alissia ran to the garage and cut off Ronnie's ties (V R.R. at 196). Alissia went to a neighbor's house and called police (V R.R. at 197-98).

5

The police arrived at the Gallagher residence and, during the crime scene investigation, recovered a white shirt and two zip ties (VI R.R. at 7-8, 11-22). The white shirt and two zip ties were secured at the police evidence room prior to submission to the lab for DNA testing (VI R.R. at 22-24, 26-27). It was determined that the robbers had gotten away with money, some loose change, codeine, and a GPS device (V R.R. at 217; VII R.R. at 64-65, 78-79).

Alissia went to the hospital after speaking to police and underwent a sexual assault examination (V R.R. at 200-02). When the nurse asked Alissia whether she had been penetrated, Alissia responded that she had not been penetrated because she thought the nurse was referring to penetration by a penis (V R.R. at 202). Alissia informed the nurse that an assailant had "put his hand on her vagina" but did not recall whether the nurse asked if her vagina had been penetrated with a finger (V R.R. at 202-03).

Alissia and Ronnie later met with Texas City police, including Detective Ernest Robles (V R.R. at 219-20; VI R.R. at 41). Detective Robles had previously dealt with Ronnie as a narcotics investigator in relation to a search warrant at Ronnie's residence (VI R.R. at 43).

Detective Robles learned that Ronnie recognized the applicant, who Ronnie knew as "Ricky D," as one of the assailants; however, Ronnie did not give this information to police officers who came to his residence because he was afraid for the

6

341

safety of his family and himself (VI R.R. at 48-49; VII R.R. at 35-36, 65). Ronnie informed Detective Robles about his history with "Ricky D" (VI R.R. at 45). Ronnie also provided Detective Robles with some physical descriptors for "Ricky D" as well as with information that "Ricky D" lived in Santa Fe, Texas (VI R.R. at 44-45, 48). Detective Robles also learned that Ronnie heard the sound of a diesel truck leaving the Gallagher residence after the home invasion (VI R.R. at 74; VII R.R. at 59).

After returning home the morning after the home invasion, Alissia was speaking to her sister on her cell phone around 10-11 AM when she was alerted to an incoming call (V R.R. at 207-08). When Alissia picked up this call, she heard a male voice saying, "This is oh [sic] boy from last night" (V R.R. at 207-09). The male voice on the phone also said that he "was going to come back and do it again" and that he was "going to have money in your mailbox" (V R.R. at 209-10). Alissia recognized this male voice as the "white" assailant from the home invasion the night before (V R.R. at 209-10). Alissia hung up on this call, and the "white" assailant immediately called her cell phone a second time saying again that he was "going to have money in your mailbox" (V R.R. at 210-11). Upon hanging up the second time, Alissia immediately called 911 and reported these phone calls to a Texas City police officer (V R.R. at 211-12).

Also that morning, Ronnie told Alissia that he knew one of the assailants and provided Alissia with the name of the suspected person (V R.R. at 204-05). Alissia did

7

**342**

not recognize the name of the person Ronnie told her (V R.R. at 205). Alissia did not know and had never met the applicant (V R.R. at 206, 222-23).

Based on the information provided by Ronnie, Detective Robles contacted the Santa Fe Police Department and received information that "Ricky D" was the applicant (VI R.R. at 50-51). Detective Robles met with Ronnie and Alissia a second time at the police department to interview them about the home invasion (VI R.R. at 41-43). Alissia provided the detectives with a written statement as well as a description of the "white" assailant, particularly, his big, round blue eyes (V R.R. at 220-21, 223). Detective Robles showed Ronnie a photograph of the applicant, and Ronnie identified the person depicted in this photograph as "Ricky D"[1] (VI R.R. at 60-61, 71). Detective Robles secured an arrest warrant for the applicant (VI R.R. at 71). Based upon information from Ronnie, Detective Robles determined the actual location of the applicant's Santa Fe residence (VI R.R. at 71).

Detective Robles later learned that the applicant was arrested in Santa Fe on January 28, 2010, while traveling in a diesel truck (VI R.R. at 73-74, 132-33). Detective Robles found it significant that the applicant had been arrested traveling in a diesel truck because Ronnie reported he heard a diesel engine "pulling away" from his residence

---

[1] Even though the jury only heard evidence that Ronnie identified the applicant from a single photograph, Ronnie actually identified the applicant from a photo array containing photographs of the applicant and five other males (VI R.R. at 52-61; VII R.R. at 73). The trial judge did not allow the jury to hear that an array of photographs was used in Ronnie's identification of the applicant (VI R.R. at 58-59).

8

after the assailants left his home (VI R.R. at 73-74). At the time of the applicant's arrest, Detective Robles learned that the applicant was with his child and the child's mother Holly Kelly (VI R.R. at 73). Detective Robles went to the Texas City Police Department where the applicant and his diesel truck were taken (VI R.R. at 74-75).

After receiving verbal and written consent to search, Detective Robles personally recovered two cell phones from the applicant's truck (VI R.R. at 86). While in Detective Robles' office and in the applicant's presence, Robles used each cell phone recovered from the applicant's truck to call his office desk phone which was equipped with caller identification in order to determine the numbers for both recovered cell phones (VI R.R. at 85-88). After these calls, the applicant requested the return of both cell phones (VI R.R. at 88). Unsure of their evidentiary value, Detective Robles returned both cell phones to the applicant, who quickly disassembled them and ate both "SIM cards"[2] in Robles' presence (VI R.R. at 88-90). Based on the applicant's swallowing the "SIM cards," Detective Robles concluded that the cell phones had some evidentiary value (VI R.R. at 89-90).

Detective Robles met with and obtained statements from Holly Kelly (Kelly), the woman who was present when the applicant was arrested and was later charged with aggravated robbery for her involvement in the invasion Ronnie and Alissia's home

---

[2] A "SIM card" is a storage device within – or "the brains" of – the cell phone which contains contact information and the actual phone number assigned to the phone (VI R.R. at 89). Eating the "SIM card" would eliminate the contacts on a cell phone for anyone to view (VI R.R. at 114).

(VI R.R. at 105-07). Kelly was the applicant's girlfriend, had a child with him, and lived with him in January of 2010 at a residence located in Santa Fe, Galveston County, Texas (VIII R.R. at 7-9).

Kelly informed Detective Robles that between December of 2009 and January of 2010, she and the applicant were involved in selling drugs (VIII R.R. at 16). Kelly had previously dropped off the applicant at Ronnie's house on about three earlier occasions during which Ronnie and the applicant would discuss business related to drugs (VIII R.R. at 12-16). About one week before January 7, 2010, Kelly heard the applicant and some friends, including an individual named Nick Salinas (Salinas), talking about Ronnie having $50,000 and a couple of kilos of drugs (VIII R.R. at 44-46).

On the morning and afternoon of January 7, 2010, Kelly was with the applicant at home in Santa Fe (VIII R.R. at 18). That evening, Salinas came to the applicant's home and smoked marijuana (VIII R.R. at 19-21). Later that same evening, the applicant told Kelly to get ready to go somewhere, and Kelly, Salinas, and the applicant got into a Ford diesel truck and left the applicant's home around 10:30 to 11 pm (VIII R.R. at 24-28). The applicant instructed Kelly to drive himself and Salinas towards Texas City (VIII R.R. at 27-29). Kelly observed Salinas and the applicant put guns in their pants and put on two "beanies"[3] (VIII R.R. at 31-33). Kelly then, per the applicant's instructions, dropped Salinas and the applicant off about two houses past

---

[3] A "beanie" is "something you'd wear on your head to keep it warm" (VIII R.R. at 33).

Ronnie's home, which Kelly found unusual (VIII R.R. at 30-32). Kelly also thought it was unusual for the applicant to visit Ronnie's home at this time of night (VIII R.R. at 75).

About 15 to 20 minutes later, Salinas and the applicant reentered the truck (VIII R.R. at 37-38). Kelly observed that the applicant and Salinas both appeared "really anxious" (VIII R.R. at 38-39, 75-76). Kelly asked the applicant what was wrong, and the applicant responded, "Nothing. Just drive, drive, drive." (VIII R.R. at 39). Kelly complied and drove back to the applicant's home, which took about 20-30 minutes (VIII R.R. at 40-41).

Kelly later observed the applicant and Salinas splitting up a few hundred dollars and a couple of pints of "Drank"[4] (VIII R.R. at 42-43, 77). Kelly also heard Salinas and the applicant talking together and saying that "it wasn't worth it" while appearing disappointed in the amount of money they were splitting (VIII R.R. at 42-43).

A few days later, Kelly and the applicant were stopped by police while driving a truck (VIII R.R. at 48). The police arrested the applicant and took the truck (VIII R.R. at 48). The applicant had cell phones in the diesel truck on the day of his arrest (VIII R.R. at 48-49). Kelly was aware that the applicant had a couple of cell phones around the time of the incident, but she did not know the phone numbers (VIII R.R. at 48).

---

[4] "Drank" is liquid form of codeine mixed with promethazine (VIII R.R. at 43).

11

346

Detective Robles obtained records from the cell phone provider for both cell phones recovered from the applicant's truck and from the cell phone provider for Alissia's cell phone (VI R.R. at 70-71, 94-98, 114-15). Detective Robles' review of Alissia's phone records revealed that her cell phone (1) received two consecutive incoming calls around 10 AM on January 8, 2010, from one of the cell phones recovered from the applicant's truck and (2) made an outgoing call to 911 immediately after receiving the two calls from the cell phone recovered from the applicant's truck (VI R.R. at 97-99). Detective Robles' review of the phone records for one of the cell phones recovered from the applicant's truck revealed that this cell phone made two consecutive outgoing calls to Alissia's phone number around 10 AM on January 8, 2010 (VI R.R. at 97-101).

Cell phone tower records indicated the geographic locations of the cell phone used to call Alissia based on the cell tower being utilized at the time of the beginning and end of a call (VI R.R. at 153, 161-62). The cell phone tower records for one of the cell phones recovered from the applicant's truck reflected that (1) from 4:57 PM to around 8:23 PM on January 7, 2010, the cell phone was located in Santa Fe; (2) from 10:30 PM to around 11:00 PM on January 7, 2010, the cell phone was located in Santa Fe; (3) from 11:11 PM to 11:36 PM on January 7, 2010, the cell phone was traveling into Texas City; (4) at 12:04 AM on January 8, 2010, the cell phone was located in Santa Fe; (5) at 12:39 AM on January 8, 2010, the cell phone was in the LaMarque/Texas City

12

area; and (6) from 1:17 AM to 2:23 PM on January 8, 2010, the cell phone was located in Santa Fe (VI R.R. at 159-66).

The Texas Department of Public Safety Crime Laboratory (TDPSCL) performed forensic analysis on the physical evidence received from the Gallagher incident, including known saliva samples from Alissia, Ronnie, and the applicant[5] (VII R.R. at 163-64, 167-69). The evidence analyzed included a sexual assault collection kit, a white shirt, and two zip ties (VII R.R. at 171, 174-75, 176).

The DNA testing performed by the TDPSCL on the breast swabs from the sexual assault kit, one zip tie, and the "wearer"[6] areas of the white shirt produced results all of which excluded the applicant as a contributor to all DNA profiles found on those items[7] (VII R.R. at 212-15, 219-23, 226). The DNA testing performed by the TDPSCL on the "body"[8] portions of white shirt produced the following results:

- A DNA profile consistent with a mixture[9] was obtained;

- Alissia could not be excluded as a contributor to this DNA mixture profile in 8 out of 16 allele locations[10];

- Ronnie could not be excluded as a contributor to this DNA mixture profile in 14 out of 16 allele locations;

---

[5] Detective Robles obtained buccal swabs from Alissia and Ronnie for DNA comparisons (VI R.R. at 62-64). Detective Robles also obtained known saliva samples from the applicant by a search warrant because he declined to voluntarily provide a sample (VI R.R. at 103-04, 190-91).

[6] The "wearer" areas of the white shirt are the neck and armhole portions of the shirt (VII R.R. at 176-177, 220).

[7] The DNA analysis on the other zip tie did not produce any DNA profile (VII R.R. at 212-13).

[8] The "body" portions of the white shirt are the "middle sections" of the shirt (VII R.R. at 177-78).

[9] A DNA "mixture" profile is a DNA profile that is from more than one person (VII R.R. at 213).

[10] "Alleles" are also referred to as "locations" or "markers" (VII R.R. at 217; VIII R.R. at 134-35).

- The applicant could not be excluded as a contributor to this DNA mixture profile in 8 out of 16 allele locations; and

- At the 8 allele locations where the applicant could not be excluded, the probability of selecting an unrelated person at random who could be a contributor to this DNA profile is approximately 1 in 87 for Caucasians, 1 in 232 for Blacks, and 1 in 53 for Hispanics.[11]

(VII R.R. at 223-25).

Dr. Melva Ketchum, a defense DNA expert and the director of DNA Diagnostics, reviewed test results from DNA analysis performed by the TDPSCL[12] (VIII R.R. at 108-10, 133-34, 136). The TDPSCL did not give Dr. Ketchum all electropherograms[13] from the complete DNA testing, particularly fifteen electropherograms (VIII R.R. at 136-37, 195-97). As to the TDPSCL testing specifically performed on the "body" areas of the white shirt, Dr. Ketchum was not given six electropherograms for review (VIII R.R. at 137). Although the TDPSCL obtained seven total electropherograms related to the "body" areas of the white shirt, Dr. Ketchum only received one of those electropherograms (VIII R.R. at 136-37). While TDPSCL could potentially have performed the DNA analyses improperly or calculated the statistics inaccurately, Dr. Ketchum could not definitively make either of these

---

[11] In other words, if "you went outside and picked a random person, the probability that you would select somebody with that combination of alleles would be" 1 in 87 Caucasians, 1 in 232 blacks, and 1 in 53 Hispanics (VII R.R. at 218).

[12] Dr. Ketchum did not perform any DNA testing in relation to this case but only reviewed DNA documentation provided by TDPSCL (VIII R.R. at 193-94).

[13] "Electropherograms" are graphic representations of the DNA test results which can affect the interpretation of the DNA results (VIII R.R. at 136-37).

14

statements because she was never provided all of the documentation from the TDPSCL DNA testing on the "body" areas of the white shirt (VIII R.R. at 195-96).

Reviewing only the documentation provided by TDPSCL, Dr. Ketchum observed that the applicant was excluded as a possible source of DNA in all evidentiary items analyzed by TDPSCL, except for the "body" portions of the white shirt (VIII R.R. at 137-38). From the documentation provided concerning the "body" areas of the white shirt, Dr. Ketchum observed that, in addition to the applicant technically not being excluded as a possible contributor of the DNA, Ronnie, Alissia, and an unknown individual could likewise not be excluded as possible contributors to this DNA profile (VIII R.R. at 138). Based on her review of the single electropherogram provided for the white shirt, Dr. Ketchum found that (1) the applicant was actually excluded at thirteen alleles – as opposed to the TDPSCL finding that the applicant was excluded from only eight alleles – because five of the alleles where the TDPSCL said the applicant could not be excluded were alleles which were also shared by Ronnie and/or Alissia (VIII R.R. at 146-64). Additionally, Dr. Ketchum found the remaining three alleles where the TDPSCL said that the applicant was not excluded from were alleles which are very commonly found in large numbers of the population in general (VIII R.R. at 162-64).

## Significant Post-Trial Forensic Events

On August 23, 2015, the Texas Forensic Science Commission (TFSC) sent a letter to the "Members of the Texas Criminal Justice Community" notifying them of concerns regarding the interpretation of DNA mixtures. *See Applicant's Appendix 6.* The TFSC documentation reflected that the Federal Bureau of Investigations (FBI) notified Combined DNA Index System (CODIS) laboratories about "minor discrepancies" in its STR Population Database used by laboratories across the U.S. for DNA statistical calculations and the corrections to this data. *See id.*

The TFSC documentation also stated that changes in DNA mixture interpretations had been initiated based upon guidance issued in 2010 by the Scientific Working Group on DNA Analysis Methods (SWGDAM). *See id.* The TFSC documentation explained that there was a "substantial variance in [DNA] mixture interpretations among laboratories" which was first reported by an international study called "MIX05" conducted by the National Institute of Standards and Technology (NIST). *See id.* The TFSC explained that the NIST did not "expressly flag which interpretation approaches were considered scientifically acceptable and which were not…" but that "significant efforts" were made to "improve the integrity and reliability of DNA mixture interpretation through various national training initiatives." *See id.* The TFSC went further to state that "there is variation among laboratories in Texas and nationwide…that could be considered scientifically acceptable" while some of the

16

variation "does not fall within the range of scientifically acceptable interpretation." *See id.* Finally, the TFSC explained that the variations in DNA mixture interpretation were the result of the DNA community having "progressed over time in its ability to understand and implement this complex area of DNA interpretation appropriately." *See id.*

On September 10, 2015, the TDPS issued a letter publicly announcing protocol changes in DNA mixture interpretations. *See id.* The TDPS letter explained that its former method of calculating DNA mixture statistics was implemented when DNA testing first began at the TDPS in 1999. *See id.* Furthermore, the TDPS letter provided that validation studies were initiated and conducted from 2011 to 2014, but, due to a lack of consensus in the forensic DNA testing community, the final changes to the interpretation protocols were not implemented until August 10, 2015. *See id.* The protocol change involved new DNA interpretation guidelines producing "data utilized for interpretation being more reliable" translating to "more conservative statistics." *See id.*

In a letter dated July 2, 2016, the State sent the applicant written notification that "forensic scientists have recently become aware that a common statistical method they used may not always have taken into account certain important scientific limitations." *See Applicant's Appendix 3.* This letter also offered the applicant the opportunity to request a statistical recalculation of the DNA test results. *See Applicant's Appendix 3.*

Subsequently, the TDPSCL performed reanalysis of earlier DNA testing done in this case using the new TDPSCL mixture protocols and delivered the results in a supplemental report dated February 9, 2017. *See Applicant's Appendix 1*. The supplemental report, among other information, reflected the applicant was excluded as a contributor to the DNA on all items of evidence, including the "body" portions of the white shirt. [14] *See id.*

### III.

The State denies all allegations raised in the instant habeas application and offers the following additional reply:

### REPLY TO APPLICANT'S FIRST GROUND FOR RELIEF

In his first ground for relief, the applicant alleges that he was denied due process. Specifically, the applicant alleges that:

1.  The State presented false evidence concerning DNA test results to the jury during trial; and

2.  The State committed a *Brady* violation by suppressing information concerning recognized problems with statistical analysis of DNA mixtures in 2010.[15]

*Applicant's writ* at 6.

---

[14] Because the DNA test results of the other physical evidence already excluded the applicant as a possible contributor to any associated DNA profiles, the new statistical results for the other items of evidence merely confirmed the earlier results and are therefore not relevant to the instant habeas proceeding.

[15] The State failed to recognize the *Brady* violation claim at the time of filing the original answer and proposed order designating issues. The State will nevertheless respond to the *Brady* violation claim even though it was not originally designated as an issue which needed resolution.

18

353

## False Evidence Claim

The applicant first alleges that the State presented false evidence concerning DNA test results obtained by the TDPSCL. The applicant particularly claims that the State presented false testimony from the TDPSCL analyst Clare Browder (Browder) that the applicant "'could not be excluded' from DNA samples taken at the scene" and that "there's no difficulty with the statistics…." *Applicant's writ* at 6.

The prosecution's use of *material* false testimony violates a defendant's due process rights under the Fifth and Fourteenth Amendments of the U.S. Constitution. *Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014)(emphasis in original); *Ex parte De La Cruz*, 466 S.W.3d 855, 866 (Tex. Crim. App. 2015). A conviction obtained from the use of false, material evidence results in a violation of due process, regardless of whether the State knowingly or unknowingly used the false evidence at the time of trial. *Ex parte Robbins*, 360 S.W.3d 446, 459-60 (Tex. Crim. App. 2011)(citing *Ex parte Ghahremani*, 332 S.W.2d 470 (Tex. Crim. App. 2011)). In a habeas proceeding alleging the material use of false testimony, a writ applicant must prove by a preponderance of the evidence that (1) evidence which was presented at his trial was false and (2) this false evidence was material to the jury's verdict. *Ex parte De La Cruz*, 466 S.W.3d at 866. The writ applicant must prove both prongs of his false evidence claim by a preponderance of the evidence. *Id.*

19

**354**

## A.    The 2017 DNA Results Were Due To Scientific Self-Correction

In the instant allegation, the applicant complains that Browder's trial testimony was false because the 2017 DNA results excluded him as a possible contributor of the DNA from the white shirt. However, the circumstances presented in the instant case concerning the DNA mixture results cannot be properly analyzed in the context of a false evidence complaint.

The instant case presents a situation in which the forensic results were obtained based upon previously validated and adopted DNA mixture protocols which subsequently evolved due to a greater understanding of the mixture interpretation methodology. This evolution resulted in the self-correction of the DNA mixture science after forensic DNA practitioners (including TDPSCL) gained a greater understanding of the limitations and proper application of the mixture interpretation protocols. As a result of this scientific self-correction, the proper manner to evaluate the change in the DNA results in the instant case is pursuant to Article 11.073 of the Code of Criminal Procedure.

To better explain this scientific self-correction in the DNA mixture interpretation methodology, Bruce Budowle, the Director of the Center for Human Identification in Fort Worth, Texas, and a member of the Texas Forensic Science Commission, provided an affidavit explaining the historical and scientific circumstances surrounding the DNA evidence in the instant case. *See State's Exhibit A, Affidavit of Bruce*

20

355

*Budowle.* In his affidavit, Budowle summarizes the 2011 DNA results, which could not exclude the applicant as a possible contributor to the DNA profile in question. *See id.* at 2. Budowle explains that TDPSCL "applied its mixture interpretation protocols which were approved and adopted by [TDPSCL] in 1999 and remained in effect until August 2015" to the 2011 DNA analysis. *See id.*

Budowle also summarizes the 2017 DNA mixture results, which excluded the applicant as a possible contributor to a DNA mixture profile, obtained using a probabilistic genotyping software – STRmix – to assist in the DNA mixture interpretation. *See id.* at 2-3. Budowle describes the STRmix software as a "valid and reliable tool to assist the analyst in mixture interpretation." *See id.* at 3.

Budowle goes on to provide historical context to the DNA mixture interpretation methodology, stating that "most laboratories in the United States, including those in Texas, employed an interpretation and statistical analysis method for mixture evidence known as the Combined Probability of Inclusion (CPI)." *See id.* at 2. Budowle specifically points out that the "***CPI is a valid statistical method*** conveying the portion of the population that cannot be excluded as a potential contributor of the mixture." *See id.* (emphasis added).

Budowle explains that the CPI requires a forensic analyst to "perform an *a priori* evaluation of the data before comparing it with a known reference profile" and identifies the CPI limitations, primarily that "the CPI…can only be applied to genetic

21

markers (or loci) in which it is highly unlikely that allele drop out has occurred (i.e. there is no missing data)." *See id.* at 2-3. Budowle recognizes that "[m]ost laboratories using the CPI did not appreciate this limitation and selected loci for the CPI calculation relying on the known reference profile(s) of person(s) of interest,...[which] is commonly referred to as 'suspect-driven bias'...." *See id.* at 2. Budowle clearly states that "suspect-driven bias" should be avoided. *See id.*

Specific to the 2011 DNA analysis, Budowle states that Browder employed the CPI method in providing "three different CPI calculations for the same mixture profile," even though only "one CPI can be generated for a mixture profile." *See id.* Budowle opines that Browder's "generation of three CPIs indicates that [Browder] was aware of the possibility of allele drop out as different loci were selected for each CPI statistic," which was an indication of 'suspect-driven bias'" in her mixture interpretation. *See id.* at 2-3. Budowle asserts that Browder should have "evaluated the mixture prior to referring to the reference samples of the victims and suspect and determined the most plausible explanation of the number of contributors." *See id.* at 3.

Based upon Budowle's affidavit, TDPSCL employed the CPI methodology in accordance with TDPSCL's existing protocols to interpret the DNA mixtures without appropriately considering the CPI limitations and requirements. However, TDPSCL, like many laboratories across the country, used known reference profiles to perform the CPI statistical calculation which reflected a "suspect-driven bias" in its methodology.

TDPSCL's misunderstanding of the CPI's limitations and requirements resulted in the applicant not being excluded as a possible contributor to the DNA profile in question.

Nonetheless, Budowle asserts in his affidavit that TDPSCL's "suspect-driven bias" approach to DNA mixture interpretation "represents a common historical misunderstanding regarding how to interpret DNA mixtures." *See id.* at 3. Although Budowle recognizes that "suspect-driven bias" was "a component of the root cause" for the 2011 mixture interpretation, Budowle emphasizes that "suspect-driven bias":

> [S]hould not be interpreted as an intentional attempt by the analyst to implicate a suspect in any given situation but rather a misunderstanding of how to approach the evidentiary data versus the known data. ***This suspect-driven approach (using the reference profile data to guide decision-making) was based on a common misunderstanding of the application of the CPI methodology by many practitioners in the field, not only in Texas but nationwide.***

*See id.* at 3-4 (emphasis added). Budowle explains that DNA mixture interpretation science evolved after the misunderstandings and methodology limitations of the CPI were recognized and addressed in stating:

> As forensic scientists became more aware of the limitations and proper application of the CPI method, [TDPSCL] self-corrected its protocol and implemented a more robust approach regarding how to interpret DNA mixture evidence. The self-correction by [TDPSCL] is one example of a broader evolution among forensic DNA laboratories nationwide with respect to DNA mixture interpretation.

*See id.* at 4.

Based upon Budowle's affidavit, Browder's misunderstanding of the proper application and limitations of the CPI was common among DNA practitioners in Texas

and across the country. Like many other forensic analysts, Browder did not make a deductive evaluation to determine the most-likely number of contributors to the DNA mixture profile before considering the known reference profiles. Furthermore, Browder used the applicant's and the victims' known reference profiles to interpret the DNA mixture profile.

However, there is no allegation or evidence that TDPSCL's 2011 DNA results was an effort or "intentional attempt" to implicate the applicant as a participant in the offenses. Rather, TDPSCL did not recognize or appreciate the CPI limitations and requirements at the time the 2011 DNA analysis was performed. After fully recognizing and appreciating the CPI limitations and requirements, TDPSCL made a self-correction by adjusting its DNA protocols and implementing a "more robust" methodology to interpret DNA mixture evidence. TDPSCL's new protocols represent an evolution in the science of DNA mixture interpretation.

**B.    Applicant's False Evidence Claim Should Be Evaluated Under Art. 11.073**

In light of Budowle's affidavit, it is readily apparent that a false evidence analysis is an inappropriate vehicle to evaluate the circumstances surrounding the instant case. Instead, TDPSCL's adoption of new protocols reflects the "broader evolution among forensic DNA laboratories nationwide with respect to DNA mixture interpretation" about which Budowle discussed.

24

Circumstances involving advancements in scientific methodology, similar to the one reflected in the instant case, were specifically meant to be addressed by Article 11.073. The Court of Criminal Appeals recognized that in 2013 the Texas Legislature "enacted Article 11.073 of the Texas Code of Criminal Procedure, which allows a defendant to obtain post-conviction relief based on a change in science relied on by the State at trial." *Ex parte Chaney*, ___ S.W.3d ___ 2018 WL 6710279, *10 (Tex. Crim. App. December 19, 2018). Part of the 11.073 analysis requires a court to "consider whether 'the field of science, a testifying expert's scientific knowledge, or *a scientific method* on which the relevant scientific evidence is based' has changed since the applicant's trial." *Id.* (emphasis added). "Scientific method is defined as 'the process of generating hypotheses and testing them through experimentation, publication, and republication.'" *Id.* (quoting *Ex parte Robbins*, 478 S.W.3d 678, 691 (Tex. Crim. App. 2014)). In fact, Judge Cochran noted in her concurring opinion in *Robbins* that Article 11.073 was created "to establish a legal mechanism to address claims of 'false and discredited forensic testimony.'" *Robbins*, 478 S.W.3d at 703 (Cochran, J., concurring), citing House Research Organization, Bill Analysis, Tex. S.B. 344, 83rd Leg. R.S. at 2 (2013).

An art. 11.073 analysis, *not* a false evidence analysis, is the proper framework within which the new DNA results evidence in this case should be evaluated. As reflected in Budowle's affidavit, the science behind forensic DNA analysis as specifically

related to DNA mixture interpretation has evolved since 2011. In 2011, laboratories like TDPSCL had previously-adopted DNA mixture protocols in place which employed the CPI. However, these protocols did not fully consider the CPI limitations and requirements.

After understanding better the CPI limitations and requirements, these forensic laboratories, including TDPSCL, changed their DNA mixture methods as a result of the evolution in the science of mixture interpretations. With the new mixture interpretation protocols in place, TDPSCL reinterpreted the DNA evidence and obtained different results.

Therefore, the evolution of DNA mixture interpretation led to the scientific self-correction which ultimately generated the new DNA results. This scientific evolution in DNA mixture interpretation methodology fits squarely within the circumstances envisioned by the Texas Legislature in enacting Article 11.073. Accordingly, the instant allegation is more appropriately analyzed within the framework established in Article 11.073 instead of a false evidence complaint.[16]

## C.    Even So, Browder's Trial Testimony Was Not Material

Assuming, *arguendo*, that the applicant could prove that Browder's trial testimony should be evaluated using a false evidence analysis, the applicant still fails to prove that Browder's testimony was material. To prove materiality on a false evidence claim, a

---

[16] The State will subsequently address the Article 11.073 claim, which the applicant raises in his second ground for relief.

26

writ applicant must prove by a preponderance of the evidence that "there is a reasonable likelihood that the false testimony affected the judgment of the jury." *Ex parte Weinstein,* 421 S.W.3d at 665. In other words, the writ applicant must prove that the false evidence "was reasonably likely to influence the judgment of the jury." *Id.*

In view of the evidence presented at trial, the applicant cannot prove that Browder's testimony was reasonably likely to influence the jury's guilty verdict. Browder's testimony or the DNA results had little, if any, effect on the jury's verdict considering the substantial inculpatory evidence presented against the applicant. Without considering Browder's testimony, the State presented an abundance of non-DNA evidence establishing the applicant's guilt during trial.

During its case-in-chief, the State presented both circumstantial and direct evidence of the applicant's guilt.  The circumstantial evidence establishing the applicant's guilt which the State presented in trial included:

- Alissia's description of one of the assailants as being "white" male and having blue eyes, which was consistent with the applicant being a Caucasian male and having blue eyes (V R.R. at 164-66);

- The applicant's traveling at the time of his arrest in a diesel truck, which was consistent with Ronnie's report to police that he heard a diesel truck driving away from his residence when the assailants fled after the home invasion (VI R.R. at 73-74; VII R.R. at 59);

- Alissia's receiving two consecutive phone calls from the "white" assailant on the morning after the home invasion, and the phone records for one of the cell phones recovered from the applicant's truck when he was arrested reflecting two consecutive phone calls to Alissia's cell phone number at the

same time on the morning after the home invasion (V R.R. at 207-11; VI R.R. at 70-71, 94-101);

- The cell phone used to call Alissia recovered from the applicant's truck at the time of his arrest was tracked by cell tower records moving from Santa Fe – where the applicant lived – to Texas City – where Ronnie and Alissia lived – and back to Santa Fe during the time periods surrounding the home invasion as described by Ronnie and Alissia (VI R.R. at 161-66); and

- The applicant, in the presence of Detective Robles, eating the "SIM cards" from both cell phones recovered from his truck when he was arrested, which exhibited consciousness of guilt (VI R.R. at 79-89).

All of this circumstantial evidence pointed to the applicant participating in the home invasion or attempting to cover up his criminal activities.

Additionally, the State presented direct evidence of the applicant's involvement in the home invasion. The jury heard evidence that Ronnie informed Alissia on the day after the home invasion that he knew one of the assailants as well as informed her of the name of the assailant (V R.R. at 204-05; VII R.R. at 71). Additionally, Ronnie informed Detective Robles during their first meeting that he had time to observe one of the home invaders, that this assailant's name was "Ricky D," and that "Ricky D" lived in Santa Fe (VI R.R. at 44-45; VII R.R. at 31-34, 71-72).

Based on the information from Ronnie, Detective Robles investigated and determined that "Ricky D" was the applicant (VI R.R. at 50-51). Ronnie positively identified the applicant from a photograph as a participant in the home invasion to Detective Robles before trial (VI R.R. at 60-61; VII R.R. at 73). Ronnie's identification of the applicant was based upon his face-to-face observation of the assailant's voice,

body height and shape, and very distinctive blue eyes (VII R.R. at 32-38). Ronnie knew the applicant for about two years, interacted with him about twenty times, and even knew his girlfriend, Holly Kelly (VII R.R. at 37-38, 73-74). During trial, Ronnie identified the applicant in court as "Ricky D" and as a participant in the home invasion (VII R.R. at 38).

The State's direct evidence, primarily provided by Ronnie, established the relational connection and history[17] between Ronnie and the applicant and Ronnie's multiple previous encounters with the applicant.[18] Additionally, the direct evidence included Ronnie's out-of-court and in-court identifications of the applicant as a participant in the home invasion. Based upon Ronnie's undisputed familiarity and prior interactions with the applicant as well as Ronnie's uncontested identification of the applicant as one of the assailants, the jury could easily have returned a guilty verdict against the applicant based solely on this direct evidence of guilt.

---

[17] During his cross-examination of Ronnie, the applicant's trial counsel suggested in his questioning that Ronnie and the applicant had several interactions in their rival drug dealing activities and that Ronnie not only disliked and made earlier accusations against the applicant but also wanted to physically harm him because Ronnie believed that the applicant had robbed and stolen from Ronnie's narcotics associates (VII R.R. at 74-77).

[18] The defense never contested the fact that Ronnie knew the applicant. In fact, the applicant's trial counsel did not merely concede the issue of Ronnie knowing the applicant but rather strategically developed this theory during Ronnie's cross-examination in order to argue in summation that Ronnie's motive to falsely accuse the applicant of the home invasion was to eliminate a rival and competitor (VII R.R. at 74-77; IX R.R. at 68-70). As a result, there was never an issue during trial about Ronnie knowing the applicant.

29

Even though the circumstantial and direct evidence cited above presented ample evidence to secure a conviction against the applicant for his involvement in the home invasion, the State presented corroborating evidence of the applicant's guilt from Kelly. In her testimony, Kelly admitted her involvement as a party to the offense, discussed her cooperation with police, and explained the plea bargain arrangement she received in exchange for her guilty plea and truthful testimony in the applicant's trial (VI R.R. at 105-06; VIII R.R. at 9-10, 49-50). Kelly testified about hearing the applicant and people, including Salinas, discussing Ronnie having $50,000 and a "couple of kilos" of drugs (VIII R.R. at 44-46).

Kelly provided details about the actions of the applicant and Salinas on the night of the home invasion. Specifically, Kelly testified that she personally drove the applicant and Salinas in a diesel truck to the Gallagher residence on the night of the offense (VIII R.R. at 24-34). Kelly said that she drove the applicant (along with Salinas) to the Gallagher residence like she had done on prior occasions, but at an hour which was unusual for the applicant to visit Ronnie (VIII R.R. at 34). Kelly said that the applicant instructed her to deliberately park about two houses past the Gallagher residence, which also was an unusual request (VIII R.R. at 31). Kelly testified that, when exiting the diesel truck by the Gallagher residence, the applicant and Salinas put on "beanies" and tucked handguns in their pants, and that Kelly had never seen the applicant take a gun into Ronnie's home in the past (VIII R.R. at 31-35).

30

365

Kelly testified that about 15 to 20 minutes later the applicant and Salinas reentered the diesel truck,[19] and they both appeared "really anxious." (VIII R.R. at 28-39). Finally, Kelly testified that she observed the applicant and Salinas dividing up money and liquid codeine[20] upon their return to the applicant's residence and overheard them saying that "it wasn't worth it." (VIII R.R. at 41-43, 47). During this conversation, Kelly said that the applicant and Salinas both appeared disappointed in the amount of money they were splitting up between themselves (VIII R.R. at 42-43).

Kelly also testified that the applicant used a couple of cell phones around the time of the home invasion (VIII R.R. at 48). Kelly testified that, on the date of his arrest, the applicant had these cell phones with him in the truck (VIII R.R. at 48-49).

Kelly's testimony removed any doubt as to the applicant's involvement in the home invasion. Kelly provided the jury with a financial motive for the applicant (and Salinas) to commit the home invasion in light of his pre-home invasion conversation with Salinas and others about Ronnie having $50,000 and "a couple of kilos" of drugs in his home. Kelly provided the jury with evidence that she drove the applicant to and picked him up from the Gallagher's residence on the night of the home invasion. Kelly provided the jury with evidence that the applicant and Salinas went to the Gallagher residence while armed and wearing "beanies. Kelly provided the jury with evidence

---

[19] A diesel truck was the type of vehicle Ronnie heard when the assailants fled his residence (VII R.R. at 59).

[20] Cash money and liquid codeine were among the items taken during the Gallagher home invasion (V R.R. at 215, 217-18; VII R.R. at 65).

31

about the applicant's unusual instructions as to the time of night they traveled to Ronnie's home as well as to parking a few houses past Ronnie's home on the night of the home invasion, both of which are consistent with efforts to minimize the chances of the applicant or his vehicle being linked to the home invasion by Ronnie's neighbors or any passersby. Kelly provided the jury with testimony about her observations of the applicant's anxious demeanor when he reentered the truck, which is reasonable to infer is consistent with the demeanor of someone who had just participated in an intense home invasion and wanted to leave the area as quickly as possible.

Kelly's testimony corroborated many parts of Ronnie's and Alissia's testimonies concerning the home invasion, including that:

- The assailants were described as "white" and "Mexican," and the applicant was Caucasian and Salinas was Hispanic;

- The assailants were armed with handguns, and Kelly saw the applicant and Salinas arming themselves with handguns while traveling to the Gallagher residence;

- The assailants got away with cash and codeine from the home invasion, and Kelly observed the applicant and Salinas dividing up cash and codeine when they returned to Santa Fe; and

- Ronnie heard a diesel truck leaving his residence when the assailants fled, and Kelly picked up the applicant and Salinas in a diesel truck.

Kelly's testimony provided the jury with her observations of the applicant and Salinas appearing disappointed and expressing disappointment when splitting up the cash and codeine in Santa Fe. The behaviors of and conversation between the applicant

and Salinas were consistent with their being dissatisfied with the amount of cash and codeine stolen in the home invasion when they were expecting to get $50,000 and a "couple of kilos" of drugs.

Finally, Kelly's testimony directly linked the applicant to the cell phones recovered from the diesel truck on the date of his arrest. Up until the point of Kelly's testimony, the evidence linking the applicant to the cell phones was circumstantial.

This direct link between the applicant and the cell phone recovered from the applicant's truck during his arrest more clearly established through cell phone provider records that the applicant was the "white" assailant who called Alissia's cell phone on the morning following the home invasion. Additionally, this recovered cell phone was geographically tracked through cell tower records, corroborating Kelly's testimony, that the applicant traveled from his Santa Fe residence to the Gallagher's Texas City residence and back to Santa Fe on the night of the home invasion. Finally, the applicant's consciousness of guilt exhibited when he ate the "SIM cards" from both recovered cell phones became even more impactful after Kelly's testimony directly linking him to these cell phones.

Kelly's testimony, in conjunction with all of other non-DNA evidence presented by the State during trial, removed any question as to the applicant's guilt. Kelly's testimony corroborated Ronnie's and Alissia's testimonies concerning the home invaders and the circumstances surrounding the offense. Additionally, Kelly gave

33

important details which provided context before and after the home invasion. Without considering the DNA evidence, the State presented a massive amount of evidence establishing the applicant's guilt.

In contrast, Browder's DNA testimony was relatively insignificant and fairly unpersuasive as to the applicant's guilt. The DNA results did not provide very discriminating statistics as to the applicant's guilt. The "1 in 87 for Caucasians" statistic did not distinguish the applicant from a significant segment of the general Caucasian population. At best, Browder's testimony about the DNA results she obtained only minimally connected the applicant to the home invasion.

The applicant's trial counsel clearly seized on the fact that the State's DNA results only loosely linked the applicant to the home invasion. Trial counsel's recognition of this insignificant forensic connection is reflected in the following portion of his argument made during guilt summation:

> Now, let's go back to the DNA. Now, our expert came in here and tried to put everything in terms that a layperson would understand it. I actually asked her to put it in terms that I would understand it, explain it to me like I'm in eighth grade. And I think she did a very good job of explaining the DNA and why – what was going on with the DNA didn't match what the State was trying to put that it matched. Remember when we talked about my client supposedly matching at eight markers? Well, even at eight markers the State says that there's a 1 in 87 chance of another person being able to contribute this DNA. If you were going to go [sic] Las Vegas I guarantee you you wouldn't put a bet out like that especially with as much as what's at stake in this case. They're asking you to bet on 1 in 87 when it should be a much higher number on the 87 end....But the bottom line is even at the State's numbers it's not compelling enough, especially with the lies that have been told in this story, especially with the

34

369

motivation of the people that are involved in this case to do [the applicant] harm.

(IX R.R. at 67-68).

During the entire guilt summation, the State never specifically mentioned the "1 in 87 for Caucasians" statistic, or for that matter, any of the DNA statistics. The State also recognized that the DNA statistics only minimally connected the applicant to the white shirt. Instead, the State's only response to the defense argument about the loose statistical connection between the applicant and the white shirt/blindfold was to repeat the trial testimony that the applicant's "DNA could not be excluded" and conclusorily state that the applicant's (1) "DNA is absolutely right there on that blindfold" and (2) genetic fingerprint is absolutely on that blindfold"[21] (IX R.R. at 80, 81). Other than these statements, the State hardly mentioned the DNA results during guilt summation.

Additionally, the defense argued about the non-Caucasian DNA statistics. The applicant's trial counsel referred to Browder's testimony about the "1 in 232 for Blacks" and "1 in 53 for Hispanics" statistics to suggest the possibility that someone from a different race left the DNA on the white shirt as reflected in the following argument:

> Another thing about the DNA that was kind of glossed over in this case – and you've got the reports and things in evidence – there's also numbers for – the possibility of unknown African-American and Hispanic male sending in the same profile as my client. Now, my client is obviously white. He's not African-American. He's not Hispanic. But they put those numbers up there because there's chance of error. And there's chances

---

[21] In the opening guilt summation, the State only mentioned that Ronnie, Alissia, and the applicant could not be excluded as possible contributors of the DNA on the white shirt as a part of a review of the evidence (IX R.R. at 50-51).

35

that these folks of these other races could be the contributor here. It's other numbers that are out there that you need to be aware of.

(IX R.R. at 69). The State never responded to this argument about an alternative-race contributor/assailant.

To further attack the State's DNA evidence, the defense presented in its case-in-chief a DNA expert, Dr. Melva S. Ketchum, to directly contradict or undermine the reliability of Browder's results and conclusions that the applicant could not be excluded as a possible contributor to the DNA on the white shirt. Dr. Ketchum's testimony provided the defense with several areas upon which to attack or discredit Browder's testimony.

First, Dr. Ketchum informed the jury that the State failed to provide the defense with all of the documentation from the DNA analyses. Dr. Ketchum testified that she was denied access to 15 electropherograms from the DNA analyses on all of the recovered physical evidence and to 6 electropherograms from the DNA analyses specifically related to the "body" portions of the white shirt (VIII R.R. at 136-37, 195-97). Dr. Ketchum further testified that she could not say whether the TDPSCL performed the forensic analyses correctly or calculated the statistics accurately because she was not provided all of the documentation from the complete DNA testing (VIII R.R. at 195-96).

The defense relied upon this portion of Dr. Ketchum's testimony to suggest that the TDPSCL either was hiding information or, at a minimum, not being completely

36

forthright about the DNA test results. The applicant's trial counsel used this portion of Dr. Ketchum's testimony to advance the theory that the State did not provide all DNA documentation for the defense to review because the results were unreliable due to either the DNA analysis being performed improperly or the statistics calculated inaccurately. The applicant's trial counsel later argued this theory in the following portion of the defense guilt summation:

> Something else our expert talked to you about was the fact that the State left things out of what they sent us; that they did other runs. What do those runs show? We don't have any idea because we didn't get it. Seems all convenient, doesn't it?

(IX R.R. at 69).

The State never presented any evidence disputing or contradicting Dr. Ketchum's testimony about not receiving all DNA documentation. Additionally, the State never responded to the defense argument that the TDPSCL was withholding documentation which could potentially reveal improper DNA analyses or inaccurate statistical calculations. As a result, the defense presented an unopposed attack on the State's DNA evidence based upon Dr. Ketchum's unrebutted testimony and the corresponding arguments about the TDPSCL withholding DNA documentation.

Next, Dr. Ketchum testified that the applicant should not be included as a possible contributor of the DNA on the white shirt. Based upon the single electropherogram provided to the defense by the TDPSCL, Dr. Ketchum had no

choice but to concede the fact that the applicant technically could not be excluded as a possible contributor at 8 of 16 STR allele locations (VIII R.R. at 163).

However, Dr. Ketchum forcefully testified that the applicant should not be included as a possible contributor at all 8 STR allele locations because Ronnie and/or Alissia shared common alleles with the applicant at 5 of the 8 STR allele locations (VIII R.R. at 163). In support of this position, Dr. Ketchum pointed out for the jury on the electropherogram exhibit that the "peak heights" at the 5 STR allele locations did not reliably support Browder's conclusions that the applicant's DNA was present because the Gallaghers had alleles at those same locations (VIII R.R. at 146-64). Dr. Ketchum also testified that the remaining 3 STR allele locations where the Gallaghers' alleles were not present contained alleles which were very common among the general population (VIII R.R. at 163-64).

The applicant's trial counsel relied upon this portion of Dr. Ketchum's expert testimony – that the applicant was only included at 3, not 8, STR allele locations – in his closing argument. In guilt summation, trial counsel argued the applicant's inclusion at only 3 STR allele locations made the State's DNA results even less relevant as to determining whose DNA was on the white shirt as reflected in the following argument:

> ...And then you look at the weight that the DNA had when you look at what all my expert explained to you, and she had it cut down based on her expert opinion to only three markers, which would have cut down that 87 number further....

(IX R.R. at 68).

38

During the closing guilt summation, the State only cursorily responded to the arguments concerning the defense expert's opinion. Essentially, the State argued that Dr. Ketchum's opinion excluding the applicant as a possible contributor was the product of her being paid by the defense (IX R.R. at 80-81). However, the State's challenge to this portion of Dr. Ketchum's testimony did not in any way bolster or improve the "1 in 87 for Caucasians" DNA statistic. Furthermore, the State never challenged Dr. Ketchum's testimony and the corresponding argument that the applicant should only be included at three, not eight, allele locations.

Dr. Ketchum's testimony provided the jury with another basis upon which to minimize or even reject Browder's testimony. Even without Dr. Ketchum's testimony, the State's DNA evidence presented through Browder was already weak and only established a minimal forensic connection between the applicant and the white shirt. In light of the defense tactics and Dr. Ketchum's testimony, the defense presented a vigorous attack on Browder's testimony rendering it even less probative in establishing the applicant's guilt.

In the end, the applicant fails to prove that Browder's trial testimony constituted material evidence. Without considering Browder's testimony about the DNA results, the State presented a substantial amount of evidence proving the applicant's guilt. Plus, Browder's testimony about DNA results only slightly connected the applicant to the home invasion. Finally, the defense presented evidence from a DNA expert who

39

374

contradicted and questioned the legitimacy of Browder's testimony which the applicant's trial counsel vigorously argued in guilt summation.

Considering the massive amount of the inculpatory evidence, the minimally persuasive DNA results, and the vigorous defense attacks on Browder's testimony, the applicant cannot show that there is a reasonable likelihood that Browder's trial testimony affected or influenced the jury's verdict. As such, the applicant fails to carry his burden of proving by a preponderance of the evidence that Browder's trial testimony about the DNA evidence was material. Accordingly, the applicant fails to prove that he was denied due process as a result of the State presenting false evidence against him in trial.

### *Brady* Violation Claim

The applicant also alleges that the State committed a *Brady* violation by possessing but not disclosing favorable evidence. Specifically, the applicant claims that the State suppressed:

1. Physical evidence that actually proved he was not at the crime scene; and

2. Information about the TDPSCL's problems with its statistical techniques for DNA mixtures.

The prosecution's suppression of material evidence favorable to the accused constitutes a violation of the Due Process Clause of the Fourteenth Amendment. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963). To establish a *Brady* violation, a writ applicant must prove by a preponderance of the evidence that (1) the State suppressed

or failed to disclose evidence in its possession, regardless of good or bad faith; (2) the withheld evidence is favorable to the defense; and (3) the evidence is material. *Ex parte Pena*, 303 S.W.3d 797, 809 (Tex. Crim. App. 2011); *Webb v. State*, 232 S.W.3d 109, 114 (Tex. Crim. App. 2007).

The applicant first complains that the State suppressed "physical evidence" which "actually proved he was *not* at the scene of the robbery." *Applicant's memorandum* at 38 (emphasis in original). The applicant does not specify what "physical evidence" the State possessed, yet withheld and suppressed, that actually proved he was not at the scene of the robbery.

When the applicant refers to "physical evidence," the State does not believe that the applicant is specifically claiming that the prosecutors suppressed the actual physical evidence recovered in relation to this offense. The recovered physical evidence – the two zip ties, white shirt, and sexual assault collection kit – and the results from any related forensic analyses were either admitted during trial or testified about by the State's witnesses (VI R.R. at 22-23; VII R.R. at 212-27). Additionally, the defense presented an expert to provide testimony about the State's forensic analyses performed on the recovered physical evidence (VIII R.R. at 137-65). Hence, the appellate record reflects that the State never suppressed any physical evidence or the results from the forensic analyses performed on these items.

41

Furthermore, the State does not believe that the applicant is claiming the prosecutors suppressed the results from the 2017 DNA analyses. Logically, the prosecutors could not have been aware of the 2017 DNA results in order to disclose to the defense for trial in 2012.

Based on the allegations presented, it appears that the applicant's main *Brady* complaint is that the State did not inform the defense about information concerning TDPSCL's problems with statistical techniques for DNA mixtures which was within the knowledge of prosecution team members. The applicant asserts that TDPSCL "was well aware of problems with its statistical techniques at the time of [the applicant's] trial [and] that fact was never disclosed until years later, and [the applicant] was never notified of the problems until July of 2016…." *Applicant's memorandum* at 38.

## A.      Information about DNA Mixture Interpretation was not Favorable

To prove a *Brady* violation, a writ applicant must also prove that the evidence withheld by the State was favorable to his case. *Ex parte Miles*, 359 S.W.2d 647, 665 (Tex. Crim. App. 2012). "Favorable evidence is that which, if disclosed and used effectively, 'may make the difference between conviction and acquittal.'" *Id.* Favorable evidence includes both exculpatory evidence and impeachment evidence. *Id.* Exculpatory evidence is that which may justify, excuse, or clear the defendant from fault, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence. *Id.*

42

377

The instant allegation is based upon the forensic events discussed in the TDPSCL letter dated September 10, 2015. *Applicant's memorandum* at 23. The applicant cites to SWGDAM's guidelines published in 2010 as the event which triggered TDPSCL's knowledge that it "was using scientifically unacceptable operating procedures by 2010." *Id.* at 23. The applicant quotes portions of the TDPSCL September 2015 letter as support for his claim that TDPSCL was aware that it utilized scientifically unacceptable operating procedures in 2010. *Id.*

From this language, the applicant appears to suggest that TDPSCL was required but improperly failed to implement the SWGDAM 2010 DNA mixture guidelines. Additionally, the applicant appears to believe that TDPSCL's failure to implement the SWGDAM 2010 guidelines for DNA mixtures was favorable information which the defense could use in trial.

In context of favorability, TDPSCL's failure to implement the SWGDAM's 2010 DNA mixture guidelines does not constitute exculpatory evidence because it would not "justify, excuse, or clear" the applicant from fault concerning the offenses for which he was convicted. The most the applicant could argue is that this information constitutes impeachment evidence because it could potentially be used to dispute or contradict the State's expert testimony or DNA evidence.

However, the applicant cannot show that the information about TDPSCL's failure to implement the SWGDAM 2010 DNA guidelines could be used to impeach

43

378

the State's expert testimony or DNA evidence. The SWGDAM's guidelines are only recommendations and are not mandatory for laboratories to adopt or implement. *See State's Exhibit B, Affidavit of Andrew McWhorter.* The SWGDAM recommendations are merely "suggested best practices" for laboratories to consider in establishing internal DNA procedures and protocols. *See id.* TDPSCL's decision to not implement the SWGDAM recommendations was partially based upon a concern that some valid and legitimate DNA data would be discarded and not considered in the DNA analyses. *See id.*

Because the SWGDAM recommendations are voluntary and not mandatory, then TDPSCL had the choice of adopting these recommendations, or not. TDPSCL's decision to disregard the SWGDAM 2010 DNA mixture interpretation recommendations does not in any way indicate that TDPSCL acted improperly, negligently, or erroneously. Additionally, the applicant fails to provide any authority which reflects that TDPSCL's failure to adopt the SWGDAM recommendations jeopardized its credentials or rendered any testing results invalid. As such, the defense would be unable to use TDPSCL's decision to not adopt the SWGDAM 2010 DNA mixture interpretation recommendations to impeach the State's expert or DNA evidence.

The applicant also alleges that TDPSCL was aware that its DNA mixture protocols were "outdated" or "scientifically unacceptable" at the time of the applicant's

44

trial. *Applicant's memorandum* at 22-23. The applicant relies upon the SWGDAM 2010 guidance concerning DNA mixture interpretations to claim that TDPSCL was informed that its mixture interpretation procedures were "scientifically unacceptable." *Id.* at 23. The applicant points to the language in the TDPSCL September 2015 letter about the "substantial variance in mixture interpretation among laboratories since 2005..." as his evidentiary support. *Id.*

However, the applicant fails to prove that TDPSCL utilized outdated or scientifically unacceptable DNA mixture protocols when the evidence was tested in 2011. None of the quotations from the TDPSCL September 2015 letter which the applicant relies upon or any other part of this letter indicates that TDPSCL's DNA mixture protocols were outdated or scientifically unacceptable.

Regardless, the existence of "substantial variance in mixture interpretation among laboratories" is not evidence that TDPSCL utilized "scientifically unacceptable" DNA mixture interpretation procedures. The TFSC letter dated August 21, 2015, provided context to the circumstances surrounding the SWGDAM guidance and the laboratory variance in DNA mixture interpretation. Particularly, the TFSC 2015 letter merely identified the fact that laboratories across the country did not utilize any uniform procedures in their DNA mixture interpretation as contained in the following:

> ...Changes in mixture interpretation have occurred primarily over the last 5-10 years and were prompted by several factors, including but not limited to interpretation guidance issued in 2010 by the [SWGDAM].

45

380

The forensic DNA community has been aware of substantial variance in mixture interpretation among laboratories since at least 2005 when the National Institute of Standards and Technology ("NIST") first described the issue in an international study called MIX05. *Though NIST did not expressly flag which interpretation approaches were considered scientifically acceptable and which were not* as a result of the study, it has made significant efforts to improve the integrity and reliability of DNA mixture interpretation through various national training initiatives. These efforts have ultimately worked their way into revised standard operating procedures at laboratories, including laboratories in Texas. Based on the MIX05 study, we know there is variation among laboratories in Texas and nationwide, including differences in standard for calculation of [Combined Probability of Inclusion/Exclusion] that could be considered scientifically acceptable. However, we also know based on a recent audit of the Department of Forensic Sciences ("DFS") in Washington, DC that some of the "variation" simply does not fall within the range of scientifically acceptable interpretation. This finding does not mean laboratories or individual analysts did anything wrong intentionally or even knew the approaches fell outside the bounds of scientific acceptability, but rather the community has progressed over time in its ability to understand and implement this complex area of DNA interpretation appropriately.

*Applicant's Appendix 6* (emphasis added).

In essence, the TFSC 2015 letter indicated that laboratories nationwide, including TDPSCL, did not utilize the same or similar DNA mixture interpretation procedures. Furthermore, this letter identified the NIST "MIX05" study as the basis for the conclusion that substantial variance existed among laboratories in their DNA mixture interpretation procedures. However, the TFSC 2015 letter never identified TDPSCL as utilizing an outdated or scientifically unacceptable DNA mixture procedure.[22]

---

[22] The TFSC 2015 letter specifically identified the Washington, DC Department of Forensic Sciences as a laboratory which utilized DNA mixture procedures which did not fall within the range of scientifically acceptable interpretation. *See Applicant's Appendix 6.*

46

The TDPSCL 2015 letter also discussed its own circumstances in relation to the SWGDAM 2010 guidance. *See Applicant's Appendix 6*. This letter specifically addressed its consideration of the SWGDAM mixture interpretation guidance but, due "to a lack of consensus in the forensic DNA testing community," TDPSCL did not change its DNA mixture protocols until August of 2015. *See id.* This "lack of consensus in the DNA testing community" indicated that reasonable minds could differ about proper DNA mixture protocols. *See id.* Additionally, the September 2015 letter reflected that there was no "clear instruction" on calculating statistics for DNA mixtures. *See id.*

The TDPSCL September 2015 letter further reflected that it was not until Dr. John Butler published *Advanced Topics in Forensic DNA Typing: Interpretation* in October of 2014 which, in part, provided the necessary "clear instruction" to change TDPSCL's DNA mixture protocols. *See id.* This publication from Dr. John Butler was instrumental in TDPSCL's changes to its mixture interpretation protocols, which went into effect on August 10, 2015, about three years after the applicant's trial. *See id.*

The lack of consensus on DNA mixture procedures and the lack of clear instruction concerning DNA mixture interpretations indicate that TDPSCL's method of mixture interpretation was not scientifically unacceptable. From 2011 to 2014, there was uncertainty as to the best practice for interpreting DNA mixtures. This is likely the reason that substantial variance existed among laboratories nationwide in DNA mixture interpretation procedures. Regardless, TDPSCL was never put on notice by the

47

SWGDAM 2010 guidance that its DNA mixture procedures were outdated or scientifically unacceptable.

The affidavit of Andrew McWhorter corroborates the information contained in the TDPSCL September 2015 letter. McWhorter states in his affidavit that, despite being aware of the SWGDAM 2010 DNA mixture guidelines, TDPSCL did not change its DNA mixture interpretation methods to utilize the suggested "dual thresholds" because there was a disagreement among TDPSCL laboratories about being able to consider relevant DNA data if the second threshold – a "stochastic threshold" – was adopted. *See State's Exhibit B.* McWhorter also states in his affidavit that an audit of TDPSCL occurring in 2014 revealed issues in its DNA mixture interpretation protocols which resulted in the adoption of "dual thresholds" in August of 2015. *See id.* McWhorter's affidavit also reflects that the former DNA mixture interpretation protocols originally adopted in 1999 were utilized to calculate the statistics in 2011 in relation to the applicant's case. *See id.*

The TDPSCL September 2015 letter and the affidavit of Andrew McWhorter both reflect that TDPSCL was not "well aware" that it was using "scientifically unacceptable operating procedures." There were reasonable disagreements among TDPSCL laboratories concerning whether to adopt the SWGDAM recommendations as related to "dual thresholds." Only after the audit in 2014 did TDPSCL become aware that a change to its DNA mixture interpretation methods was necessary. Based upon

48

the audit, TDPSCL changed its interpretation procedures and adopted "dual thresholds" for DNA mixtures.

The affidavit from Bruce Budowle also confirms that TDPSCL's method of mixture interpretation was not scientifically unacceptable. Budowle asserts in his affidavit that most laboratories in the United States, including those in Texas, employed the CPI for the interpretation and statistical analysis for DNA mixture evidence. *See State's Exhibit A* at 2. Budowle further states in his affidavit that the CPI, which TDPSCL used in 2011, "is a valid statistical method conveying the portion of the population that cannot be excluded as a potential contributor of the mixture." *See id.*

However, Budowle recognizes that issues with the CPI came about because "[m]ost laboratories using the CPI did not appreciate this limitation [concerning allele drop out] and selected loci for the CPI calculation relying on the known reference profile(s) of person(s) of interest." *See id.* These issues led to the scientific self-correction and evolution needed for DNA mixture interpretation calculations.

Budowle's affidavit reflects that TDPSCL's use of the CPI for DNA mixture interpretation was not scientifically unacceptable, but instead, a valid statistical method. The problem was not the method, but the fact that TDPSCL, like most laboratories, did not appreciate the limitations and requirements of the CPI. TDPSCL's failure to appreciate the CPI limitations and requirements does not render the methodology scientifically unacceptable.

49

**384**

In light of the circumstances, the applicant fails to show that TDPSCL was aware, much less well aware, that in its DNA mixture protocols in 2011 were anything other than a difference of scientific opinion with SWGDAM. The applicant fails to demonstrate that this difference in scientific opinion regarding "dual thresholds" indicated that TDPSCL utilized "outdated" or "scientifically unacceptable" mixture protocols. Because the applicant cannot prove that TDPSCL was aware that its former DNA mixture interpretation protocols were "outdated" or "scientifically unacceptable," the applicant likewise cannot show that this information about TDPSCL's former mixture protocols was favorable to the defense. Accordingly, the applicant fails to prove a due process violation by the State not disclosing this information to the defense.

**B.    Information about DNA Mixture Interpretation was not Material**

Assuming, *arguendo*, that the applicant could establish that information concerning TDPSCL's former DNA mixture protocols was favorable, the applicant fails to demonstrate that this undisclosed information was material. For a *Brady* violation claim, the materiality standard requires a showing that "in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure." *Ex parte Kimes*, 359 S.W.3d 647, 666 (Tex. Crim. App. 2012). A "reasonable probability" of a different result is shown when the prosecution's evidence suppression "undermines confidence in the outcome

50

of the trial." *Id.* "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.*

Although "materiality" is a required element in the analyses for both false evidence claims and *Brady* violation claims, they do not require the same proof. The false evidence materiality standard is "more stringent (*i.e.,* more likely to result in a finding of error) than the [materiality] standard applied to *Brady* claims of suppressed evidence…." *Ex parte Ghahremani*, 332 S.W.3d at 478. Said another way, the materiality standard for *Brady* violation claims is "less likely to find error than the [materiality] standard applicable to false testimony claims." *Id.* at 480.

In its false evidence materiality analysis above, the State summarized the substantial amount of non-DNA evidence which was presented to establish the applicant's guilt during trial. Additionally, the State summarized the defense's extensive attacks on the State's DNA expert and evidence. Finally, the State discussed the weak forensic connection between the applicant and the white shirt.

In the instant case, the applicant fails to prove that the purportedly favorable evidence concerning the TDPSCL mixture interpretation protocols was material in light of the considerable amount of non-DNA evidence presented by the State in trial. Assuming that information about the TDPSCL's alleged "problems" with DNA mixture interpretation had been disclosed before trial and could be used effectively

51

during trial, the most the defense could gain from this disclosed information would be for the jury to not consider, but reject, the DNA evidence. Even in that circumstance (i.e., the jury finds the DNA evidence not credible), the applicant still cannot demonstrate that it is reasonably probable that the jury would have returned a different verdict.

As summarized earlier within the response to the false evidence claim, the State presented substantial inculpatory evidence, without considering the DNA evidence, against the applicant in trial. Even if the jury rejected the DNA evidence, the applicant cannot show that it is reasonably probable that the outcome of the trial would have been different based on totality of the State's non-DNA evidence. It is reasonably probable that the jury only minimally considered, if considered at all, the State's DNA evidence, in light of its weak forensic connection and the defense expert testimony, but returned the guilty verdict based exclusively on the State's non-DNA evidence. As such, the applicant fails to demonstrate that this purportedly favorable information concerning TDPSCL's "problems" with DNA mixture interpretation was material. Therefore, the applicant fails to establish that the State committed a *Brady* violation.

In summary, the applicant fails to prove that his due process rights were violated. The applicant fails to carry his burden of establishing that the State presented false DNA evidence in securing his conviction and that the purportedly false evidence presented against him was material. The applicant also fails to carry his burden of

proving that the State committed a *Brady* violation by being aware of, yet not disclosing, information concerning the physical evidence and TDPSCL's alleged problems with statistical analysis involving DNA mixtures and that such purportedly favorable information was material. Accordingly, the applicant completely fails to establish that the State acted in a manner which denied him due process.

Based on the foregoing, the applicant's first ground for relief is without merit and should be denied.

### REPLY TO APPLICANT'S SECOND GROUND FOR RELIEF

In his second ground for relief, the applicant alleges that he is entitled to habeas relief based upon Article 11.073 of the Code of Criminal Procedure. Specifically, the applicant alleges that he should receive a new trial in light of new scientific evidence related to the forensic DNA test results which now exclude the applicant as a possible contributor of DNA from all samples recovered at the scene.

Article 11.073 of the Texas Code of Criminal Procedure applies to relevant scientific evidence that (1) was not available to be offered by a convicted person at the convicted person's trial; or (2) contradicts scientific evidence relied on by the State at trial. TEX. CODE CRIM. PROC. art. 11.073(a). Under Article 11.073, a court is authorized to grant habeas relief if:

> (1)  the convicted person files a habeas application containing specific facts indicating that:

(A)    relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the defense before or during trial; and

(B)    the scientific evidence would be admissible under the Rules of Evidence at a trial held on the date of the habeas application; and

(2)    the court makes the necessary findings about the scientific evidence under Subsection (1) and also finds by a preponderance of the evidence that the convicted person would not have been convicted if the new scientific evidence had been presented at trial.

Essentially, Article 11.073 provides a "legal basis for habeas relief in a small number of cases where an applicant can show by a preponderance of the evidence that the applicant would not have been convicted if the newly available scientific evidence had been presented in trial." *Ex parte Robbins*, 478 S.W.3d 678, 690 (Tex. Crim. App. 2014). In particular, Article 11.073 affords relief to a writ applicant who can show that there is "relevant scientific evidence" which "contradicts scientific evidence relied on by the state at trial." *Ex parte Robbins*, 560 S.W.3d 130, 150 (Tex. Crim. App. January 27, 2016) (Richardson, J., concurring).

The State does not contest that the applicant has fulfilled the first element of Article 11.073(b)(1), which requires the applicant to provide allegations and evidence that (a) relevant scientific evidence is currently available but was not available at the time of his trial because the scientific evidence was not ascertainable through the exercise of reasonable diligence and (b) the scientific evidence would have been admissible in the applicant's trial. The new scientific evidence which the applicant relies

54

upon is the TDPSCL supplemental report dated February 9, 2017, which contains the DNA results utilizing the new TDPSCL mixture interpretation guidelines implemented on March 18, 2016. *Applicant's memorandum* at 41; *Applicant's Appendix 1*. This TDPSCL report specifically reflected that the applicant was excluded as a possible contributor of the DNA contained on all recovered physical evidence, including the white shirt. *Id.*

However, the applicant has failed to prove the second element of Article 11.073(b)(2), which requires that the applicant show by a preponderance of the evidence that he would not have been convicted if the new scientific evidence had been presented in his trial. If the jury had heard evidence of the 2017 DNA results, the greatest benefit for him would be that the jury would not have received or been able to consider the minimally-inculpatory "1 in 87 for Caucasians" DNA results obtained in 2011 (VII R.R. at 225).

Nonetheless, the State presented a substantial amount of non-DNA evidence easily establishing the applicant's guilt. In the false evidence materiality analysis above, the State summarized all of the inculpatory evidence, without considering the DNA evidence, which conclusively proved the applicant's guilt. Additionally, the DNA evidence provided a weak forensic connection between the applicant and the white shirt. Finally, the defense presented vigorous attacks on the testimony of the State's DNA expert and DNA test results, including evidence from a defense DNA expert. Viewing the totality of the State's non-DNA evidence presented at trial, the applicant

failed to establish that he would not have been convicted even if evidence of the 2017 DNA results were presented to the jury.

In the instant argument, the applicant claims that the DNA evidence was the only "conclusive" evidence placing the applicant at the crime scene. *Applicant's memorandum* at 43. The State disagrees with the applicant's characterization that the DNA evidence was "conclusive" in placing the applicant at the crime scene.

During trial, Browder testified that the applicant could not be excluded as a possible contributor to the DNA on the "body" portions of the white shirt at 8 of 16 allele locations (VII R.R. at 224-25). Browder also testified that at the allele locations where the applicant could not be excluded, the probability of selecting an unrelated person at random who could be a contributor to this DNA profile was approximately "1 in 87 for Caucasians" (VII R.R. at 225).

This statistic did not eliminate a significant number of persons as possible contributors of the DNA on the white shirt. The applicant's trial counsel recognized this fact during his guilt summation when he argued that this DNA statistical calculation did not sufficiently and reliably link the applicant to the white shirt – and thereby the home invasion – as reflected in the following:

> …Well, even at eight markers the State says that there's a 1 in 87 chance of another person being able to contribute this DNA. If you were going to go Las Vegas I guarantee you you wouldn't put a bet out like that especially with as much as what's at stake in this case. They're asking you to bet on 1 in 87 when it should be a much higher number on the 87 end.

(IX R.R. at 67-68).

In no way did the "1 in 87" DNA statistical calculation definitively or conclusively either place the applicant at the crime scene or connect him to the crime. This statistical calculation, at best, only weakly connected the applicant to the white shirt.

On the other hand, all of the remaining evidence – direct and circumstantial – presented by the State overwhelmingly established the applicant's culpability. As a result, the applicant's argument that the DNA evidence was the only conclusive evidence connecting him to the crime scene is not supported by the trial record.

In the instant allegation, the applicant has carried his burden of providing specific facts that relevant unascertainable scientific evidence is currently available which was not available at the time of his trial and would be admissible in his trial. But the applicant has failed to carry his burden of proving that he would not have been convicted if the new scientific evidence had been presented at his trial. Since the applicant has not carried his burden of proving both requirements of Article 11.073, then the applicant is not entitled to habeas relief on this basis.

Based on the foregoing, the applicant's second ground for relief is without merit and should be denied.

57

**392**

### REPLY TO APPLICANT'S THIRD GROUND FOR RELIEF

In his third ground for relief, the applicant alleges that he was denied effective assistance of counsel in trial. Specifically, the applicant alleges that his trial counsel, Franz Michael Von Hoffman and Robert Hatcher, rendered ineffective assistance by failing to impeach Detective Robles by showing that the applicant did not eat the cell phone "SIM card," evidence of which the State relied upon to argue the applicant's consciousness of guilt.

In support of the instant allegation, the applicant attaches, among other exhibits, a photographic copy of a "SIM card" which was purportedly in the applicant's property as well as a report somehow connected to this "SIM card." *Applicant's Appendix 8.* Additionally, the applicant attaches an affidavit from Barbara Carter, the applicant's mother, who stated that the "SIM card" in question was in the applicant's property in 2010 and that she informed the applicant's trial counsel about the "SIM card" but was told that it was irrelevant. *Id.*

If a subsequent writ application is filed after final disposition of an initial application challenging the same conviction, the Court may not consider the merits of or grant relief based on a subsequent application unless the application contains **sufficient specific facts** establishing that:

(1)  the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the <u>factual or legal basis for the</u>

<u>claim was unavailable</u> on the date the applicant filed the previous application; or

(2)     by a preponderance of the evidence, but for a violation of the United States Constitution <u>no rational juror could have found the applicant guilty beyond a reasonable doubt</u>.

TEX. CODE CRIM. PROC. art. 11.07, § 4(a) (emphasis added). Therefore, all subsequent habeas applications regarding the same conviction, including those which do not directly challenge the conviction (e.g., time credit complaints), must meet one of the conditions established by Article 11.07, Section 4(a), before the substance of the allegations may be considered. *Ex parte Whiteside*, 12 S.W.3d 819, 821 (Tex. Crim. App. 2000)(op. on reh'g).

The instant writ applications were filed after the final disposition of the applicant's initial writ applications, cause numbers 10CR0325-83-1 and 10CR0326-83-1, challenging the same convictions. In an effort to overcome the procedural bar of Article 11.07, Section 4(a), the applicant claims that he "could not have known to raise [this ineffective assistance of counsel claim] while proceeding pro se" in the initial writ. *Applicant's writ* at 4. However, the applicant cannot avoid this procedural bar based upon the instant allegation.

In making the instant claim, the applicant is essentially saying he was unaware that trial counsel should have challenged Detective Robles' testimony about him eating the cell phone "SIM cards," but deficiently failed to impeach this testimony with evidence, seemingly from the applicant's mother, that at least one "SIM card" was not eaten. Yet the applicant would absolutely have known during his earlier habeas proceeding, if not at

59

**394**

the time of trial, whether he in fact ate one or both of the "SIM cards" during the interview with Detective Robles. Furthermore, the applicant would have known, if in fact he did not eat the "SIM cards," that these "SIM cards" would still be inside the cell phones which were recovered from his diesel truck by Detective Robles.

As a result, the applicant would have known during the prior habeas proceeding to challenge the effectiveness of his trial counsel for not attempting to impeach Detective Robles' testimony with evidence that a "SIM card" still existed. Since the applicant should have been aware of this potential claim of ineffective assistance by trial counsel during the prior habeas proceeding, then the applicant is barred by Article 11.07, Section 4, from raising this allegation in the instant habeas proceeding.

Based on the foregoing, the applicant's third ground for relief should be dismissed.

### REPLY TO APPLICANT'S FOURTH GROUND FOR RELIEF

In his fourth ground for relief, the applicant alleges that his right to due process and right to counsel were violated. Specifically, the applicant alleges that his trial counsel suffered from an actual conflict of interest because he represented George Stanford in civil matters related to criminal charges in which Sanford was the applicant's co-defendant.

In both of his prior habeas applications, cause numbers 10CR0325-83-1 and 10CR0326-83-1, the applicant complained in his first ground for relief that his trial counsel was subject to a conflict of interest from representing George Sanford during

his representation of the applicant for the underlying convictions, and the Court of Criminal Appeals denied habeas relief in the earlier proceeding. Issues raised and rejected in an earlier habeas proceeding need not be reconsidered in a subsequent habeas proceeding. *Ex parte Twyman*, 716 S.W.2d 951, 952-53 (Tex. Crim. App. 1986).

In the portion of a writ application where reasons may be identified that the current claims were not presented and could not have been presented in the previous application, the applicant claimed that the instant allegation was raised in the prior writ application but was "not addressed on the merits or even mentioned in any way." *Applicant's writ* at 4. The applicant is correct that, in its prior denial of habeas relief, the Court of Criminal Appeals did not specifically mention the instant allegation about trial counsel's alleged conflict of interest. The Court of Criminal Appeals' ruling in the applicant's earlier habeas proceeding was reported on a "white card" which specifically stated the following:

> This is to advise that the Court has **denied** without written order the application for writ of habeas corpus on the findings of the trial court without a hearing.

*See Official Notice from the Court of Criminal Appeals of Texas* in cause numbers 10CR0325083-1 and 10CR0326-83-1 (emphasis added).

In writ jurisprudence, a "denial" signifies that the Court of Criminal Appeals addressed and rejected the merits of a particular claim. *Ex parte Grigsby*, 137 S.W.3d 673, 674 (Tex. Crim. App. 2004) (citing *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim.

61

App. 1997)(en banc)).  In the applicant's prior writ proceeding, the Court of Criminal Appeals denied habeas relief.

The use of the word "denied" reflected that the Court of Criminal Appeals considered the merits of all allegations presented in the prior habeas proceeding, including the conflict of interest claim, and determined that the applicant was not entitled to relief on any of these claims.  Since the applicant presented and the Court of Criminal Appeals considered and rejected the instant allegation in the previous habeas proceeding, the instant habeas allegation need not be reconsidered in this habeas proceeding.

Based on the foregoing, the applicant's fourth ground for relief is without merit and should be denied.

## IV.

The applicant raises questions of law and fact which can be resolved upon review of official trial court records and without need for an evidentiary hearing.  The State respectfully requests that the trial court adopt the State's proposed findings of fact and recommend to the Court of Criminal Appeals that all requested habeas relief be denied.

397

## V.

Service was accomplished by sending a true and correct copy of this instrument via e-filing e-service to the applicant's habeas counsel, Jonathan Landers [jlanders.law@gmail.com].

Respectfully submitted,

JACK ROADY
Criminal District Attorney

*/s/ Jack Roady*
600 59th Street, Suite 1001
Galveston, Texas 77551
(409) 766-2354
FAX: (409) 765-3132
SBOT # 24027780

63

398

## CERTIFICATE OF COMPLIANCE

The undersigned Attorney for the State certifies this answer is computer-generated, 14-point font, complies with Tex. R. App. P. 9.4, and, based on the word count from the computer program used to prepare this answer, consists of 15,775 words.

<div style="margin-left:40%">

_/s/ Jack Roady_
JACK ROADY
Criminal District Attorney
Galveston County, Texas

</div>

Cause Nos. 10CR0325-83-2 & 10CR0326-83-2

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE 10TH JUDICIAL** |
| | § | **DISTRICT COURT OF** |
| **RICHARD ANTHONY HEROD,** Applicant | | |
| | § | **GALVESTON COUNTY, TEXAS** |

## AFFIDAVIT OF BRUCE BUDOWLE

THE STATE OF TEXAS
COUNTY OF GALVESTON

1. My name is Bruce Budowle. I am Director of the Center for Human Identification and Professor and Vice Chair in the Department of Microbiology, Immunology, and Genetics at the University of North Texas Health Science Center at Fort Worth Texas. I am also a member of the Texas Forensic Science Commission appointed by Governor Greg Abbott.

2. I was previously employed for 26 years at the Federal Bureau of Investigation's Laboratory Division where I was involved in the research, development, and validation of numerous DNA methods. I led the team that developed DNA typing capabilities at the FBI Laboratory in Quantico, Virginia. I ended my tenure at the FBI as Senior Scientist in the Laboratory Division.

3. I have extensive experience in all aspects of forensic DNA analyses, including analyses of low-level samples, mixture analyses, population genetics, statistical interpretations, STR markers, SNP markers, and mitochondrial DNA.

4. I have authored or co-authored more than 630 scientific articles predominately encompassing all aspects of forensic genetics.

5. I have been qualified as an expert in well over 300 cases in state, federal, and international courts in various aspects of forensic DNA analyses including quality assurance, methodology, validation, molecular biology, population genetics, and statistics.

6. I continue to have an active role in casework and research, development, validation, and implementation of forensic genetic methods to increase capabilities for human identification among other applications. My qualifications are summarized in my curriculum vitae (*See* **Exhibit A**).


STATE'S EXHIBIT 400

7. I was asked by the Galveston County Criminal District Attorney to provide this affidavit to explain the challenges in mixture interpretation that the forensic science community, and in particular Texas forensic crime laboratories, have experienced for more than a decade with respect to the interpretation of DNA mixture evidence and how it may have impacted the different conclusions in this case (case number L2H-201861).

8. For background, the DNA mixture in question was derived from item 3 (B) which is a white shirt. Reference profiles were obtained from two victims (Alissia Gallagher and Ronald Gallagher) and the suspect (Richard Herod). The Texas Department of Public Safety Regional Crime Laboratory in Houston (DPS) originally issued results from an autosomal Short Tandem Repeat (STR) DNA analysis in a report dated May 11, 2011. DPS concluded that: (1) Richard Herod could not be excluded as a possible contributor to the DNA profile at 7 of 15 STR locations, (2) Alissia Gallagher could not be excluded as a possible contributor to the DNA profile at 7 of 15 STR locations, and (3) Ronald Gallagher could not be excluded as a possible contributor to the DNA profile at 13 of 15 STR locations. DPS applied its mixture interpretation protocols which were approved and adopted by DPS in 1999 and remained in effect until August 2015.

9. On February 9, 2017, DPS issued a new report detailing the findings of a reanalysis of the evidence using a different method of mixture interpretation of which guidelines were implemented by DPS on March 18, 2016. The report concluded for item 3 (B), now labeled item 7-03, that (1) Ronald Gallagher could not be excluded as a possible contributor to this DNA profile, (2) it was inconclusive whether Alissia Gallagher was a contributor to this DNA profile, and (3) Richard Herod was excluded as a contributor to this DNA profile. Thus, there were some notable differences in the interpretation of who may or may not have been potential contributors of the mixture from item 3 (B) between the 2011 and 2017 reports.

10. Historically, most laboratories in the United States, including those in Texas, employed an interpretation and statistical analysis method for mixture evidence known as the Combined Probability of Inclusion (CPI). A DNA mixture refers to an evidentiary sample containing at least two contributors. The CPI is a valid statistical method conveying the portion of the population that cannot be excluded as a potential contributor of the mixture. The CPI was used to interpret the mixture evidence in the 2011 report. One must be aware of the limitations of any method to apply it correctly. The primary requirement of using the CPI is that it can only be applied to genetic markers (or loci) in which it is highly unlikely that allele drop out has occurred (i.e. there are no missing data). Most laboratories using the CPI did not appreciate this limitation and selected loci for the CPI calculation relying on the known reference profile(s) of person(s) of interest. An approach that uses the known reference profile(s) to drive the interpretation of the evidentiary data is commonly referred to as "suspect-driven bias" and should be avoided.

11. In this case, the DPS analyst provided three different CPI calculations for the same mixture profile from item 3 (B) in the 2011 report – one for each of the victims (Alissia Gallagher and Ronald Gallagher) and one associated with the suspect (Richard Herod). Only one CPI can be generated for a mixture profile. The generation of three CPIs

2

indicates that the DPS analyst was aware of the possibility of allele drop out as different loci were selected for each CPI statistic. Calculating three CPIs is an indication of "suspect-driven bias" (using reference profiles to select loci for statistical calculations).

12. Annotation on the item 3 (B) electropherogram (i.e. the print out of the DNA profile) indicates that the DPS analyst assumed there were four contributors to the mixture. The likely explanation for deriving four contributors is that the DPS analyst used the data from the known reference samples to drive the mixture interpretation. As an example, the STR locus TH01 displayed 5 alleles. If one were to assume that Richard Herod, Alissia Gallagher and Ronald Gallagher were in fact contributors, their combined DNA profiles explain 4 of the 5 alleles observed. Thus, the one remaining allele (allele 8) would have had to come from another (unknown) person. Instead, the DPS analyst should have evaluated the mixture prior to referring to the reference samples of the victims and suspect and determined the most plausible explanation of the number of contributors.

13. My interpretation of the mixture profile is that the most plausible explanation is the mixture is comprised of three individuals (not four). There is always some uncertainty in estimating the number of contributors and one cannot state with 100% certainty that there are three contributors to the mixture. However, the data in this case clearly show the most likely explanation is a three-person mixture. Assuming the most likely explanation for the data is a three-person mixture, the interpretations can change and did change.

14. In the 2017 report the DPS analyst ran the analysis using a probabilistic genotyping software - STRmix. This software is a valid and reliable tool to assist the analyst in mixture interpretation. Use of STRmix requires that the analyst state the number of contributors to the mixture. In the re-analysis, the DPS analyst assumed there were three contributors (not four as in the 2011 report), which is consistent with my manual review of the DNA mixture profile. Under the three-person scenario, the manual and STRmix approaches both support the conclusion that Richard Herod is excluded as a potential contributor.

15. Indeed, Richard Herod should have been excluded even considering four contributors. At the D3S1358 locus Richard Herod carries a 13 allele which was not detected in the mixture and at the D19S433 locus Richard Herod carries a 13 allele which was not detected in the mixture. These two markers support the exclusion of Richard Herod even under a four-person scenario.

16. The approach to mixture interpretation used by the DPS analyst in the 2011 analysis in this case represents a common historical misunderstanding regarding how to interpret DNA mixtures. A core principal of interpretation using the CPI statistic is that the analyst must perform an *a priori* evaluation of the data before comparing it with a known reference profile. While "suspect-driven bias" is a component of the root cause for the initial interpretation in this case, the use of this approach should not be interpreted as an intentional attempt by the analyst to implicate a suspect in any given situation but rather a misunderstanding of how to approach the evidentiary data versus the known data. This suspect-driven approach (using the reference profile data to guide decision-making) was

3

based on a common misunderstanding of the application of the CPI methodology by many practitioners in the field, not only in Texas but nationwide.

17. It is true that a protocol change by DPS led to a different interpretation that excluded Richard Herod in the 2017 report. As forensic scientists became more aware of the limitations and proper application of the CPI method, DPS self-corrected its protocol and implemented a more robust approach regarding how to interpret DNA mixture evidence. The self-correction by DPS is one example of a broader evolution among forensic DNA laboratories nationwide with respect to DNA mixture interpretation.

18. I have read the above statement and find it to be true and correct to the best of my knowledge. I am signing this affidavit voluntarily. I have not been coerced or threatened in any way to sign this affidavit, nor has any promise of any nature been made in exchange for my execution of this affidavit.

*Bruce Budowle*

Bruce Budowle
Director, Center for Human Identification
Professor, Department Microbiology, Immunology, and Genetics
University of North Texas Health Science Center
Fort Worth, Texas 76107
Email: bruce.budowle@unthsc.edu
Tel: 817-735-2979
January 10, 2019

4

Cause Nos. 10CR0325-83-2 & 10CR0326-83-2

| | | |
|---|---|---|
| EX PARTE | § | IN THE 10TH JUDICIAL |
| | § | DISTRICT COURT OF |
| RICHARD ANTHONY HEROD,<br>Applicant | | |
| | § | GALVESTON COUNTY, TEXAS |

### AFFIDAVIT OF ANDREW MCWHORTER

THE STATE OF TEXAS
COUNTY OF GALVESTON

Before me, the undersigned authority, a notary public, on this day personally appeared ANDREW MCWHORTER, who being by me duly sworn, upon his oath deposes and says:

"My name is ANDREW MCWHORTER. I am the DNA Technical Leader at the Region II Lab for the Texas Department of Public Safety (TDPS) located in Houston. I have been employed with the TDPS since 2004. My forensic work primarily focuses on DNA analysis.

During my time with the TDPS Crime Laboratory, this office was made aware that the Scientific Working Group on DNA Analysis Methods (SWGDAM) had published guidance on DNA mixture interpretations in 2010. SWGDAM is a group composed of DNA stakeholders (primarily practicing forensic scientists and researchers from numerous laboratories around the United States) which, among other activities, meets to address issues of importance to the DNA community, holds public meetings to provide periodic updates as to the work of the group, and publishes suggested recommendations and guidelines on



STATE'S
EXHIBIT
404

protocols related to DNA analyses. SWGDAM provides recommendations on what it deems as "best practices" concerning DNA and related topics for the FBI Laboratory. SWGDAM's guidelines are published and publicly available for anyone, especially DNA analysts and laboratories around the United States and the world, to utilize in establishing internal laboratory DNA protocols. However, no laboratory is required to adopt or implement any protocols based upon SWGDAM's suggested guidelines or recommendations.

After the 2010 SWGDAM guidelines were published, the TDPS Crime Laboratory Service began evaluating and implementing some of these recommendations from 2011 to 2014. The TDPS Crime Laboratory Service was already required to implement the revised FBI Quality Assurance Standards, which is mandatory for government laboratories, as well as conducting new validation studies on instruments, DNA kits, and models; these validation studies are necessary to determine the scientific limits for instruments, kits, and models.

While the TDPS Crime Laboratory Service considered ways to implement the SWGDAM guidelines from 2011 to 2014, not all of the SWGDAM recommendations were adopted and implemented. One of the SWGDAM recommendations not adopted and implemented at this time was a "dual threshold" for evaluating DNA mixture data as recommended by SWGDAM.

Prior to the 2010 SWGDAM guidelines, most laboratories only used a single threshold called the analytical threshold as part of the interpretation of a DNA profile. The "analytical threshold" was basically a level below which an observed "peak" (as seen on an

405

electropherogram) could not be distinguished from "noise" which is inherent in a laboratory instrument or a DNA process.

The 2010 SWGDAM guidelines included a recommendation that laboratories adopt a second threshold called a stochastic threshold when analyzing DNA data. When utilizing the "stochastic threshold," the laboratory could only consider complete DNA data at each location (locus) which was above this new level (stochastic threshold) before comparing it to another DNA profile at that same location (locus). This "stochastic threshold" helps analysts have confidence that all DNA data (alleles) are present from each contributor in a particular biological sample and to identify any missing DNA data in mixtures prior to downstream interpretation. If the DNA data at a specific location (locus) is not above the "stochastic threshold," then all DNA data (including any data above this threshold) at that location (locus) is not considered for any DNA comparison or statistical purposes.

One of the reasons that the "dual threshold" was not adopted by the TDPS Crime Laboratory Service is because there were differences of opinions between laboratories on whether or not to adopt SWGDAM's recommendation. One concern with "dual thresholds" was that some valid and legitimate DNA data visibly observed on electropherograms was being discarded because such data did not reach the "stochastic threshold." In the end, some laboratories chose to adopt "dual thresholds" while other laboratories chose to continue interpreting DNA profiles in accordance with their existing guidelines which only employed the single "analytical threshold." Partly because there were such differences of opinions concerning "dual thresholds," the TDPS Crime Laboratory

406

Service did not make any changes to its DNA interpretation methods from 2011 to 2014 in regards to dual thresholds.

Unlike the FBI Quality Assurance Standards, the SWGDAM guidelines are not compulsory or mandatory for laboratories to adopt or implement. There was not a consensus among laboratories that adopting and implementing the 2010 SWGDAM guidelines was the best practice. In addition to the TDPS Crime Laboratory Service, other laboratories did not implement a dual threshold protocol. Because the TDPS Crime Laboratory Service did not change its DNA mixture protocols in accordance with the 2010 SWGDAM guidelines from 2011 through 2014, all DNA analyses performed during this period utilized the DNA mixture protocols which had been approved and implemented in 1999.

On August 10, 2015, the TDPS Crime Laboratory Service changed its DNA mixture protocols to adopt the SWGDAM's recommendation for "dual thresholds." One reason that the TDPS Crime Laboratory Service changed the interpretation guidelines is because an audit was conducted of the TDPS Crime Laboratory Service in 2014 which, among other things, revealed issues with the DNA mixture interpretation procedures. The audit required the finding to be addressed within one year which, in turn, led to the change of the TDPS DNA mixture methods.

Another reason that the interpretation guidelines were changed is because in October of 2014, Dr. John Butler published <u>Advanced Topics in Forensic DNA Typing: Interpretation</u> which, in part, provided the clear instruction needed to implement the new

407

DNA mixture protocols. This publication resolved differences of opinion concerning "dual thresholds" for DNA mixture interpretations.

On March 18, 2016, seven months after the August 10, 2015 adoption of the "dual threshold" protocols, the TDPS Crime Laboratory Service again implemented new mixture interpretation protocols, which included the probabilistic genotyping software called "STRmix" along with the updated and continued use of "dual threshold" protocols. The "STRmix" software allowed for consideration of the DNA data that fell below the "stochastic threshold", which would have disallowed their consideration before March 18, 2016, in calculating the DNA mixture statistics. The current DNA mixture protocols properly consider the DNA data in the "stochastic" region in order to assist the analyst in producing more consistent and scientifically supported statistical results than those produced when using earlier DNA mixture protocols.

I have reviewed the complete case file related to the forensic analyses for TDPS Crime Laboratory case number L2H-201861, which is connected to a Galveston County incident occurring on or about January 8, 2010, involving persons of interests named Richard Herod, Alissia Gallagher, and Ronald Gallagher. The results from autosomal Short Tandem Repeat (STR) DNA analysis were originally issued by TDPS Crime Laboratory analyst Clare Browder in a report dated May 11, 2011. This 2011 report reflected, in relevant part, that a DNA profile from the swabs of the body portions of the white shirt was obtained and was consistent with a mixture and that (1) Richard Herod could not be excluded as a possible contributor to the DNA profile at 8 of 16 STR allele locations, (2) Alissia Gallagher could not be excluded as a possible contributor to the DNA profile at 8 of

16 STR allele locations, and (3) Ronald Gallagher could not be excluded as a possible contributor to the DNA profile at 14 of 16 STR allele locations. The results from the 2011 DNA testing were obtained using the mixture interpretation protocols approved and adopted by TDPS Crime Laboratory in 1999, which were still in effect until August 10, 2015.

Subsequently, the results from this DNA testing were reanalyzed by TDPS Crime Laboratory analyst Jennifer Young utilizing the new TDPS Crime Laboratory mixture guidelines implemented on March 18, 2016, and issued in a report dated February 9, 2017. In reviewing the case file, it appeared that the evidence needed to be re-amplified. The reason that the re-amplification needed to be done was because the original 2011 DNA analysis (including the amplification stage) was performed using the "Identifiler" DNA analysis kit. However, in implementing the 2016 protocols, the "STRmix" interpretation computer software had only been validated for use with the subsequently-adopted "Identifiler Plus" DNA analysis kit, but not the "Identifiler" DNA analysis kit. In light of this situation, a re-amplification needed to be done using the "Identifiler Plus" DNA analysis kit before the "STRmix" interpretation computer software could be used to analyze the DNA data.

The 2017 reanalysis produced results which reflected, in relevant part, that a DNA profile from the swabs of the body portions of the white shirt was interpreted as a mixture of 3 individuals and that (1) Ronald Gallagher could not be excluded as a possible contributor to this DNA profile, (2) it was inconclusive whether Alissia Gallagher was a contributor to this DNA profile, (3) Richard Herod was excluded as a contributor to this DNA profile, and (4) obtaining this DNA profile was 2.12 trillion times more likely if the

DNA came from Ronald Gallagher and 2 unknown individuals than if the DNA came from 3 unrelated, unknown individuals.

The 2017 results changed as a direct result of the adoption of the March 18, 2016 mixture interpretation protocol change. The DNA results which were obtained using the TDPS Crime Laboratory's former (pre-2015) mixture interpretation protocols would produce the same results if those same protocols were utilized today to interpret the DNA mixture profile from the original 2011 DNA testing. The reason that the conclusion of Richard Herod not being excluded as a possible contributor changed to the conclusion that Herod was excluded as a possible contributor was because the DNA mixture interpretation protocols changed on August 10, 2015, and subsequently on March 18, 2016.

"I have read the above statement and find it to be true and correct to the best of my knowledge. I am signing this affidavit voluntarily. I have not been coerced or threatened in any way to sign this affidavit, nor has any promise of any nature been made in exchange for my execution of this affidavit."


_____
ANDREW MCWHORTER
Affiant


SWORN AND SUBSCRIBED before me on this the ___20th___ day of __August__, 2018.


_____
Notary Public
State of Texas

CAROLINA PEREZ
NOTARY PUBLIC
ID# 126427883
State of Texas
Comm. Exp. 10-30-2020
NOTARY WITHOUT BOND

410

Cause Nos. 10CR0325-83-2 & 10CR0326-83-2

| | | |
|---|---|---|
| EX PARTE | § | IN THE 10TH JUDICIAL |
| | § | DISTRICT COURT OF |
| RICHARD ANTHONY HEROD, Applicant | | |
| | § | GALVESTON COUNTY, TEXAS |

### AFFIDAVIT OF KEVIN PETROFF

**THE STATE OF TEXAS**
**COUNTY OF GALVESTON**

Before me, the undersigned authority, a notary public, on this day personally appeared KEVIN PETROFF, who being by me duly sworn, upon his oath deposes and says:

"My name is KEVIN PETROFF. I am attorney licensed in the State of Texas since 1998. I am employed as the First Assistant Criminal District Attorney for the Galveston County Criminal District Attorney's Office. I have been employed with the Galveston County Criminal District Attorney's Office since 2011.

I was the lead prosecutor who handled the cases styled *The State of Texas v. Richard Herod*, cause numbers 10-CR-0325 and 10-CR-0326, which were in the 10th Judicial District Court of Galveston County, Texas. Richard Herod was charged with and indicted for aggravated sexual assault and aggravated robbery from a home invasion committed in Texas City, Galveston County, Texas, on or about January 7, 2010. I represented the State of Texas in a jury trial in these cases, and Richard Herod was convicted by the jury and received a punishment of confinement for life in prison in both cases in 2012.



STATE'S
EXHIBIT
411

After Richard Herod was charged with and arrested for these offenses, the Texas Department of Public Safety Crime Laboratory performed in 2011 the DNA analysis on physical evidence recovered from the complainants' residence, including a white shirt that one of the home invaders used to blindfold the male complainant and that was recovered at the crime scene. The 2011 DNA lab report results reflected that Richard Herod could not be excluded as a possible contributor of DNA on the white shirt/blindfold at 8 of 16 allele locations and that at the allele locations where Richard Herod could not be excluded, the probability of selecting an unrelated person at random who could be a contributor to this DNA profile is approximately 1 in 87 for Caucasians, 1 in 232 for Blacks, and 1 in 53 for Hispanics.

During Richard Herod's trial, I presented testimony about the forensic analyses performed by the Texas Department of Public Safety Crime Laboratory analysts, including forensic analyst Clare Browder. I sponsored testimony to the jury through Ms. Browder about her analyses and conclusions on the physical evidence, including the white shirt/blindfold, based upon the reports and other documentation provided about the forensic analyses. Ms. Browder testified in a manner consistent with the reports which I received. I am not aware of Ms. Browder testifying falsely concerning any part of her testimony in Richard Herod's trial.

Based upon the statistical calculations performed on the DNA evidence, I did not believe that the DNA evidence was very solid in linking Richard Herod to the white shirt/blindfold. In my experience, the "1 in 87 for Caucasians" statistic did not eliminate a substantial number of persons as possible contributors to the DNA profile. In earlier cases,

412

I have observed beneficial statistics of inclusion to involve numbers like "1 in 100 quadrillion" or even more exclusive. A "1 in 87 for Caucasians" statistic included too many possible contributors to be very useful. Nonetheless, I believed that it was necessary to present this evidence to the jury, despite its minimal usefulness in eliminating a substantial number of persons as possible contributors of the DNA on the white shirt/blindfold.

During trial, the defense presented a DNA expert who testified about the forensic analyses and conclusions by the Texas Department of Public Safety Crime Laboratory. Among other things, the defense DNA expert testified that Richard Herod could not in reality be included as a possible contributor based upon the DNA results obtained by the Texas Department of Public Safety Crime Laboratory. In closing arguments, Richard Herod's defense attorney strenuously argued about the DNA results not sufficiently connecting Herod to the blindfold based upon the DNA statistics and the defense expert's testimony.

Before or during Richard Herod's trial in 2012, I was not aware of the Texas Department of Public Safety Crime Laboratory DNA mixture interpretation methods. Additionally, I was not aware then and am not currently aware of whether the Texas Department of Public Safety Crime Laboratory's DNA mixture interpretation methods which were used in relation to the DNA testing in Richard Herod's case were scientifically unacceptable or outdated. I essentially learned enough about the DNA technology, testing methods, and science in order to adequately question the forensic scientists to allow them to explain their actions, analyses, and conclusions to the jury.

413

Furthermore, I was not aware of the Scientific Working Group on DNA Analysis Methods (SWGDAM) publishing recommendations and guidelines in 2010 concerning DNA mixture interpretations before or during Richard Herod's trial. I only learned about SWGDAM and the issues concerning DNA mixture interpretations in 2015 when the Texas Forensic Science Commission reported about variances in DNA mixture interpretations protocols among laboratories across the country.

If I learned before or during Richard Herod's trial that the Texas Department of Public Safety Crime Laboratory's DNA mixture interpretation procedures were outdated or scientifically unacceptable, I would have had attempted to locate a laboratory which did not employ outdated or scientifically unacceptable interpretation procedures and retained that laboratory to forensically analyze the physical evidence in this case. This is not to suggest that I believe that the Texas Department of Public Safety Crime Laboratory was using outdated or scientifically unacceptable DNA mixture interpretation procedures in 2011; I do not know either way. I only learned that the Texas Department of Public Safety Crime Laboratory changed its DNA interpretation protocols in 2015 and then again in 2016.

After the DNA mixture protocols changes, the Texas Department of Public Safety Crime Laboratory performed a DNA reanalysis of the physical evidence in 2017 and that the 2017 DNA results excluded Richard Herod as a possible contributor of the DNA on all physical evidence, including the white shirt/blindfold. The 2017 DNA reanalysis was performed using the DNA mixture interpretation procedures implemented in March of 2016, not the procedures in effect in 2011, when the original DNA testing occurred.

414

"I have read the above statement and find it to be true and correct to the best of my knowledge. I am signing this affidavit voluntarily. I have not been coerced or threatened in any way to sign this affidavit, nor has any promise of any nature been made in exchange for my execution of this affidavit."

KEVIN PETROFF
Affiant

SWORN AND SUBSCRIBED before me on this the 13th day of September 2018.

HEATHER GRUBEN
Notary Public, State of Texas
My Commission Expires
May 06, 2019

Notary Public
State of Texas

415

Filed: 4/29/2019 3:19 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 33149089
By: Alytha Green-Pickney
4/29/2019 3:54 PM

## CAUSE NOS. 10CR0325-83-2 ~~& 10CR0326-83-2~~

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT OF** |
| | § | **GALVESTON COUNTY, TEXAS** |
| **RICHARD ANTHONY HEROD,** | § | |
| **Applicant** | § | **10TH JUDICIAL DISTRICT** |

### STATE'S MOTION FOR LEAVE TO EXCEED WORD LIMITATION IMPOSED BY RULE 73 OF TEXAS RULES OF APPELLATE PROCEDURE

The State of Texas, by and through the undersigned Criminal District Attorney, respectfully requests that this Court grant leave to exceed the word limitation imposed by Rule 73 of the Texas Rules of Appellate Procedure in the above-numbered application for writ of habeas corpus would show the following in support thereof:

### I.

On March 2, 2018, the applicant filed applications for writ of habeas corpus, cause numbers 10CR0325-83-2 and 10CR0326-83-2, which presented allegations seeking habeas relief based upon a denial of due process from false evidence and *Brady* violations, new scientific evidence pursuant to Article 11.073 of the Code of Criminal Procedure, and ineffective assistance of counsel. On March 14, 2018, this Court entered a timely order designating issues which needed resolution. On April 19, 2018, this Court entered an additional order designating issues.

### II.

Rule 73.3 of the Texas Rules of Appellate Procedure requires, in pertinent part, that any response by the State "must comply with length, typeface, and certificate of

compliance requirements set out by rule 73.1(d)....'"  Rule 73.1(d) requires that a computer-generated memorandum not exceed 15,000 words.

## III.

In its original answer, the State requested the designation of issues which needed resolution based upon the need for an evaluation of the evidence presented during the applicant's original trial in the context of the habeas allegations and evidence.  After fully evaluating the trial record and habeas evidence, the State has prepared an amended first supplemental answer which thoroughly responds to the habeas allegations.

However, the comprehensive summary of the trial evidence and the responses to the habeas allegations contained in the State's amended first supplemental answer exceed the 15,000 word limit imposed by Rule 73 of the Texas Rules of Appellate Procedure.[1] The State respectfully submits that exceeding the word limitations is necessary to sufficiently respond to the instant habeas allegations.  The instant habeas allegations are fact-intensive and require an in-depth review and development of the trial evidence as well as detailed materiality analyses.

## IV.

In light of the nature of the allegations and the need to comprehensively evaluate the trial evidence, the State respectfully requests that this Court grant leave to exceed the

---

[1] The word count from the computer program used to prepare the State's Amended First Supplemental Answer reflects that the document contains 15,775 words.

2

word limitation imposed by Rule 73 of the Texas Rules of Appellate Procedure.

## V.

Service was accomplished by sending via certified mail a true and correct copy of

this instrument to:

> Jonathan Landers
> 917 Franklin, Suite 300
> Houston, Texas 77002

Respectfully submitted,

JACK ROADY
Criminal District Attorney

*/s/ Jack Roady*
600 59th Street, Suite 1001
Galveston, Texas 77551
(409) 766-2354
FAX: (409) 765-3132
SBOT # 24027780

3

418

OFFICIAL
COURT
DOCUMENT

**Wilson, Lori**

| | |
|---|---|
| **From:** | jonathan landers <jlanders.law@gmail.com> |
| **Sent:** | Wednesday, May 1, 2019 2:40 PM |
| **To:** | Neves, Kerry |
| **Cc:** | Roady, Jack; Wilson, Lori |
| **Subject:** | Re: Richard Herod Writs - Request for Extension from CCA |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Judge Neves,

The State has filed their response in the Herod matter. I wanted to reach out to you and Mr. Roady and see if the Court would like to have a status conference in the near future. I am fairly swamped until next Thursday, May 9th, and would request any date that works for the Court and the prosecutor after that date.

Please let us know if you would like to set this for a status conference so that we can decide how to move forward.

Thank you,

Jonathan

On Thu, Feb 21, 2019 at 9:21 AM jonathan landers <jlanders.law@gmail.com <mailto:jlanders.law@gmail.com> > wrote:

  Thank you Judge,

  I am working on my updated reply as we speak.

  -Jonathan



10CR0325-83-2
DCCORR
Correspondence
1813105

  On Thu, Feb 21, 2019 at 8:22 AM Neves, Kerry <Kerry.Neves@co.galveston.tx.us <mailto:Kerry.Neves@co.galveston.tx.us> > wrote:

        I have signed the Motion, and will instruct the clerk as you request. Thanks for your efforts, and let's keep this moving.

1

419

Kerry Neves


From: Roady, Jack
Sent: Wednesday, February 20, 2019 2:48 PM
To: Neves, Kerry <Kerry.Neves@co.galveston.tx.us
<mailto:Kerry.Neves@co.galveston.tx.us> >
Cc: jlanders.law@gmail.com <mailto:jlanders.law@gmail.com>
Subject: Richard Herod Writs - Request for Extension from CCA


Good afternoon, Judge Neves -


The deadline for the Clerk to submit the habeas record to the Court of Criminal Appeals in Richard Herod's pending writs is Monday, February 25th.


Habeas counsel Jonathan Landers and I intend to file additional separate pleadings in these cases based on the recently filed affidavit of Dr. Budowle.


Therefore, we jointly request that you seek a second extension from the Court of Criminals for an additional 90 days before the habeas record is submitted to them. A copy of our agreed proposed motion is attached for your consideration.


If this approach is acceptable to you, we would request that you sign the motion and instruct the Clerk to submit the motion to the Court of Criminal Appeals, but NOT to submit the habeas record at this time. Also, if you do decide to sign the motion, I would like to get a signed copy as soon as possible so that we can email it to the Court of Criminal Appeals, as well.

2

420

I'm copying Mr. Landers on this email – please let us know if you would like us to approach on this matter or provide you with additional information.


Respectfully,

Jack.


Jack Roady

Criminal District Attorney

Galveston County

600 59th Street, Suite 1001

Galveston, TX  77551-4137

(409) 766-2355

(409) 765-3230 (fax)


This e-mail is the work product of the Galveston County Criminal District Attorney's Office prepared in anticipation of or in the course of preparing for criminal litigation.  This e-mail reflects the mental impressions or legal reasoning of an attorney representing the State of Texas or his staff.  This e-mail is not subject to public disclosure without the express permission of the Galveston County Criminal District Attorney or his designated representative.

--

3

421

Jonathan D. Landers
917 Franklin, Suite 300
Houston, Tx, 77002

Cell:   (713) 301-3153
Office: (713) 685-5000
Fax:   (713) 513-5505

E-MAIL CONFIDENTIALITY NOTICE - This transmission may be: (1) subject to the Attorney-Client Privilege, (2) an attorney work product, or (3) strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, disseminate or otherwise use this information. If you have received this in error, please reply and notify the sender only and delete the message. Unauthorized interception of this email is a violation of federal criminal law.

--

Jonathan D. Landers
917 Franklin, Suite 300
Houston, Tx, 77002

Cell:   (713) 301-3153
Office: (713) 685-5000
Fax:   (713) 513-5505

E-MAIL CONFIDENTIALITY NOTICE - This transmission may be: (1) subject to the Attorney-Client Privilege, (2) an attorney work product, or (3) strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, disseminate or otherwise use this information. If you have received this in error, please reply and notify the sender only and delete the message. Unauthorized interception of this email is a violation of federal criminal law.

4

**OFFICIAL**
**COURT**
**DOCUMENT**

**Wilson, Lori**

| | |
|---|---|
| **From:** | Wilson, Lori |
| **Sent:** | Thursday, May 2, 2019 2:22 PM |
| **To:** | jonathan landers; Neves, Kerry |
| **Cc:** | ~~Roady, Jack~~ |
| **Subject:** | 10CR0325-83-2 10CR0326-83-2 --- Richard Anthony Herrod |

| **Tracking:** | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | jonathan landers | | |
| | Neves, Kerry | Delivered: 5/2/2019 2:22 PM | |
| | Roady, Jack | Delivered: 5/2/2019 2:22 PM | Read: 5/2/2019 2:22 PM |

The Court has set a status conference in these cases for 5/10/19, at 8:30 a.m. to discuss the recent filings.  Please accept this as notice of the status conference.

Thanks.

Lori Wilson, CCM
10th District Court Coordinator
for Judge Kerry L. Neves
600 59th Street, Room 4305
Galveston, Texas 77551
(409) 766-2230
Facsimile: (409) 770-5266

```
10CR0325-83-2
DCCOFC
Correspondence from Court
1813128
```

-----Original Message-----
From: jonathan landers [mailto:jlanders.law@gmail.com]
Sent: Wednesday, May 1, 2019 2:40 PM
To: Neves, Kerry <Kerry.Neves@co.galveston.tx.us>
Cc: Roady, Jack <Jack.Roady@co.galveston.tx.us>; Wilson, Lori
<Lori.Wilson@co.galveston.tx.us>
Subject: Re: Richard Herod Writs - Request for Extension from CCA

Judge Neves,

The State has filed their response in the Herod matter.  I wanted to reach out to you and Mr. Roady and see if the Court would like to have a status conference in the near future.  I am fairly swamped until next Thursday, May 9th, and would request any date that works for the Court and the prosecutor after that date.

1

423

Please let us know if you would like to set this for a status conference so that we can decide how to move forward.

Thank you,

Jonathan

On Thu, Feb 21, 2019 at 9:21 AM jonathan landers <jlanders.law@gmail.com <mailto:jlanders.law@gmail.com> > wrote:

Thank you Judge,

I am working on my updated reply as we speak.

-Jonathan

On Thu, Feb 21, 2019 at 8:22 AM Neves, Kerry <Kerry.Neves@co.galveston.tx.us <mailto:Kerry.Neves@co.galveston.tx.us> > wrote:

I have signed the Motion, and will instruct the clerk as you request.  Thanks for your efforts, and let's keep this moving.

Kerry Neves

From: Roady, Jack
Sent: Wednesday, February 20, 2019 2:48 PM
To: Neves, Kerry <Kerry.Neves@co.galveston.tx.us <mailto:Kerry.Neves@co.galveston.tx.us> >
Cc: jlanders.law@gmail.com <mailto:jlanders.law@gmail.com>
Subject: Richard Herod Writs - Request for Extension from CCA

Good afternoon, Judge Neves -

2

424

The deadline for the Clerk to submit the habeas record to the Court of Criminal Appeals in Richard Herod's pending writs is Monday, February 25th.

Habeas counsel Jonathan Landers and I intend to file additional separate pleadings in these cases based on the recently filed affidavit of Dr. Budowle.

Therefore, we jointly request that you seek a second extension from the Court of Criminals for an additional 90 days before the habeas record is submitted to them. A copy of our agreed proposed motion is attached for your consideration.

If this approach is acceptable to you, we would request that you sign the motion and instruct the Clerk to submit the motion to the Court of Criminal Appeals, but NOT to submit the habeas record at this time. Also, if you do decide to sign the motion, I would like to get a signed copy as soon as possible so that we can email it to the Court of Criminal Appeals, as well.

I'm copying Mr. Landers on this email – please let us know if you would like us to approach on this matter or provide you with additional information.

Respectfully,

Jack.

Jack Roady

Criminal District Attorney

3

425

Galveston County

600 59th Street, Suite 1001

Galveston, TX  77551-4137

(409) 766-2355

(409) 765-3230 (fax)


This e-mail is the work product of the Galveston County Criminal District Attorney's Office prepared in anticipation of or in the course of preparing for criminal litigation. This e-mail reflects the mental impressions or legal reasoning of an attorney representing the State of Texas or his staff. This e-mail is not subject to public disclosure without the express permission of the Galveston County Criminal District Attorney or his designated representative.


--

Jonathan D. Landers
917 Franklin, Suite 300
Houston, Tx, 77002

Cell:   (713) 301-3153
Office: (713) 685-5000
Fax:    (713) 513-5505

E-MAIL CONFIDENTIALITY NOTICE - This transmission may be: (1) subject to the Attorney-Client Privilege, (2) an attorney work product, or (3) strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, disseminate or otherwise use this information. If you have received this in error, please reply and notify the sender only and delete the message. Unauthorized interception of this email is a violation of federal criminal law.

--

Jonathan D. Landers
917 Franklin, Suite 300
Houston, Tx, 77002

Cell:   (713) 301-3153
Office: (713) 685-5000
Fax:    (713) 513-5505

E-MAIL CONFIDENTIALITY NOTICE - This transmission may be: (1) subject to the Attorney-Client Privilege, (2) an attorney work product, or (3) strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy, disseminate or otherwise use this information. If you have received this in error, please reply and notify the sender only and delete the message. Unauthorized interception of this email is a violation of federal criminal law.



10CR0325-83-2
DCMOT
Motion
1825923

TRIAL COURT CAUSE NOS. 10CR0325-83-2 & 10CR0326-83-2

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT OF |
| | § | GALVESTON COUNTY, TEXAS |
| RICHARD ANTHONY HEROD, Applicant | § | 10TH JUDICIAL DISTRICT |

**TRIAL COURT'S THIRD MOTION/REQUEST
FOR EXTENSION OF TIME**

The 10th Judicial District Court of Galveston County, Texas, moves the Honorable Court of Criminal Appeals to grant a third extension of time to resolve the designated issues and to complete its factual investigation concerning the above-numbered application for writ of habeas corpus in accordance with Texas Rules of Appellate Procedure 73.5 and would show the following in support thereof:

**I.**

On March 2, 2018, the applicant, through his habeas counsel Jonathan Landers, filed an application for writ of habeas corpus, cause numbers 10CR0325-83-2 and 10CR0326-83-2, which challenged his convictions and sentences in cause numbers 10CR0325 and 10CR0326 based upon allegations which included due process (*Brady* and false evidence) violations and Article 11.073 of the Code of Criminal Procedure, claims of ineffective assistance of counsel and conflicted counsel, and the State was served with this habeas application. The basis of the Due Process claims and the Article 11.073 claim was a DNA reinterpretation in which DPS concludes that Applicant Herod

428

was excluded as a contributor to all DNA evidence found at the scene. At trial, DPS had concluded Herod could not be excluded from one piece of DNA evidence.

On March 12, 2018, the State filed an original answer in cause numbers 10CR0325-83-2 and 10CR0326-83-2. On March 14, 2018, the trial court timely signed orders designating issues which need resolution in cause numbers 10CR0325-83-2 and 10CR0326-83-2. On April 19, 2018, the trial court signed amended orders designating issues which need resolution in cause numbers 10CR0325-83-2 and 10CR0326-83-2.

On August 10, 2018, this Court requested an extension of time to complete factual investigation and enter findings of fact. Particularly, this Court expressed the need to review all the documents filed from the habeas proceeding along with the complete trial record. On August 29, 2018, the Court of Criminal Appeals granted this Court's request for an extension of time and allowed until February 25, 2019, to forward the habeas transcript to the Court of Criminal Appeals.

On September 18, 2018, the State filed a supplement answer arguing, in part, that the DNA testimony at trial was not false. In response, the Applicant filed a motion requesting a hearing on September 21, 2018.

On January 10, 2019, renowned DNA expert Dr. Bruce Budowle provided the parties with his opinion on the case, and on January 24, 2019, the applicant's habeas counsel filed a document entitled "Notice of Reply Briefing" wherein he requested thirty (30) days to provide briefing based upon a recently-obtained affidavit from Dr. Bruce

2

429

Budowle. This Court granted the applicant's habeas counsel the requested thirty-day period to provide briefing based upon the recently-obtained affidavit.

In light of additional pleadings anticipated by the Applicant and the State, on February 21, 2019, this Court requested an additional extension of time to complete factual investigation and enter findings of fact, namely until May 27, 2019. The Galveston County District Clerk forwarded this Motion to the Court of Criminal Appeals on February 21, 2019.

On March 1, 2019, the Applicant filed his Reply to the State's First Supplemental Answer. On April 29, 2019, the State filed its Amended First Supplemental Answer. Both parties have since appeared before this Court to argue whether additional fact-finding is needed before this Court can enter Findings of Fact and Conclusions of Law. This Court has requested additional briefing on these matters.

## II.

Although the Court of Criminal Appeals has graciously granted several extensions to forward the habeas transcripts in these matters, the parties have requested additional time to submit briefings to this Court concerning further development of the habeas record. This Court is in favor of granting the parties the requested additional time. Further, additional time is necessary for the Court to determine whether an evidentiary hearing is necessary and for the Court to enter Findings of Fact and Conclusions of Law.

3

430

## III.

THEREFORE, this Court needs an additional extension of time of ninety (90) days to complete its factual investigation, enter findings of fact, and transmit the habeas record to the Court of Criminal Appeals. The attorneys for the applicant and the State have concurred with this Court's request for an additional extension of ninety (90) days.

4

**IV.**

WHEREFORE, PREMISES CONSIDERED, this Court respectfully requests that the Court of Criminal Appeals allow until Monday, August 25, 2019,[1] for this Court to fully resolve all designated factual issues and enter findings of fact in cause numbers 10CR0325-83-2 and 10CR0326-83-2.

SIGNED this 23 day of MAY, 2019.

_____

HONORABLE KERRY L. NEVES
PRESIDING JUDGE, 10TH DISTRICT COURT
GALVESTON COUNTY, TEXAS

**AGREED AS TO FORM AND SUBSTANCE:**

Jack Roady
District Attorney
Galveston County, Texas
TBN 24027780
600 59th Street, Suite 1001
Galveston, Texas 77551
409-766-2355 (phone)
Jack.Roady@co.galveston.tx.us (email)

Jonathan Landers
Attorney for Richard Herod
TBN 24070101
917 Franklin Street
Suite 300
Houston, Texas 77002
713-685-5000 (phone)
JLanders.law@gmail.com (email)

---

[1] The actual ninety-day period would run on Sunday, August 25, 2019. However, pursuant to TRAP 4.1(b), the ninety-day period officially runs on Monday August 26, 2019.

5

432





**John D. Kinard**
**DISTRICT CLERK**
**GALVESTON COUNTY, TEXAS**

Galveston Office
600 59th Street, RM 4409
Galveston, TX 77551-2388
Phone(409)766-2424
Fax (409)766-2292

League City Office
174 Calder Rd.
League City, TX 77573
Phone (281)316-8729
Fax (281) 316-8740

5/23/2019

```
10CR0325-83-2
DCAPTL
Appeal – Transmittal Letter Returned from C
1840976
```

Abel Acosta, Clerk
Court of Criminal Appeals
Supreme Court Building
P.O. Box 12308 Capitol Station
Austin, Texas 78711

IN RE: Ex Parte: Richard Anthony Herod
CASE NUMBER – 10CR0325-83-2      WR-83,515-03
                    10CR0326-83-2      WR-83,515-04
10th District Court

Dear Mr. Acosta:

Enclosed please find the Trial Court's Third Motion/Request for Extension of Time on the Post- Conviction Habeas Corpus in the above styled and numbered causes.  Please acknowledge receipt of this transcript on the enclosed copy of this letter and return to my office.

Sincerely,

**JOHN D. KINARD**
**DISTRICT CLERK**
**GALVESTON COUNTY, TEXAS**

By: /s/ Terrie Kahla

Enclosures

cc:     Richard Anthony Herod, APPLICANT
        Honorable Jack Roady, District Attorney

**RECEIVED IN**
**COURT OF CRIMINAL APPEALS**

**MAY 28 2019**

Deana Williamson, Clerk

Receipt acknowledged of the above transcript on the _28th_ day of _May_____, _2019_.

_Kelley P Reyes, Chief Deputy Clerk_

*600 59th Street, Room 4001, Galveston County Justice Center, Galveston, Texas 77551-2388*

*Phone (409) 766-2424 Fax (409) 766-2292*

433

# FILED

2019 JUN -6 AM 11: 22

DISTRICT CLERK
GALVESTON COUNTY, TEXAS

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS    FILE COPY
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

Tr. Ct. No. 10CR0325-83-2    WR-83,515-03

6/4/2019
HEROD, RICHARD ANTHONY
On this day, this Court has granted the trial court's request for an extension of time
pursuant to T.R.A.P. 73.5. The clerk's record containing the 11.07 writ application
is due in this Court on 8/25/2019.

Deana Williamson, Clerk

RICHARD ANTHONY HEROD
COFFIELD UNIT - TDC # 1795915
2861 FM 2054
TENNESSEE COLONY, TX  75884

10CR0325-83-2
DCCOFCA
Correspondence from Court of Appeal
1837359

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS   FILE COPY
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

**6/4/2019**
**HEROD, RICHARD ANTHONY   Tr. Ct. No. 10CR0325-83-2      WR-83,515-03**
On this day, this Court has granted the trial court's request for an extension of time
pursuant to T.R.A.P. 73.5. The clerk's record containing the 11.07 writ application
is due in this Court on 8/25/2019.

Deana Williamson, Clerk

PRESIDING JUDGE  10TH DISTRICT COURT
GALVESTON COUNTY JUSTICE CENTER
600 59TH STREET, SUITE 3204
GALVESTON, TX  77551
* DELIVERED VIA E-MAIL *

435

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS   FILE COPY
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

6/4/2019
HEROD, RICHARD ANTHONY   Tr. Ct. No. 10CR0325-83-2      WR-83,515-03
On this day, this Court has granted the trial court's request for an extension of time
pursuant to T.R.A.P. 73.5.  The clerk's record, containing the 11.07 writ application
is due in this Court on 8/25/2019.

Deana Williamson, Clerk

DISTRICT ATTORNEY GALVESTON COUNTY
JACK ROADY
600 59TH STREET SUITE 1001
GALVESTON, TX  77551
* DELIVERED VIA E-MAIL *

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS    FILE COPY
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

**6/4/2019**
**HEROD, RICHARD ANTHONY    Tr. Ct. No. 10CR0325-83-2    WR-83,515-03**
On this day, this Court has granted the trial court's request for an extension of time
pursuant to T.R.A.P. 73.5.  The clerk's record containing the 11.07 writ application
is due in this Court on 8/25/2019.

Deana Williamson, Clerk

DISTRICT CLERK GALVESTON COUNTY
JOHN KINARD
600 59TH ST. SUITE 4001
GALVESTON, TX  77551
* DELIVERED VIA E-MAIL *

Filed: 7/9/2019 3:59 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 34989318
By: Emileigh Fletcher
7/9/2019 4:01 PM

No. 10CR0325-83-2 & ~~10CR0326-83-2~~

| | | |
|---|---|---|
| EX PARTE | § | IN THE 10th JUDICIAL |
| | § | |
| | § | |
| RICHARD ANTHONY HEROD | § | DISTRICT COURT |
| | § | |
| | § | |
| | § | GALVESTON COUNTY, TEXAS |

### APPLICANTS REQUEST FOR A HEARING

Applicant Richard Herod requests this Court, pursuant to Texas Code of Criminal Procedure art. 11.07, § 3(d), to set an evidentiary hearing date to resolve the factual issues material to the legality of the Applicant's confinement. A review of Herod's Reply to the State's First Supplemental Answer and the State's Amended First Supplemental Answer show that, in spite of the recently obtained affidavit from renowned DNA expert Dr. Bedowle (establishing the falsity of the DNA evidence submitted at Herod's trial), the parties still disagree about important factual elements related to Herod's claims. Specifically, a hearing is necessary to resolve the following factual disputes between the parties:

### I.    A HEARING IS NECESSARY TO DETERMINE WHETHER THE DNA EVIDENCE PRESENTED AT TRIAL WAS FALSE OR MISLEADING.

At Herod's trial the prosecution presented expert testimony from DNA analyst Clare Browder that Richard Herod could not be excluded from DNA evidence found

1

438

at the scene of the crime. We now know that Richard Herod is excluded from all DNA evidence found at the scene. Indeed, the recently obtained affidavit of Dr. Bedowle explains, not only that Herod is excluded as a contributor to all DNA found at the scene, but also that he should have been excluded even based upon the techniques being utilized at the time of Herod's trial. In short, not only is Herod excluded under the current scientific methodology, but he should have been excluded under the scientific methodology used by DPS in 2011..

Prior to obtaining Dr. Bedowle's affidavit, the State argued the testimony presented at trial was not false or misleading. *See* State's Supplemental Answer, at 22.[1] The State's argument was that DNA analyst Clare Browder's trial testimony was not false because she was simply relying on a flawed scientific method when she found that Herod could not be excluded as a contributor to the DNA evidence found at the scene. *Id.* The State's previous argument has been firmly rebutted by the affidavit of their own expert, Dr. Bruce Bedowle, who affirms that Herod is excluded based upon the current scientific process, but also that Herod should have

---

[1] In its answer to Herod's claim II (arguing that he is entitled to relief pursuant to Art. 11.073) the State accepts that the new DNA report contradicts the DNA testimony offered at Herod's trial. *See* State's Supplemental Answer, at 53-58; Tex. C. Crim. P. art. 11.073 (a)(2) (explaining that the article only applies to scientific evidence that "contradicts scientific evidence relied on by the State at trial.").

2

been excluded even under the techniques being employed during the time of trial. *See* Herod's Reply, Appendix 1, Affidavit.

Dr. Bedowle's affidavit makes clear that DNA Analyst Clare Browder simply misapplied the science when she worked on Herod's case. *Id.* However, because the State wants to avoid the more favorable false evidence standard of harm, the State continues to argue that the testimony at Herod's trial was not false. *See* State's Amended Supplemental Answer, at 20-24. The State continues to argue that the previous results were false simply because they were based upon a now outdated interpretation methodology. *Id.* The State would have the Court believe that the change in Herod's case is the result of "a greater understanding of the mixture interpretation methodology" and that the results changed because of a "scientific self-correction." The State simply ignores what Dr. Bedowle explains in his affidavit: that the methodology in place during Herod's trial could have produced valid results, but that the methodology was not properly applied in Herod's case.

Herod's Due Process and Due Course of Law claims hinge upon whether or not the DNA evidence presented at his trial was false or misleading. This Court should hold hearing to determine whether or not DPS analyst Clare Browder's testimony, that Herod could not be excluded as a contributor to DNA evidence found at the scene, was false or misleading.

3

## II.   A HEARING IS NECESSARY TO DETERMINE WHETHER THE STATE WITHHELD EVIDENCE SHOWING HEROD WAS NOT AT THE SCENE OF THE ROBBERY, AND TO DETERMINE WHETHER THE STATE WITHHELD FAVORABLE IMPEACHMENT EVIDENCE.

Herod also alleges that his right to Due Process was violated because the State withheld evidence showing that he was excluded as a contributor to all DNA found at the scene, and withheld evidence that the Scientific Working Group on DNA Analysis Methods had made recommendations to make DNA interpretation more reliable, recommendations that were not followed by DPS. *See* Herod's Memorandum at 36-39, Appendix 6; *See* Herod's Reply, 13-17. Specifically, Herod has presented evidence showing that DPS was aware that there was a "lack of consensus in the forensic DNA testing community" concerning the reliability of the DNA interpretation techniques used by DPS in Herod's case. *Id.* Further, as far back as 2005, DPS was aware that "there [was] variation among laboratories in Texas and nationwide, including differences in standards for calculation of CPI that could be considered scientifically acceptable." *See* Herod's Memorandum, Appendix 6, Appendix page 29. Finally, Dr. Bedowle's affidavit bolsters that the CPI method of DNA Anaylsis was not as fool-proof as analysist Clare Browder claimed at trial. *See* Herod's Reply, Appendix 1, Affidavit.

DPS was aware that it might be using scientifically unacceptable techniques, or at least misapplying otherwise reliable techniques, as far back as 2005, but did

4

441

not make corrections until 2015. However, at trial, DNA analyist Clare Browder specifically denied that there could be problems with her interpretation.

The State has argued, and continues to argue, that although DPS was aware of certain guidelines published in 2010 (prior to trial) suggesting that DPS was using improper techniques in evaluating DNA mixture evidence, and although nobody from DPS or the prosecution team turned over this information, the information was not actually favorable to the defense. *See* State's Supplemental Answer, at 43-50; State's Amended Supplemental Answer, at 42-50. The State argues that the guidelines in question, eventually adopted by DPS, were only recommendations and "suggested best practices" and therefore were not favorable to the defense team. *Id.* at 44.

The State accepts that members of the prosecution team were aware of this evidence, and that the evidence was not turned over to the defense, but the State disputes that the evidence was favorable to the defense.

A hearing remains necessary to determine whether the withheld evidence was favorable to the defense.

5

442

### III.    A HEARING IS NECESSARY TO DETERMINE WHETHER TRIAL COUNSEL LABORED UNDER AN ACTUAL CONFLICT OF INTEREST.

Herod has presented this Court with evidence that his trial attorney was laboring under an actual conflict of interest by representing both Herod, and his co-defendant in another case, George Evan Sanford. *See* Herod's Memorandum at 50-55, Appendix 9. Although the State does not specifically dispute the factual basis of this claim, or the existence of a conflict of interest, the State does generally deny "all allegations raised in the instant habeas application. . . ." *See* State's Supplemental Answer, at 18.

A hearing is necessary to soldify the factual basis of trial counsel's conflict of interest.

### IV.    CONCLUSION

The Applicant request this Court set a hearing date so that the factual issues in question can be resolved and to assist this Court making a finding of fact or in approving the findings of the person designated to make them. The Applicant believes four or five witnesses are all that are needed to establish the factual basis of all claims before the Court.

6

443

Respectfully Submitted,

/s/
_____
Jonathan D. Landers
Texas Bar No. 24070101
917 Franklin St., Suite 300
Houston, Texas 77002
Telephone    (713) 685-5000
Facsimile    (713) 513-5505
Email: JLanders.Law@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this motion was provided to the District Attorney handling this case via the e-filing system and by email, on July 8, 2019.

/s/
_____
Jonathan D. Landers

7

444

No. 10CR0325-83-2

| | | |
|---|---|---|
| EX PARTE | § | IN THE 10th JUDICIAL |
| | § | |
| | § | |
| RICHARD ANTHONY HEROD | § | DISTRICT COURT |
| | § | |
| | § | |
| | § | GALVESTON COUNTY, TEXAS |
| | § | |

## ORDER

UPON PRESENTATION of the foregoing motion, it is hereby ---

ORDERED that a hearing is scheduled on the _____ day of _____ 2019, at _____ o'clock _____.m.

SIGNED this _____ day of _____ 2019.

_____

Judge Presiding

8

445