United States District Court
Southern District of Texas
**ENTERED**
April 03, 2025
Nathan Ochsner, Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:15-0338

RICHARD ANTHONY HEROD, PETITIONER,

v.

ERIC GUERRERO, RESPONDENT.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE:

The petitioner, Richard Anthony Herod, seeks federal habeas relief under 28 U.S.C. § 2254 from two judgments imposed in Galveston County in 2012, one for aggravated robbery and one for aggravated sexual assault. In each case, the court sentenced Herod to 99 years or life imprisonment. While this federal habeas action has been pending, counsel appeared for Herod, the court granted him a stay to return to state court and exhaust his remedies, the parties filed multiple rounds of briefing, and the court held oral argument. Having reviewed the petition, the briefing, the applicable authorities, and all matters of record, the court will grant habeas relief on Claim 1 and reserve judgment on the remaining claims. The court's reasons are explained below.

## I.    BACKGROUND

### A.    Procedural Background

In 2012, a jury convicted Herod of aggravated sexual assault (Case No. 10CR325) and aggravated robbery (Case No. 10CR326) in the 10th District Court of Galveston County. Dkt. 19-4, at 99-103; Dkt. 19-10, at 50-56. The jury found two enhancements true on each conviction. The court imposed a sentence of 99 years or life in each case, with sentences to run concurrently. Dkt. 19-4, at 99; Dkt. 19-10, at 50.

On October 22, 2013, the Fourteenth Court of Appeals affirmed Herod's convictions and sentences. Dkt. 20-20; Dkt. 21-1; *Herod v. State*, Nos. 14-12-00645-CR & 14-12-0646-CR, 2013 WL 5760739 (Tex. App.—Hou. [14th Dist.] Oct. 22, 2013, pet. ref'd). On March 12, 2014, the Court of Criminal Appeals refused Herod's petitions for discretionary review (PD-1564-13, PD-1565-13).

On February 12, 2015, Herod executed a *pro se* application for state habeas review of each conviction. *See* Dkt. 21-10, at 4-23 (WR-83,515-01) (challenging conviction for aggravated sexual assault); Dkt. 21-16 at 4-24 (WR-83,515-02) (challenging conviction for aggravated robbery). The trial court recommended denial of relief in each case. Dkt. 21-12, at 35-36 (10CR325); Dkt. 21-15, at 30-31 (10CR326). On August 5, 2015, the Court of Criminal Appeals denied the applications without written order on the trial court's findings. Dkt. 21-8; Dkt. 21-13.

On December 3, 2015, proceeding *pro* se, Herod filed a petition for federal

habeas relief in these proceedings. Dkt. 1. The respondent answered. Dkt. 18. On February 9, 2017, while Herod's federal petition was pending, the Department of Public Safety (DPS) issued a supplemental report concluding that Herod's DNA was excluded from all DNA evidence in the case. Dkt. 33-1. In August 2017, counsel appeared on Herod's behalf and moved to amend the petition to bring a claim based on the DNA recalculation, to stay these proceedings, and to return to state court to exhaust his new claim. The respondent was unopposed and, on January 16, 2018, the court entered a stay.

On March 2, 2018, Herod filed his second state habeas application, bringing four claims. Dkt. 49-8, at 4-22. On August 20, 2019, the state habeas court issued detailed findings of fact and conclusions of law recommending denial of three claims, including the claim based on DNA evidence, and dismissal of one claim as procedurally barred. Dkt. 49-10, at 18-64. The Court of Criminal Appeals did not follow the recommendation or rely on the trial court's findings but instead, on November 6, 2019, dismissed Herod's entire application as subsequent. Dkt. 49-11.

On January 21, 2020, Herod returned to this court and filed an amended habeas petition raising nine claims for relief. Dkt. 41. The respondent argued that all of Herod's claims are procedurally barred because the Court of Criminal Appeals dismissed his second application as subsequent. Dkt. 48.

Because the respondent had left several key issues unbriefed, the court entered a detailed order for supplemental briefing. Dkt. 53; *see* Dkt. 58

(respondent's supplemental brief); Dkt. 61 (petitioner's supplemental brief). On October 2, 2023, the court ordered the parties to submit a second round of supplemental briefing addressing three questions. Dkt. 63; *see* Dkt. 64; Dkt. 67. On April 22, 2024, the court held oral argument. The parties then submitted another round of briefing. Dkt. 76; Dkt. 79.

### B.    **Factual Background**

#### 1.    **Trial Evidence**

A jury convicted Herod of aggravated robbery and aggravated sexual assault and assessed two life sentences. The appellate court summarized the facts as follows:

> [Herod] was indicted for aggravated robbery on March 24, 2010; he was indicted for aggravated sexual assault on April 9, 2010. A jury trial was held from June 4, 2012 to June 12, 2012. During the guilt-innocence phase of his trial, the following evidence was presented.
>
> On January 7, 2010, two robbers with guns broke into the home of Alissia and Ronnie Gallagher. Ronnie recognized the first robber as "Ricky D"—the appellant. The man Ronnie identified as "Ricky D" blindfolded Ronnie, used a zip tie to restrain him, and took codeine and $500 in cash. "Ricky D" also sexually assaulted Alissia and asked for her cell phone number, which she gave him. Ronnie heard the sound of a diesel truck pulling away when the robbers left. Alissia went to the neighbor's house to call 9-1-1, and police arrived to investigate the scene.
>
> On January 8, 2010, Alissia received two cell phone calls in quick succession; she recognized the voice as that of her assailant from the night before, the man Ronnie identified as [Herod]. Alissia called 9-1-1 immediately afterwards. Detective Robles of the Texas City Police Department, who was in charge of investigating the aggravated robbery and sexual assault, obtained arrest warrants for [Herod] in connection with both offenses. Detective Robles also requested Alissia's cell phone records from her service provider.

Police officers stopped and arrested [Herod] on January 28, 2010, while he was driving in his truck. The arresting officers started conducting an inventory of the truck on the grass embankment next to the highway where they had stopped [Herod]. One of the police officers present at the scene, Officer Johnson of the Texas City Police Department, noticed dark-colored clothing and what looked like a black beanie or ski mask in the truck and contacted his supervisor, Sergeant Pope of the Texas City Police Department. Johnson claimed he contacted Pope because the police reports from the aggravated robbery and sexual assault indicated that the robbers had their faces covered and were wearing dark-colored clothing. Pope told Johnson to stop the inventory so that he could determine if consent to search or a warrant was necessary. Officer Johnson then drove the truck to the Texas City Police Department, leaving everything in the truck where it was.

At the police department, [Herod] was taken to Detective Robles's office. Robles explained to [Herod] the investigation and the charges against him. [Herod] was offered food, water, cigarettes, and a chance to use the restroom. Robles then asked whether [Herod] would consent to a search of his truck. After Robles read and explained the Consent to Search form, [Herod] signed it, granting Detectives Robles and Flores (also of the Texas City Police Department) permission to search the vehicle, "[i]ncluding the containers and contents located therein." Robles described [Herod's] demeanor at the time as "calm." [Herod] also gave verbal permission to search the truck, and Robles explained to [Herod] that he could withdraw his consent at any time. [Herod] was present in leg shackles with Robles and Flores as Robles conducted the search. [Herod] did not withdraw his consent at any time.

During the search, Robles found several articles of clothing and two cell phones and tagged the clothing into evidence. Robles did not tag the two cell phones because he was not sure the cell phones had evidentiary value. Robles and [Herod] returned to Robles's office immediately after the truck search was completed. Robles called his office phone with each of the cell phones he found in [Herod's] truck in order to get the cell phone numbers from his office phone's caller identification. Robles documented the two numbers. After Robles made the calls and documented the numbers, [Herod] requested that Robles return the cell phones to [Herod]. Robles handed the cell

phones to [Herod], who then disassembled them and swallowed the SIM cards.

*Herod*, 2013 WL 5760739, at *1-2.

### a. The crime and reports to law enforcement

The State presented evidence that Herod broke into the home of Ronnie and Alissia Gallagher on January 7, 2010, robbed them, and sexually assaulted Alissia. Alissia Gallagher testified that Herod, who had a gun, threw her on the couch, strangled her so that she was "barely . . . able to talk," asked her repeatedly where the money was, pulled down her pants to her ankles, lifted her legs, rubbed his gloved finger "on [her] private parts," moaned, and penetrated her vagina with his finger. Dkt. 19-15, at 174, 177-80. She stated that she then asked him to "please pull my pants up," and that he moaned and did so. *Id.* at 183-84. She also testified that she could see his eyes which, like Herod's, were blue. *Id.* at 165.[1]

On the night of the crime, officers took Alissia Gallagher to the hospital for an exam by a sexual assault nurse examiner (SANE nurse). *Id.* at 200-03. The SANE nurse testified at Herod's trial that Alissa denied sexual penetration, that there was no physical trauma to her genitalia, and that she saw no signs of choking. Dkt. 19-17, at 147, 151-52, 159. The nurse documented a "fake cry." *Id.* at 158.

The prosecution's theory at trial was that the second robber was Nick

---

[1] In her initial report to law enforcement, Alissia stated that both robbers wore ski masks and the taller one, who sexually assaulted her, also wore sunglasses. *Id.* at 129-30. On cross-examination, she stated that the shorter robber was the one wearing sunglasses. *Id.* at 228.

Salinas. Prosecutors never charged Salinas in connection with the incident. Alissia testified that she did not know Salinas or his wife, despite being related to him by marriage. Dkt. 19-15, at 248-50; *see id.* at 248 ("I did not know [Salinas]. I didn't know him personally"); *id.* at 249 (Alissia testified that she had not seen Salinas at family events). Nevertheless, she also testified that "[b]y visualizing the profile of the man that was in the house that night, I can say it was Nick Salinas." *Id.* at 248; *see id.* at 249 (based on Salinas's nose, skin color, and build, which fit the picture she had seen, "I just know it is [Salinas]").

Evidence at trial showed that Herod and Ronnie Gallagher knew each other before the crime, and that both had dealt drugs. However, in Ronnie's initial statement to police officers at the crime scene, he did not identify Herod to the officers. At trial, he testified that he had recognized Herod during the robbery but did not identify him to the police who investigated the scene that night because he feared retaliation.

Ronnie Gallagher testified that he had previously dealt drugs for years, that he had been convicted of drug offenses and sexual assault and that, at the time of the crime, he was on probation for possession of a firearm by a convicted felon. Dkt. 19-17, at 9-14. He further testified that he had three children, that he and his wife did not have jobs, and that his grandmother financially supported his family. *Id.* at 7-8. He stated that he had purchased codeine on the day of the crime and that, although he had a prescription for codeine at the time, this purchase was for an "extra amount" and was from "a friend," not a pharmacist. *Id.* at 17-18, 93-94.

He told the jury that, when the robbers entered his home, he thought the house "was getting raided" and that police were kicking in his door. *Id*. at 20-21.

Alissia Gallagher testified that Ronnie "was known to sell drugs" and that, at the time of the crime, "Ronnie was addicted to codeine" and "would drink a lot." Dkt. 19-15, at 143-44, 152. She also stated that, on the night of the crime, a friend of Ronnie's had come to the house and sold Ronnie two pint bottles of codeine. *Id*. at 151-52. Like her husband, Alissia initially thought the intruders were the police who had come because of "Ronnie's drug[-]dealing activities." *Id*. at 155.

On January 8, 2010, the day after the crime, Ronnie told Detective Ernest Robles of the Texas City Police Department that one of the robbers was "Ricky D," which was Herod's nickname. Dkt. 19-16, at 44-45. Ronnie did not provide Detective Robles with Herod's full name. Robles testified that Ronnie was "very certain" that one of the intruders was "Ricky D," and was able to tell Robles "where Ricky D resided" in Santa Fe, Texas, "and also that he had a little bit of a history." *Id*. at 46. On cross-examination, Ronnie testified that he had known Herod for "[a]bout two years," that he previously had an altercation with him, and that he had seen and talked to Herod "at least three times a week" in the six months before the crime. Dkt. 19-17, at 74-76, 110-112.

Detective Robles testified that he had "indications" that the crime could be drug-related based on "the history of Mr. Gallagher and some of the dealings that [Robles] had with him as a narcotics investigator," as well as the nature of the

crime and the neighborhood. Dkt. 19-16, at 47. When the prosecutor asked Detective Robles how the aggravated sexual assault "jibe[d] with being a drug-related offense," Robles responded that it was atypical:

> That disturbed me a little bit. That's not something typical that you would see in my experience. You know, it kind of surprised me that something like that had taken place.

*Id.* at 47. He testified that he had asked Ronnie why he hadn't disclosed Ricky D's identity to officers at the scene and that Ronnie had said that he was "fearful" that, if he identified Ricky D as a suspect, "he would come back and do additional harm" to him and his family. *Id.* at 49. Ronnie testified that, once he learned that Alissia had been sexually assaulted, he decided to make an identification. Dkt. 19-17, at 72.

Also on January 8, Alissia Gallagher received two calls to her cell phone from a phone with the number (409) 682-1537 ("the x1537 phone"). Alissia testified at trial that she recognized the caller's voice as that of her assailant from the night before. Dkt. 19-15, at 208-09. The caller told her to put money in the mailbox and that he was "going to come back and do it again." *Id.* at 209. Alissia also testified that she had given her assailant her cell phone number during the crime because he asked for it. *Id.* at 192-93. She immediately called 911 and reported the calls, which were the basis for her "voice identification" of Herod.

The next day, January 9, 2010, an anonymous female informant met with Officer C. Ham, an investigator with the Texas City Police Department. The person provided Officer Ham with Herod's full name, a photograph of Herod,

and an address for Herod in Santa Fe. Dkt. 21-11, at 34.[2] According to Officer Ham's report, the informant stated that she "wanted to remain anonymous due to the fact that the victims were family members and [she] was afraid of retaliation." *Id.* She also told Officer Ham that she had acquired the information she supplied about Herod from "the male victim 'Ronnie' [who] had confided in her." *Id.* On the witness stand, Ronnie acknowledged that his mother had given a picture of Herod "to one of her cop friends." Dkt. 19-17, at 81-83.

On January 19, 2010, Detective Robles met with Ronnie Gallagher and showed him a photograph of Herod, whom Ronnie identified as "Ricky D." Dkt. 19-16, at 60-61. Detective Robles then obtained an arrest warrant for Herod in connection with both the aggravated robbery and the aggravated sexual assault. He also requested Alissia Gallagher's cell-phone records. *Id.* at 70-71. At the time Robles obtained a warrant, all incriminating information regarding Herod had come from the Gallaghers.

### b. Arrest and search yielding two cell phones

On January 28, 2010, officers with the Texas City Police Department pulled Herod over in a diesel truck and arrested him. Holly Kelly, the mother of Herod's child, was in the truck at the time, as was their child. Dkt. 19-16, at 73. Kelly testified at trial that she was married to someone else at the time but had not told Herod about the marriage. Dkt. 19-18, at 51. She also testified that she

---

[2] The informant said Herod's name was "Ricky Heard" and that she was not sure of spelling. *Id.*

had not told Herod that she did not put his name on the birth certificate of their mutual child. *Id.*

Officers took Herod to the Texas City Police Department, where Detective Robles obtained a signed consent from Herod for the search of his truck and its contents. The search yielded several articles of clothing and two cell phones, including the x1537 phone that had placed calls to Alissia Gallagher on the day after the crime. Dkt. 19-16, at 99-101.

Detective Robles testified that, after he documented the phone numbers, he returned the phones to Herod, who then "disassembled the phones and ate the SIM cards" from both phones in "a quick motion." *Id.* at 89. Robles's written report, however, did not mention that Herod had eaten the SIM cards. *Id.* at 102-03 (Robles testified that his failure to document Herod eating the SIM cards was an "[o]mission on [his] part," stating he "just didn't do it"). In his closing argument, the prosecutor referred to Herod's action as proof of Herod's consciousness of guilt because he had swallowed the "brains" of the phones. Dkt. 19-19, at 79. In these proceedings, Herod claims that he did not swallow the SIM cards and that one card, from the x1537 phone, is in the possession of his current counsel. Dkt. 41-1, at 83 & n.29; Dkt. 41-2, at 18-25 (Appendix 4).

At trial, the State presented tracking data on the x1537 phone, which had been used to make calls to Alissia Gallagher on the day after the crime, and testimony from Leng Chheng, a Sprint network manager. Dkt. 19-16, at 144-73. The prosecutor argued to the jury that the phone could be tracked from Herod's

home to the Gallaghers' home. Dkt. 19-19, 51. However, on cross-examination, Chheng testified that the x1537 phone could have been anywhere within a four-mile radius of the cell phone towers used to track the phone's location. Dkt. 19-16, at 167-71.

The x1537 phone was registered to Shawn Davis. At trial, Detective Robles stated that he never found a person named Shawn Davis in Galveston County. *Id.* at 99. On cross-examination, he testified that he had not checked the records or tracking data for Herod's personal phone number, even though the number was in his case records. *Id.* at 178-79.

Although not raised by Herod's counsel at trial, documents in the trial record reflected that the x1537 phone had several unexplained connections with Alissia Gallagher's cell phone. First, the x1537 phone was set up by someone with the same contact phone number, same address, and same date of birth as the person who set up Alissia's phone. Second, the x1537 phone and Alissia's phone were set up within 11 days of each other in October 2009, approximately 2.5 months before the crime. *See* Dkt. 20-3, at 7-21 (State's Exhibit 52 reflects that Alissia Gallagher's phone was set up on Oct. 19, 2009); *id.* at 27-39 (State's Exhibit 64 reflects that the x1537 phone was set up on Oct. 30, 2009).

In these proceedings, Herod argues that the phones were planted in his truck, that neither was registered or linked to him, and that one could have belonged to Holly Kelly, who was in the truck when he was arrested. Dkt. 41-1 at

76. Kelly testified that she had left her phone in Herod's truck at the time of the arrest. Dkt. 19-18, at 79.

### c. Holly Kelly's testimony

Holly Kelly testified for the State and provided incriminating evidence against Herod. She testified that, at Herod's instruction, she had driven his diesel truck on the night of the crime, stating that she took Herod and Salinas to the Gallaghers' house, waited outside, and then drove them away. *Id.* at 24-41. She also testified that Herod and Salinas were anxious when they returned to the truck, that she heard them say it "wasn't worth it," and that she later watched them split a few hundred dollars. *Id.* at 39-42. The prosecutor described her as a key witness whose testimony pulled other evidence together. Dkt. 19-19, at 51-52.

Kelly was charged with aggravated robbery but received a deal from the State in exchange for her testimony. Dkt. 19-18, at 9-10. She testified that she knew Ronnie Gallagher "somewhat" before the crime, that Ronnie and Herod knew each other, and that Ronnie sold and bought drugs out of his home. *Id.* at 12-14. As discussed below, evidence in the trial record reflected that, approximately two months before the crime, Kelly had falsely accused Herod of pulling a knife in the presence of Kelly and their child and stabbing a mattress over 100 times. *Id.* at 95-96; Dkt. 21-11, at 46.

### d. DNA evidence

The prosecution presented DNA evidence at trial and argued that the evidence placed Herod at the crime scene. Clare Browder, a DPS analyst, testified

for the prosecution. Browder testified that Herod could not be excluded from the DNA mixture collected from the "body" of a white shirt used to blindfold Ronnie Gallagher but that Herod was excluded from all other DNA evidence collected at the scene, including zip ties, other parts of the white shirt, and the sexual assault kit. Dkt. 19-17, at 218-26. Regarding the blindfold, she stated that Herod "cannot be excluded as a contributor of the [DNA] profile at eight of the 16 locations," or alleles. *Id.* at 225. She told the jury that, given his non-exclusion from eight of 16 alleles, the statistical probability of selecting an unrelated person at random who could be the contributor was "1 in 87 for Caucasians" such as Herod. *Id.*; *see id.* at 216 (explaining probability statistics). She also testified that Ronnie and Alissia Gallagher could not be excluded from the same mixture and that the mixture had a fourth, unknown contributor. *Id.* at 225-26.

On cross-examination, Herod's trial counsel asked Browder about the certainty of her testimony that Herod could not be excluded from the DNA mixture on the blindfold. Browder testified that, with a DNA mixture, there could be "overlay" of the alleles because some of the contributors may share certain alleles. *Id.* at 231. She explained that, when multiple people contribute to a DNA sample, "we will not give certainty to that inclusion." *Id.* However, she disagreed with Herod's counsel's suggestion that the DNA mixture, and Herod's non-exclusion from eight of 16 alleles, created difficulty with her testimony about the statistical probability of Herod as a contributor:

> Counsel: So would you say this being a mixture and there being eight of 16 [non-excluded alleles] and the possibility that some of these are overlapping [with alleles from other contributors to the mixture], doesn't that give you some difficulty with the statistics and being able to identify somebody?
>
> Browder: ***There's no difficulty with the statistics***. I calculate statistics based on at what location is the known sample included in this profile.

*Id.* at 231-32 (emphasis added). On re-direct, the prosecutor revisited the point. Browder testified that her conclusion that Herod "[could not] be excluded" was the strongest conclusion she could reach for a DNA mixture:

> Q. When we're used to, I guess, on the law enforcement side of saying, "It's a match" or "It's not a match," that's not the language that you use?
>
> A. That's correct. We don't use that terminology.
>
> Q. And when we're talking about a DNA mixture, can you ever say that this is a match or that it's absolutely this person?
>
> A. I cannot.
>
> Q. All right. Is "cannot be excluded" the strongest language you could use in a mixture?
>
> A. That's correct.

*Id.* at 245.

The defense called Melva Ketchum as a DNA expert. Dkt. 19-18, at 108-98. Ketchum stated that she had been unable to perform her own statistical analysis on the data because she had not been provided with all electropherograms produced by DPS. *Id.* at 126-28, 137-38, 193, 195-97. She testified that, as

Browder had stated, Herod was not excluded from the DNA mixture on the blindfold. *Id.* at 138, 163. She further stated that, in her opinion, Herod "should be excluded" because he was excluded from eight alleles in the DNA mixture and, of the eight alleles from which Herod could not be excluded, five were shared with the two victims and the other three were very common. *Id.* at 163.[3] However, on cross-examination, Ketchum again agreed with the prosecution's conclusion that Herod could not be excluded as a contributor. *Id.* at 178-79. She did not disagree with Browder's assumption that there were four contributors to the mixture rather than three. *Id.* at 138; *id.* at 180.

Ketchum testified that her training was in veterinary medicine rather than human medicine. *Id.* at 108-09. The prosecution's cross-examination of Ketchum established that her lab, DNA Diagnostics, Inc., in Timpson, Texas, was not an accredited laboratory. *Id.* at 166. She agreed with the prosecutor that her lab had received an "F" grade from the Better Business Bureau, which she attributed to "multiple contract problems." *Id.* at 172. She also agreed with the prosecutor that she had "been involved in the DNA quest for Bigfoot for some time" and that she had seen "a Sasquatch" herself. *Id.* at 173-74.

### e. Herod's evidence at trial

The defense presented alibi evidence to the jury. Herod's mother, stepfather, and brother, all testified that Herod was at his mother's house on the

---

[3] Ketchum also testified that there was "a good possibility" or "a chance" that Herod's DNA was not in the mixture. *Id.* at 180-81; *id.* at 187.

night of the crime, which was the night that the University of Texas's football team lost the national championship game to the University of Alabama.[4] The witnesses also testified that Holly Kelly was at Herod's mother's house earlier in the evening, but left in a blue or black truck while Herod stayed. *Id.* at 199-200; *id.* at 220-21; Dkt. 19-19, at 26-30. The witnesses testified that Herod was driving his Cadillac that night because his diesel truck was at the mechanic. Dkt. 19-18, at 198-201, 222-24.

As stated above, the prosecution's theory was that the second robber was Nick Salinas, and Alissia Gallagher testified that Salinas was the second robber. Dkt. 19-15, at 248-50. However, the prosecution never brought charges against Salinas. Salinas chose to testify on Herod's behalf, despite the trial court's admonishment regarding his Fifth Amendment rights. Dkt. 19-19, at 6-8. Salinas and his wife, Tava Salinas, both testified that they were together at home on the night of the crime and that Nick Salinas did not leave at the time of the robbery. Dkt. 19-18, at 237-38; Dkt. 19-19, at 13-14. Both also confirmed that Alissia Gallagher and Nick Salinas knew each other, despite Alissia Gallagher's statements to the contrary. Dkt. 19-18, at 242-43; Dkt. 19-19, at 14-15; *see* Dkt.

---

[4] *Id.* at 198-201 (Herod's mother testified that her son arrived at her house at 5:00 p.m. for a barbeque, that he was driving his Cadillac because his diesel truck was at the mechanic, and that he was still there at 11:30 p.m. or midnight when she went to bed); *id.* at 222-24 (Herod's stepfather testified that Herod was at his home during the football championship game with Kelly, that he was driving a Cadillac, that Kelly left in a truck without Herod, and that Herod remained until around 10:00 a.m. the next day); Dkt. 19-19, at 26-30 (Herod's brother testified that Herod was at his mother's house for the barbeque and game and that he stayed all night, but that Kelly left after a short while).

19-15, at 248-50 (Alissia Gallagher testified that, based on the "profile" of the second robber, she "[could] say that it was Salinas" but that, although she was related to Salinas by marriage, she did not "know him personally").

### f. Closing arguments and verdict

At closing arguments, the prosecutor focused the jury on seven pieces of evidence tying Herod to the crime: (1) Ronnie Gallagher's testimony identifying Herod; (2) the two calls placed to Alissia Gallagher from the man who assaulted her; (3) the cell phones and clothing found in Herod's truck; (4) the phone records matching the x1537 phone recovered from Herod's truck to the phone that called Alissia Gallagher, as well as Herod eating the SIM cards during his meeting with Detective Robles; (5) Browder's testimony that Herod, Ronnie, and Alissia could not be excluded from DNA mixture recovered from the blindfold; (6) cell-phone tower data that tracked the x1537 phone from Santa Fe to Texas City and back again at the time of the crime; and (7) Holly Kelly's testimony implicating Herod. Dkt. 19-19, at 49-52.

Herod's counsel argued to the jury that Herod had been framed by the Gallaghers, highlighting the State's witnesses' inconsistent accounts as evidence that the accounts were fabricated. *Id.* at 52-73; *see id.* at 52 ("Mark Twain once said, 'Always tell the truth so you don't have to remember what you said.'"). He pointed out, for example, that the Gallaghers each changed their stories, and differed with each other, about what the robbers were wearing or whether they had sunglasses, whether the taller robber was with Alissia or Ronnie, whether

Ronnie was blindfolded or tied up, and whether the robbers' faces were fully covered by masks, as well as specifics about the sexual assault and Alissia's injury. *Id.* at 53-56. Counsel also argued that Ronnie had pressured Alissia to help him frame Herod:

> None of these inconsistencies as you go throughout this story when you're looking at what was said in the reports, when you're looking at what was said in the statements, when you're looking at what was said here in court, none of this can be explained by excitement or anything else. The stories change because Ronnie got her on a path, Ronnie told her what she was going to say, and had her execute it. He figured out a way to eliminate an adversary, something that he had been trying to do for quite some time.

*Id.* at 57. He noted that Kelly's reports were inconsistent with the Gallaghers' statements regarding the location of the truck, the robbers' clothing, and other details, and suggested that she was motivated to lie about Herod to "get out of jail so she can continue her life of using drugs." *Id.* at 61-64.

Herod's counsel also argued that Detective Robles failed to collect critical evidence, including evidence about the phones:

> Detective Robles talked about the phones that he found in the truck. Now, there were two people in that truck that day. When my client was arrested, there were two people in the truck. There was Holly Kelly and my client. Now, somehow by some leap of faith Detective Robles attributes these cell phones to my client when he was told by my client another cell phone number was the one that was his. It's just as likely that these cell phones were left in the vehicle by the other person in the vehicle that day. Possibly intentionally. . . .
>
> Detective Robles did not do his job, and what his job was and what would have helped this case is this. We found cell phones in the truck. We know from the reports that somebody called Alissia Gallagher on the 8th. Hmm, that would seem to be important evidence, right? But did he collect the evidence the way a normal

> police officer would do? No, he didn't. Did he take the evidence and did he have it analyzed for fingerprints or look for DNA, as they like to do in this case? Because if Ricky Herod used those phones, then there should have been his fingerprints at least on there, right? But we didn't look for those. We just assumed they were his. But there were two people in the truck. You can't make that assumption, is my point.

*Id.* at 65-66. He reminded the jury of Herod's alibi, supported by multiple witnesses who were certain of the date because of the championship football game:

> Now, we brought forth folks that told you where Ricky Herod was that night. And it was a big night. We're not talking just any college football game. We were talking about the national championship. And Texas was playing in that national championship. And it was a pretty memorable game. That's why people remember what was going on that night. That's why they were having a barbecue.

*Id.* at 70. Regarding the DNA, counsel argued that the "1 in 87" probability statistic was not compelling enough to convict Herod, "especially with all the other inconsistencies, especially with the lies that have been told in this story, especially with the motivation of the people that are involved in this case to do Ricky Herod harm." *Id.* at 68; *see id.* at 71 ("The State just has not proven their case. When it comes right down to it looking at everything—the DNA, all the statements, everything else, and considering the motivation of everybody involved—the State hasn't proven their case.").

In rebuttal, the prosecutor acknowledged the inconsistencies in the accounts of the State's witnesses. He emphasized the cell phones and their SIM cards:

> They ask you to believe that it's just chance that that phone ended up in the defendant's presence. And what does the defendant do once he sees Detective Robles with those two phones? ***There's something called consciousness of guilt***. He grabs them, cracks them open, and eats and digests the SIM cards, the brains of the phone. That's the person that we know Ricky Herod to be.

*Id*. at 79 (emphasis added). He also emphasized Browder's testimony that Herod could not be excluded from the DNA on the blindfold, stating that her conclusion was "as much as you can ever say about DNA":

> . . . Ms. Browder testified that words are important. You just can't say [the DNA] is a match. That's not scientifically accurate. You've got to say—in a mixture you can never say it's a match. You have to say 'cannot be excluded.' We know Alissia Gallagher's DNA cannot be excluded, we know Ronald Gallagher's DNA cannot be excluded, and we know the defendant's DNA could not be excluded. And that's as much as you can ever say about DNA. The rest are statistics. The Caucasians, the Hispanic males, African-American males, that's not saying they're one and the other. That's just saying those are the statistics. And that's what we know. And ***DNA is better than a fingerprint. It's your genetic fingerprint. And the defendant's DNA is absolutely right there on that blindfold***.

*Id*. at 80 (emphasis added). He dismissed Ketchum's testimony regarding DNA mixtures, again insisting to the jury that Herod's "genetic fingerprint" was "absolutely on that blindfold":

> The defense expert would have you believe, "Well, that's not how I do it. I . . . say that people are included in a mixture and then I take out all the DNA things that they have in common, and then I'm going to say, 'Well, there are still some unknowns so I'm going to exclude the defendant.'" And you saw the testimony. I don't have to rehash it. But the language is there for a reason. And when you as an expert assume that everybody is in there except for the guy who's paying you, that's a problem. And that's not unknown female DNA. Of course, there's female DNA in the mixture. That's Alissia Gallagher. Don't let her paint that as, "Well, you take out Alissia Gallagher and

Ronald Gallagher." That's not how a mixture works. You know that and you've heard the testimony. ***The defendant's genetic fingerprint is absolutely on that blindfold.***

*Id*. at 80-81 (emphasis added). *See* Dkt. 19-15, at 95 (prosecutor stated in opening argument that Herod's "DNA profile was present" on the blindfold).

The prosecutor also responded to the defense's argument that Ronnie Gallagher had fabricated the account against Herod:

And in the end you've got to ask yourself, Is it more reasonable that all of that evidence is what it is; that the Gallaghers are telling you the truth about what happened that night; or if Ronnie Gallagher decided in that hospital waiting room, "I'm just going to name this guy that I kind of know," "I'm going to hope that two cell phones show up in his truck," "I'm going to hope that he eats the SIM cards," "I'm going to hope that he calls using those cell phones when we get back home," "I'm going to hope his DNA is on my white T-shirt that was used to blindfold me," "I'm going to hope that the person driving his truck just happens to flip on me," as she did in March of 2010, or is it more reasonable that it was this very defendant who we know committed those acts?

Dkt. 19-19, at 82-83.

The jury convicted Herod of both aggravated robbery and aggravated sexual assault. The court sentenced him to 99 years to life on each conviction.

## 2. First state habeas proceeding

After both of Herod's convictions were affirmed in 2013, he filed a *pro se* application for state habeas relief. He raised seven claims for relief in each application, including multiple claims that his trial counsel was constitutionally ineffective. The trial court recommended denial of relief with identical findings of fact and conclusions of law for each case. The trial court's findings of fact and

conclusions of law, in their entirety, read as follows:

> This Trial Court finds that there is no necessity for a fact finding hearing because there is ample evidence from the State's answer, the State's supplemental answer, Counsels' affidavits (attached), and the Trial Court's record to rule on the relief sought.

> This Trial Court finds that the representations contained in the State's Answer, State's Supplemental Answer, and said affidavits are correct and credible. This Trial Court finds [Herod] hasn't shown his trial attorney or appellate attorney were ineffective. This Trial Court finds the outcome of the proceedings wouldn't have been different but for counsel's alleged errors.

> Moreover, the Trial Court finds that there are no controverted previously unresolved facts or issues exist [sic] which would entitle [Herod] to relief and that [Herod's] claims have no legal merit.

> This Trial Court recommends relief be denied.

Dkt. 21-12, at 35-36 (10CR325); Dkt. 21-15, at 30-31 (10CR326). The Court of Criminal Appeals then denied both applications without written order on the trial court's findings.

### 3.    Federal habeas petition, DNA recalculation, and stay of federal proceeding

Herod filed his initial federal habeas petition *pro se* on December 3, 2015. In 2016, while his federal petition was pending, Herod received a letter from the district attorney informing him that recalculation was available. Herod requested recalculation and, on February 9, 2017, the DPS issued its supplemental report concluding that Herod was excluded from all DNA evidence in the case. Dkt. 33-1.

In August 2017, counsel appeared on behalf of Herod in these federal proceedings. Herod filed a motion for leave to amend his petition to bring a new

claim that the State had used false DNA evidence to support his conviction. He also requested that this court stay the habeas proceedings to permit him to return to state court and exhaust his new claim. The respondent was unopposed and, on January 16, 2018, the court stayed the case.

### 4.    Second state habeas proceeding

On March 2, 2018, Herod filed his second state habeas application, bringing four claims, including a claim based on the post-trial DNA recalculation. His claim was supported by the conclusions of two experts—Dr. Bruce Budowle for the State and Dr. Robert Collins for Herod—that Herod was excluded from all DNA evidence collected in the case, including the evidence collected from the blindfold.[5]

The trial court issued detailed findings of fact and conclusions of law as proposed by the State. Dkt. 49-10, at 18-64. Among other determinations, the trial court recommended denial of relief on Herod's DNA claim based on its conclusion that the new DNA evidence was not material because, "in view of all of the evidence presented at trial," Herod could not prove that the DNA evidence at trial "was reasonably likely to influence the jury's guilty verdict" given "an

---

[5] *See* Dkt. 49-9, at 20-24 (affidavit of Bruce Budowle, Director of the Center for Human Identification and Professor and Vice Chair in the Department of Microbiology, Immunology, and Genetics at the University of North Texas Health Science Center at Fort Worth, Texas, and a member of the Texas Forensic Science Commission); *id.* at 59-72 (affidavit of Robert Collins, a consultant and expert witness who holds a Ph.D. in Molecular and Human Genetics from Baylor College of Medicine).

abundance of non-DNA evidence establishing [Herod's] at trial." *Id.* at 57, ¶¶ 10-11.

The Court of Criminal Appeals did not follow the recommendation or rely on the trial court's findings, but instead dismissed Herod's entire application as subsequent.

### 5.    Amended federal habeas petition

Herod's amended federal habeas petition brings nine claims and challenges most of the prosecution's evidence against him. His claims are:

1.    The false DNA evidence violated his due-process rights.

2.    His trial counsel's conflict of interest violated his due-process rights.

3.    His trial counsel was constitutionally ineffective because he failed to require the disclosure of the confidential informant's identity.

4.    His trial counsel was constitutionally ineffective because he failed to preserve a *Brady* claim regarding the prosecution's incomplete DNA file.

5.    His trial counsel was constitutionally ineffective because he failed to call or adequately examine witnesses with exculpatory information.

6 & 7. His trial counsel was constitutionally ineffective in connection with the two cell phones recovered from Herod's truck.

8.    His appellate counsel was constitutionally ineffective because he failed to raise a sufficiency-of-the-evidence claim on direct appeal.

9.    His trial counsel was constitutionally ineffective because he did not adequately challenge Detective Robles's testimony that Herod swallowed the SIM cards for both phones recovered during the search incident to his arrest.

Dkt. 41. In Claim 1, he presents the post-trial DNA recalculation. His remaining claims point to evidence in the trial and state habeas record that undermines the prosecution's theory of the case, including law-enforcement records and cell-phone records. Herod argues that all of this evidence could have been presented to support his defensive theory that Ronnie Gallagher framed him for the crime and supplied the authorities with most of the evidence against him.

### a.   DNA evidence

DPS concluded in 2017, based on its recalculation of the evidence, that Herod was excluded from all DNA collected from the crime scene. As stated above, the State's expert in state habeas proceedings agrees that Herod was excluded from all DNA evidence in the case. Herod argues in Claim 1 that the prosecution violated his rights under the Due Process Clause when it failed to disclose DNA evidence and presented false evidence at his trial.

### b.   Witnesses

Herod raises multiple federal habeas claims regarding his trial counsel's failure to adequately challenge the State's witnesses at his trial and failure to call other available witnesses who could have supported the defense theories that Herod had an alibi and had been framed. Although the prosecution relied heavily on testimony from Ronnie Gallagher, Alissia Gallagher, and Holly Kelly, Herod presents evidence that his trial counsel failed to impeach their testimony with available evidence, including the testimony of law-enforcement witnesses.

### 1. Officer Minor

Herod claims that his attorney could have used the testimony and report of Officer Minor of the Galveston County Sheriff's Office, who was subpoenaed to the trial. Officer Minor authored the initial report on the robbery and assault and interviewed Ronnie Gallagher who, on the day of the crime, gave detailed descriptions of the suspects but did not identify Herod as the perpetrator. Dkt. 41-2, at 115-17 (Officer Minor's report). At trial, however, Ronnie Gallagher testified that he recognized Herod during the crime. Herod claims that his attorney should have used Officer Minor's report and testimony to further impeach Ronnie Gallagher's testimony. Dkt. 41-1, at 72 (Claim 5).

### 2. Officer Ham

Herod argues that Ronnie Gallagher's testimony could have been impeached based on information about the informant who anonymously supplied police with Herod's photograph and full name. He claims that his trial counsel failed to use the testimony and report of Officer Ham, who interviewed the informant two days after the crime and was available to testify at Herod's trial. Officer Ham's report reflected that the informant's identification of Herod was based on information given to her by Ronnie Gallagher and that she was related to the Gallaghers. Dkt. 21-11, at 34. As Ronnie acknowledged on the stand, the informant was his mother. Herod claims that his trial counsel failed to use Officer Ham's report and testimony to support the theory that Ronnie Gallagher had framed him and to cast doubt on the accuracy of the information supplied by

Ronnie's mother. Dkt. 41-1, at 57-63 (Claim 3); *id.* at 72-73 (Claim 5)

### 3.    Officer Strickland

Officer Strickland of the Galveston County Sheriff's Office, who had been subpoenaed and was available to testify at Herod's trial, had written a police report documenting an incident in which Holly Kelly falsely accused Herod of aggravated assault. Dkt. 21-11, at 46. On October 31, 2009, about two months before the crime in this case, Strickland investigated a welfare call from Kelly. His report states that Kelly accused Herod of pulling out a knife in the presence of their mutual child and stabbing a mattress over one hundred times. *Id.* Herod denied her accusations and agreed to show Officer Strickland the mattress. Upon inspection, Strickland "did not find any cuts" on any mattress in the house. *Id.* Officer Strickland then spoke again with Kelly, who said Herod must have turned the mattress over. When he told her that he had checked both sides of the mattress, Kelly "had no explanation." *Id.*

Herod claims that his trial counsel did not adequately present this impeachment information at trial, *see* Dkt. 19-18, at 95-96, and that Kelly's harmful testimony against him could have been impeached and corrected. Dkt. 41-1, at 68-71 (Claim 5).

### 4.    Sanford

Herod claims that his trial counsel had an actual conflict of interest based on counsel's representation of George Sanford in a civil matter that was related to a criminal prosecution pending against both Sanford and Herod in 2010, at the

time of Herod's trial. Sanford signed an affidavit dated May 1, 2013, which Herod filed in his first state habeas proceeding. Dkt. 21-11, at 4-7. The affidavit stated that Sanford was outside the courtroom during Herod's trial and prepared to testify on Herod's behalf, but that Herod's counsel failed to call him to the stand. Sanford states that Herod's counsel told him that criminal charges pending against Sanford "would go away if [Sanford] didn't testify." *Id.* at 5. Sanford did not testify and, two days after Herod was convicted, the authorities dismissed the pending felony charges against him. *See* Dkt. 41-1, at 50-56 (Claim 2).

Herod additionally claims that Ronnie Gallagher could have been impeached through Sanford's testimony because, as detailed in Sanford's affidavit, he was acquainted with the Gallaghers, Herod, and Kelly. Sanford avers that he was available to testify at Herod's trial that Holly Kelly planted the phones in Herod's truck at Ronnie Gallagher's direction; that Ronnie pressured Kelly to testify falsely; that Ronnie was supplying Kelly with drugs in exchange for sex and in order to gain Kelly's assistance in testifying against Herod; that Ronnie and Herod had previously argued about Kelly, who was the mother of Herod's child; and that Sanford had witnessed a tense disagreement between Ronnie and Herod in October 2009, a few months before the robbery.[6] *See* Dkt. 41-1, at 71-72

---

[6] *See* Dkt. 21-11, at 7 (Ronnie Gallagher and Herod had "problems and disagreements for months about Holly Kelly (Herod's fiancée/son['s] mother trading sex for narcotics to Ronnie Gallagher)"); *id.* (Herod told Kelly "to get off of the drugs or their relationship was over and he would file for sole custody of their son. [Kelly] then beg[a]n to sneak off and ran the streets with Ronnie Gallagher doing and selling drugs, where then Ronnie used drugs to his advantage in getting her to help him set [Herod] up

(Claim 5).

### c.    Cell phones

Herod claims that his trial counsel was ineffective because he failed to adequately challenge the State's evidence regarding two cell phones recovered from his truck at the time of his arrest. The prosecution relied on the phones at trial, contending that the tracking data showed them moving from Santa Fe to the Gallaghers' residence at the relevant time. One phone, the x1537 phone, had been used to place two calls to Alissia Gallagher on the day after the crime. However, Herod points out that neither phone was registered or otherwise connected to him. The x1537 phone was registered to Shawn Davis, whom Detective Robles testified he could not find, and Robles testified that he did not check records or tracking data for Herod's personal phone. Herod claims that the phones and tracking data presented were irrelevant. Dkt. 41-1, at 75-79 (Claims 6 & 7).

Herod also points to records showing that the phones were linked to Alissia Gallagher's phone. Evidence in the trial record demonstrates that the x1537 phone recovered from his truck, registered to Shawn Davis, had been set up by the same person who had set up Alissia Gallagher's cell phone, was set up within 11 days of Alissia's phone, and was registered to the same account holder with the same birthday. Trial counsel did not present this information, which would have supported the defense's theory that the Gallaghers framed Herod.

by placing a cell phone in [Herod's] truck and giving false testimony in court for a reduced sentence[] on her probation violation for failing drug test [sic] and pending charges").

Additionally, Herod presents Sanford's affidavit stating he was prepared to testify that Kelly, who was present in the truck during the arrest, had planted the cell phones at the direction of Ronnie Gallagher. Dkt. 21-1, at 4-7; *see* Dkt. 19-18, at 79-80 (Kelly testified that she left her phone in Herod's truck at the time of his arrest).

Herod further claims that his current counsel is in possession of the SIM card for the x1537 phone, which counsel received from Herod's mother. Herod's mother states in an affidavit dated July 11, 2017, that she received the SIM card from Holly Kelly, to whom law-enforcement officials released the phones in February 2010. She also states that she told Herod's trial counsel about the card, but that counsel said it was irrelevant. Herod claims that his trial counsel was constitutionally ineffective because the State relied heavily at trial on Detective Robles's testimony that Herod had eaten the SIM cards for both phones. *See* Dkt. 19-19, at 79 (at closing argument, the prosecutor stated that Robles's testimony that Herod had eaten the SIM cards showed "consciousness of guilt"); Dkt. 41-1, at 82-87 (Claim 9).

## II.  <u>LEGAL STANDARDS</u>

This federal petition for habeas corpus relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act (AEDPA). *See Woodford v. Garceau*, 538 U.S. 202, 205-08 (2003); *Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Under AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the

state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Cobb v. Thaler*, 682 F.3d 364, 372-73 (5th Cir. 2012).

Federal courts look to the "last reasoned opinion" as the state court's "decision." *Ylst v. Nunnemaker*, 510 U.S. 797, 803 (1991); *see Wilson v. Sellers*, 584 U.S. 122, 125 (2018); *Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012). "Where a state court's decision is unaccompanied by an explanation," and the lower courts did not issue a reasoned opinion, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding that there is a rebuttable presumption that the federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

Review under AEDPA is "highly deferential" to the state court's decision. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). To merit relief under AEDPA, a petitioner may not merely show legal error in the state court's decision. *White v. Woodall*, 572 U.S. 415, 419 (2014) (stating being "merely wrong" or in "clear error" will not suffice federal relief under AEDPA). AEDPA review exists only to "guard against extreme malfunctions in the state criminal justice

systems." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up). "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 572 U.S. at 419-20 (quoting *Richter*, 562 U.S. at 103). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent. *See Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005). Under the "contrary to" clause, this court may afford habeas relief if the state court "reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Matamoros v. Stephens*, 783 F.3d 212, 215 (5th Cir. 2015) (cleaned up). To constitute an "unreasonable application" of clearly established federal law, the state court's determination "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods*, 575 U.S. at 316 (cleaned up).

On factual issues, AEDPA precludes federal habeas relief unless the state court's adjudication of the merits was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *See* 28 U.S.C. § 2254(d)(2); *Martinez v. Caldwell*, 644 F.3d 238, 241-42 (5th Cir. 2011).

Under § 2254(e)(1), factual determinations made by a state court are presumed correct and the petitioner must rebut the presumption by "clear and convincing evidence." Under § 2254(e)(2), a federal court may not hold an evidentiary hearing on any claim for which the petitioner "failed to develop the factual basis" in state court, unless the petitioner makes a showing including that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

## III.  <u>ANALYSIS</u>

Herod's federal habeas petition presents nine claims for relief. For the reasons stated below, the court will grant habeas relief on Claim 1 regarding DNA evidence. The court reserves judgment on the remaining eight claims, many of which identify other serious errors in the state-court proceedings.[7] In their post-

---

[7] In Claims 3-8, Herod brings multiple claims that his trial and appellate counsel were constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. Herod argues that the recommended ruling in his first state habeas proceeding was "contrary to" *Strickland* under 28 U.S.C. 2254(d)(1). The court requested, and has carefully considered, the parties' supplemental briefing on this question. *See* Dkt. 64; Dkt. 67.

argument briefing, the parties agree that the court may enter final judgment without resolving all habeas claims. *See Moore v. Vannoy*, 968 F.3d 482, 486 n.1 (5th Cir. 2020); *Young v. Herring*, 777 F.2d 198, 202 (5th Cir. 1985); Dkt. 76; Dkt. 79.

### A.    Due-Process Standards

In Claim 1, Herod claims that the State violated his rights under the Due Process Clause when it failed to disclose DNA evidence and presented false DNA evidence to the jury.

### 1.    Failure to Disclose

The Due Process Clause requires the prosecution to disclose material evidence that is favorable to the defense. *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a *Brady* violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material to either guilt or punishment. *Grace v. Hooper*, 123 F.4th 800, 805 (5th

---

*Strickland* requires a petitioner to show a "reasonable probability" that, without his counsel's errors, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. In this case, however, the state habeas court's findings of fact and conclusions of law, which are set out in full above, did not cite *Strickland* and determined that "the outcome of the proceedings ***wouldn't have been different*** but for counsel's alleged errors." Dkt. 21-12, at 35-36 (emphasis added); *see* Dkt. 21-15, at 30-31. The Supreme Court has held that the standard applied by the state habeas court in this case is contrary to *Strickland*. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Lucio v. Lumpkin*, 987 F.3d 451, 469 (5th Cir. 2021) (en banc). Therefore, if the court reached Claims 3-8, it would conduct *de novo* review under 28 U.S.C. § 2254(d)(1).

Cir. 2024); *Prystash v. Davis*, 854 F.3d 830, 837 (5th Cir. 2017). The prosecution's good or bad faith in the suppression is not a factor. *Brady*, 373 U.S. at 87; *see Canales v. Stephens*, 765 F.3d 551, 574 (5th Cir. 2014) (a *Brady* claim requires a showing that the evidence at issue was "suppressed by the State, either willfully or inadvertently") (cleaned up). The duty to disclose "extends to all evidence known not just to the prosecutors, but 'to the others acting on the government's behalf in the case, including the police.'" *Floyd v. Vannoy*, 894 F.3d 143, 161-62 (5th Cir. 2018) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

Evidence is material under *Brady* "when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (cleaned up); *Grace*, 123 F.4th at 805; *see Floyd*, 894 F.3d at 166 (evidence is material "where it simply demonstrates a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different") (cleaned up). Undisclosed evidence is not "material" under *Brady* when (1) the evidence is "merely cumulative" of other evidence in the record or (2) when the trial testimony that could have been impeached by the new evidence was "strongly corroborated" by additional evidence supporting a guilty verdict. *United States v. Brumfield*, 89 F.4th 506, 514-15 (5th Cir. 2023). *See Smith v. Cain*, 565 U.S. 73, 76 (2012) (evidence "may not be material if the State's other evidence is strong enough to sustain confidence in the verdict"); *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) ("The materiality of

*Brady* material depends almost entirely on the value of the evidence relative to other evidence mustered by the state.") (cleaned up).

The *Brady* materiality inquiry "is not a sufficiency of the evidence test," but rather asks whether the favorable evidence "undermine[s] confidence in the verdict." *Kyles*, 514 U.S. at 434-35; *see Graves v. Dretke*, 442 F.3d 334, 340 (5th Cir. 2006). Materiality "does not require the defendant to demonstrate by a preponderance of the evidence that omitted evidence would have resulted in acquittal" and a defendant "need not weigh the withheld evidence against the disclosed evidence to show he would have been acquitted by the resulting totality." *DiLosa v. Cain*, 279 F.3d 259, 263 (5th Cir. 2002) (citing *Kyles*, 514 U.S. at 434-37). *See Strickler v. Greene*, 527 U.S. 263, 290 (1999) ("[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions."). Rather, the question for the court is whether, in the absence of the favorable evidence, the verdict was worthy of confidence:

> [T]he threshold for materiality is 'that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' 'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'

*Grace*, 123 F.4th at 805-06 (cleaned up) (quoting *Kyles*, 514 U.S. at 434-35).

### 2. *Giglio* and *Napue*

A conviction violates the Fourteenth Amendment if it was obtained through false testimony. A petitioner bringing a false-testimony claim must show that (1) the testimony was actually false; (2) the prosecution knew or should have known that the testimony was false; and (3) the testimony was material. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014). The testimony is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103 (1976); *Canales*, 765 F.3d at 573.

### B. Procedural Default

The parties agree that Claim 1 is procedurally defaulted because the Court of Criminal Appeals dismissed Herod's second state habeas application as subsequent. "[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 582 U.S. 521, 527 (2017); *see Guidry v. Lumpkin*, 2 F.4th 472, 486 (5th Cir. 2021). However, a state prisoner may overcome the prohibition on review of defaulted claims if he shows "cause" to excuse his failure to comply with the state procedural rule and "actual prejudice" from the alleged constitutional violation. *Davila*, 582 U.S. at 528 (cleaned up); *see Guidry*, 2 F.4th at 486. Herod argues

that he has shown cause and prejudice for procedural default, and thus that this court can review Claim 1 *de novo*.

When conducting the inquiry regarding cause and prejudice, which are questions of federal law, this court does not defer to state-court decisions under 28 U.S.C. § 2254(d) or § 2254(e). *See Murray v. Carrier*, 477 U.S. 478, 489 (1986); *Mullis v. Lumpkin*, 70 F.4th 906, 909-11 (5th Cir. 2023); *Barrientes v. Johnson*, 221 F.3d 741, 763 (5th Cir. 2000).

### 1.    Cause

Herod argues that he has shown cause for defaulting his DNA claim because the claim was not available during his first state habeas proceeding and because he pursued the claim diligently and presented it as soon as it became available. The respondent concedes that Herod has shown cause. Dkt. 58, at 11-12. The respondent further concedes that Herod has established the first two prongs of the *Brady* test, *i.e.*, that (1) the evidence was favorable to Herod, and (2) the evidence was suppressed by the prosecution, either willfully or inadvertently. *Id.* at 11; *see Canales*, 765 F.3d at 574.

### 2.    Prejudice

A petitioner claiming prejudice from procedural default must show that the errors in his case "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Prible v. Lumpkin*, 43 F.4th 501, 514 (5th Cir. 2022) (citing *Smith v. Quarterman*, 515 F.3d 392, 403 (5th Cir. 2008)). This prejudice showing can be satisfied by a showing of

prejudice, or materiality, under *Brady*. *Id*. As the Fifth Circuit explained, these overlapping standards occur "because 'cause and prejudice parallel two of the three components of the alleged *Brady* violation itself.'" *Guidry*, 2 F.4th at 486 (quoting *Strickler*, 527 U.S. at 282). The cause requirement for default aligns with *Brady*'s suppression element, and the prejudice requirement aligns with *Brady*'s materiality element. *Prible*, 43 F. 4th at 514.[8]

Herod argues that the DNA evidence was material, noting that it was the only physical evidence incriminating him for either aggravated robbery or aggravated sexual assault. He also points to the prosecution's heavy reliance on the DNA evidence at trial. As stated above, Browder testified for the prosecution that Herod could not be excluded from eight of the 16 alleles on the DNA mixture collected from the blindfold. She also testified that there was "no difficulty" with her statistics regarding the probability of Herod being a contributor to the mixture.[9] The prosecution heavily emphasized the DNA evidence in its closing argument, telling the jury that "could not be excluded is "as much as you can ever

---

[8] The court analyzes prejudice for procedural default without deference under § 2254(d) or § 2254(e)(1). Nevertheless, because the prejudice analysis aligns with *Brady* standards, which the court will apply in the subsequent analysis of the merits of Claim 1, and because deference under § 2254(e)(1) is required for the merits analysis, the court includes citations to the state habeas court's findings in this section.

[9] *See* Dkt. 49-10, at 38-39, ¶ 40 (state habeas court recounts Browder's testimony regarding non-exclusion and her testimony regarding a "1 in 87" probability of selecting an unrelated Caucasian person at random).

say about DNA," that "DNA is better than a fingerprint, and that "[Herod's] DNA is absolutely right there on that blindfold." Dkt. 19-19, at 80.[10]

The parties agree that, based on DPS's recalculation of the evidence in 2017, Herod's DNA was excluded from the mixture. The respondent argues that Herod's trial expert, Ketchum, mitigated the damage from Browder's false testimony when she testified that Herod "should" be excluded as a contributor of the DNA on the blindfold. Dkt. 58, at 15-16. However, as the state habeas court found, Ketchum also agreed with Browder that Herod could not be excluded from the DNA sample.[11] Although Ketchum also testified that she believed Herod should not have been included in the mixture, given that the alleles from which Herod could not be excluded were either shared with the victims or very common, Dkt. 19-18, at 163, this testimony was largely negated by her agreement

---

[10] *See* Dkt. 49-10, at 42, ¶ 49 (state habeas court found that "[t]he State twice specifically argued in closing that [Herod's] DNA was on the white shirt which was used as a blindfold").

[11] *See* Dkt. 49-10, at 39-40, ¶¶ 41-42 (state habeas court found that Ketchum testified that she did not have complete data from the DPS testing and that, based only on the documentation produced to her by DPS, Herod could not be excluded from the blindfold; she further testified that she believed that he should not be included because of common and overlapping alleles). *See also id.* at 41, ¶ 45 (state habeas court found that Herod's trial counsel "presented arguments that the defense expert's testimony contradicted the State's DNA evidence or undermined its significance in sufficiently connecting [Herod] to the home invasion"); *id.* ¶¶ 46-47 (state habeas court found that Herod's trial counsel argued that the State's DNA evidence was incomplete and inconclusive); *id.* at 46, ¶ 62 (state habeas court found that the defense presented expert testimony to contradict the State's DNA evidence regarding Herod's non-exclusion); *id.* ¶ 63 (state habeas court found that Ketchum testified that Herod should not be included and gave a scientific basis for her testimony); *id.* ¶ 64 (state habeas court found that "the State's DNA evidence was not unrebutted or uncontested at trial").

with Browder's conclusion that Herod could not be excluded. *See id.* at 138, 163, 178. Moreover, Ketchum testified that she had been unable to do her own independent analysis of the DNA evidence because DPS had provided her with incomplete data. The prosecutor impeached Ketchum's credibility on cross-examination, drawing out her testimony that she had no training in human medicine, that her lab was not accredited and had received a failing grade from the Better Business Bureau, and that she was involved in the DNA search for "Bigfoot."

The respondent also argues that, when the evidence at trial is viewed in its entirety, the DNA evidence was immaterial because of "considerable evidence linking [Herod] to the crime." Dkt. 58, at 13; *see id.* at 16. In particular, the respondent relies on the following incriminatory evidence presented at trial: Ronnie Gallagher's testimony and identification of Herod; Alissia Gallagher's voice identification of Herod based on two calls from the x1537 phone; Holly Kelly's testimony; the cell phones found in Herod's truck; and the fact that Herod and the robber both drove a diesel truck. *Id.* at 13-15.

Herod's habeas claims challenge all of the evidence the respondent relies on, citing evidence from the trial and state habeas records.

- Ronnie Gallagher's testimony and identification of Herod. The respondent points to Ronnie Gallagher's testimony that he knew Herod and recognized him during the crime. Ronnie testified that he did not initially tell police that he knew Herod because he feared retaliation. However, the next day, he supplied police with Herod's nickname, and he later identified Herod in a photo array. *Id.* at 13-14.

As recounted above, Ronnie Gallagher's testimony was challenged at trial. Herod's counsel argued that Ronnie was motivated to frame Herod to eliminate a rival drug dealer, that Ronnie had pressured Alissia to lie about Herod, and that Ronnie and Alissia's inconsistent accounts of the crime supported Herod's position that their accounts were fabricated. Although Ronnie did not identify Herod to police on the night of the crime, he changed his mind the next day and provided Herod's nickname; additionally, Ronnie supplied his mother with information about Herod, and his mother anonymously contacted police and provided them with Herod's full name and a photograph.

George Sanford's affidavit, which is in the state habeas record, provides further support for the defense's theory that Ronnie Gallagher framed Herod. Sanford avers that Ronnie knew both Herod and Holly Kelly, that Ronnie had pressured Kelly to testify falsely, that Ronnie was supplying Kelly with drugs in exchange for sex, and that he directed Kelly to plant the phones that were found in Herod's truck at the arrest.

- <u>Alissia Gallagher's voice identification of Herod</u>. The respondent cites Alissia Gallagher's identification of Herod based on his voice, both during the offense and later on a call from the x1537 phone. Alissia testified that she had given the robber her phone number during the robbery when he asked for it and that, during two calls the next day, she recognized his voice from the night before. *Id.* at 14.

Herod's counsel challenged Alissia's testimony at trial and, as with Ronnie's testimony, pointed out numerous inconsistencies in her accounts. On cross examination, Alissia admitted she had made a false statement to police when she told them that the perpetrator attempted to put his penis in her vagina. Although Alissia testified that one of the robbers threw her on the couch, choked her, and sexually assaulted her by rubbing his finger on her private parts, the SANE nurse at the hospital on the night of the crime documented a "fake cry" and stated that Alissia had denied choking or physical trauma. Additionally, Alissia's testimony that she had not met or seen Salinas, the second robber, despite being related to him by marriage, was internally inconsistent and was countered by testimony from Salinas and his wife. Finally, as addressed below, the x1537 phone used to call Alissia on the day after the crime, which

was the basis for her voice identification, was not registered to Herod and had significant similarities to the registration of Alissia's own phone.

- Holly Kelly's testimony. The respondent cites to Holly Kelly's testimony that she drove Herod and Salinas to the Gallaghers' home on the time of the crime, that she saw Herod and Salinas put on beanies and take handguns before going inside, that Herod was motivated to rob the Gallaghers for drugs and money, and that she watched Herod and Salinas divide up money and drugs after the crime. *Id.* at 15. Salinas was never charged in the case.

  Evidence in the trial record reflects that Kelly received a plea deal in exchange for her testimony against Herod. Herod's counsel argued that Kelly's testimony was inconsistent with the Gallaghers' testimony, that she was motivated to fabricate her account in order to implicate Herod, and that her testimony was unreliable. Herod presented witnesses that challenged her account, testifying that Herod and Kelly were both at Herod's parents' home on the night of the crime, which was also the night of the college football championship, and that Kelly had left the gathering while Herod stayed. Sanford's affidavit stated that he was available to testify that Ronnie had pressured Kelly to testify falsely against Herod in exchange for drugs.

  The record also reflects that Kelly had deceived Herod in the past. Kelly acknowledged on the stand that, although she and Herod had a child together, she had not told him that she was married to someone else at the time. The trial record contains evidence that Kelly had falsely accused Herod of a violent assault, claiming that he had repeatedly stabbed her mattress when she and their child were present, but that an officer called to the scene found no evidence supporting her allegation.

- Cell-phone evidence. The respondent argues that the phones recovered from Herod's truck, which included the x1537 phone used to call Alissia Gallagher's phone twice after the crime, "directly" linked Herod to the crime. *Id.* at 14.

  Herod challenges the cell-phone evidence, including the calls to Alissia and the tracking data, and argues that it is irrelevant because the phones were not his. Although officers found two phones in his truck when he was arrested, neither phone was registered to Herod.

Moreover, Kelly was with Herod at the time and testified that she had left her phone in the truck. At trial, Detective Robles testified that the x1537 phone was registered to Shawn Davis, whom Robles could not find, and that he had not obtained records for Herod's personal phone or checked its location at the time of the crime. Additionally, although the respondent argues that the prosecution tracked one of the phones "from Herod's home to the Gallagher[s'] home" at the time of the robbery, *id.* at 15, the trial testimony showed that the phone actually was tracked to an area within a four-mile radius of the two locations.

Although not presented by Herod's counsel, evidence in the trial record showed that the x1537 phone had multiple unexplained similarities to Alissia Gallagher's phone. Both the x1537 phone and Alissia's phone were set up in October 2009, about 11 days apart, and approximately 2.5 months before the crime. Phone records demonstrate that the x1537 phone was set up by a person who had the same contact phone number, same address, and same date of birth as the person who set up Alissia's phone. As stated above, Sanford avers in his affidavit that he was available to testify that Kelly planted the x1537 phone in Herod's truck at Ronnie's direction.

Finally, Detective Robles testified at trial that Herod ate both SIM cards while in his office, including the card for the x1537 phone, although he did not include the information in his written report. The prosecutor argued in closing that eating the SIM cards demonstrated Herod's "consciousness of guilt." Herod denies this account and states that his current counsel is in possession of the SIM card for the x1537 phone.

- Herod's diesel truck. The respondent cites the fact that Herod drove a diesel truck at the time of his arrest, which was consistent with Ronnie Gallagher's testimony that he heard a diesel truck outside during the crime. *Id.* Herod argues that diesel trucks are common in southeast Texas and thus could not implicate Herod specifically. Additionally, Herod's mother testified at trial that Herod's diesel truck was at the mechanic on the night of the crime and that he arrived at her house in his Cadillac.

In summary, the parties agree that Herod's DNA was not found at the scene. Browder testified at trial that Herod could not be excluded from the DNA

mixture on the blindfold and that the statistical probability of selecting an unrelated Caucasian person at random as contributor was "1 in 87" for Caucasians.[12] Although Ketchum testified for the defense and countered some of Browder's testimony, she also agreed with Browder that Herod could not be excluded from the DNA evidence on the blindfold. Given that the DNA evidence was the only physical evidence that placed Herod at the crime scene or incriminated him for either aggravated robbery or aggravated sexual assault, Browder's testimony was not "merely cumulative" of other evidence in the record. *See Brumfield*, 89 F.4th at 514-15.

Moreover, the non-DNA evidence cited by the respondent was challenged at trial and is further weakened by evidence in the state habeas record. As reflected in the state habeas court's findings, the prosecution relied heavily on testimony from Ronnie and Alissia Gallagher, *see* Dkt. 49-10, at 22-31, ¶¶ 12-27, and Detective Robles obtained an arrest warrant for Herod based entirely on information from the Gallaghers. *Id.* at 31-32, ¶¶ 28-29. However, the Gallaghers' testimony had significant inconsistencies, as did Kelly's testimony, and Herod's trial counsel argued to the jury that all three witnesses were motivated to frame Herod. The prosecution also relied on evidence from the x1537 phone, including the calls placed to Alissia, tracking information, and SIM cards, but did not

---

[12] The state habeas court found that Browder's "1 in 87" probability statistic "only minimally connected" Herod to the crime. Dkt. 49-10, at 46, ¶ 65. Herod's counsel made the same argument at trial, arguing that the probability was not sufficiently compelling.

directly link Herod to the phone. The record contained evidence supporting the defense's theory at trial that the Gallaghers and Kelly framed Herod, including phone records strongly suggesting that the same person set up the x1537 phone and Alissia's phone, Kelly's presence in Herod's truck when officers recovered the phone, and Kelly's testimony at trial that her phone was in the truck at the time of the arrest. The court thus concludes that the non-DNA evidence supporting the guilty verdict did not provide "strong corroboration" of Browder's testimony incriminating Herod. *See Brumfield*, 89 F. 4th at 515.

For the reasons stated above, the court holds that Browder's false testimony that Herod could not be excluded from the DNA evidence worked to Herod's actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions, and was material under *Brady*. *See Prible*, 43 F.4th at 514. The materiality standard does not require Herod to weigh the DNA evidence against other evidence presented at his trial or to show that his exclusion from the DNA evidence would have resulted in his acquittal. *See DiLosa*, 279 F.3d at 263. Herod has shown a "reasonable likelihood" that the false DNA evidence "could have affected the judgment of the jury." *See Wearry*, 577 U.S. at 392; *Guidry*, 2 F.4th at 486. He also has shown that the DNA evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *See Kyles*, 514 U.S. at 435; *Grace*, 123 F.4th at 805-06.

Because Herod has shown cause and prejudice for the procedural default of Claim 1, the court proceeds to the merits of his claim.

### C. Due-Process Merits

Herod claims that the prosecution violated his due-process rights under (1) *Brady* and its progeny and (2) the "false evidence" line of cases. He raised these claims in his second state habeas application. Because he has shown cause and prejudice for defaulting Claim 1, the court conducts the merits inquiry *de novo*, without deference under § 2254(d). However, the court must defer to "a determination of a factual issue made by a State court," which is presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Murphy v. Davis*, 901 F.3d 578, 595 (5th Cir. 2018). § 2254(e)(1) does not apply to the state court's recommended legal conclusions.

Materiality is a mixed question of law and fact. *Uvukansi v. Guerrero*, 126 F.4th 382, 387 (5th Cir. 2025) (citing *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997)). When this court reviews mixed questions, § 2254(e)(1) applies only to the underlying fact questions, and not to the state court's determination on the mixed question. *Austin v. Davis,* 876 F.3d 757, 778-79 (5th Cir. 2017); *see Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023) (§ 2254(e)(1) applies to "underlying factual findings").

### 1. *Brady*

Herod's petition claims that the prosecution violated *Brady* when it failed to turn over evidence that Herod was excluded as a contributor to all DNA

evidence from the crime scene and that, at the time of Herod's trial, the forensic-science community had concerns about the reliability of the method used by Browder to analyze the DNA evidence in his case. Dkt. 41-1, at 40-46. *Brady* requires a petitioner to show that the undisclosed evidence at issue was favorable to the accused; was suppressed by the prosecution; and was material. *Grace*, 123 F.4th at 805. The third element, materiality, conflates entirely with prejudice for procedural default, as discussed above. *See Prible*, 43 F.4th at 514.

The respondent has conceded *Brady*'s first two elements, suppression and favorability.[13] The respondent also concedes that the relevant DNA evidence was "unascertainable through the exercise of reasonable diligence." Dkt. 58, at 11. The only remaining question, therefore, is materiality. Evidence is material under *Brady* where it shows "any reasonable likelihood" that the evidence could have affected the judgment of the jury. *Wearry*, 577 U.S. at 392; *see Floyd*, 894 F.3d at 166. In determining materiality, the court does not defer to the state habeas court's materiality conclusion, but defers to the underlying findings of fact. *See Uvukansi*, 126 F.4th at 387; *Neal*, 78 F.4th at 783; *Austin*, 876 F.3d at 778-79.

---

[13] The respondent conceded both suppression and favorability when arguing that Herod has not shown prejudice for procedural default. Dkt. 58, at 11-12; Dkt. 61, at 10. Although Herod also seeks relief on the merits of his *Brady* claim, Dkt. 41-1, at 39-46, the respondent has not opposed the claim on its merits. Herod's briefing requested that the respondent, "in the name of [d]ue [p]rocess, truth, and science, . . . at a minimum not dispute that favorable evidence was withheld by the state at Herod's trial." *Id.* at 46. The State forcefully opposed both elements during state habeas review but, in these federal proceedings, the respondent has not argued that the DNA evidence was not suppressed or not favorable.

For the reasons stated in the discussion above, which applied *Brady* standards, and presuming under § 2254(e)(1) that all of the state habeas court's findings of fact relevant to materiality are correct, the court concludes that Herod has met his burden to show materiality under *Brady*. Herod therefore is entitled to habeas relief under *Brady* on Claim 1.

### 2.    False testimony and evidence

Herod argues that the State presented false evidence and testimony through Browder, the DPS analyst. As stated above, a petitioner bringing a false-testimony claim must show that (1) the testimony was actually false; (2) the prosecution knew or should have known that the testimony was false; and (3) the testimony was material. *Giglio*, 405 U.S. at 153-54; *Napue*, 360 U.S. at 269; *Canales*, 765 F.3d at 573. False testimony is material if there is "any reasonable likelihood" that it "could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103. The respondent argues that, when analyzing the DNA evidence in Herod's case, Browder followed protocols that were common and acceptable at the time, Dkt. 58, at 12, but does not otherwise address Herod's arguments on the merits of this claim.

Browder testified at trial that Herod could not be excluded from eight of the 16 alleles in the DNA mixture recovered from the blindfold. She further testified that, based on her analysis using the Combined Probability of Inclusion (CPI) method, the statistical probability of selecting an unrelated person at random who could be the contributor was "1 in 87 for Caucasians" such as Herod.

She stated that non-exclusion was the "strongest language" possible when the DNA evidence at issue is a mixture and that there was "no difficulty" with her statistics regarding the probability of Herod's non-exclusion. The prosecutor then emphasized the point in closing argument. The parties now agree that Herod's DNA was not found anywhere at the scene. Moreover, the prosecution was aware in 2012, when Herod was tried, of concerns regarding the reliability of the CPI method for analysis of DNA mixtures.

### a.   Falsity

The respondent does not oppose Herod's argument that Browder testified falsely when she stated that Herod could not be excluded from the DNA mixture on the blindfold. Dr. Budowle, the State's state habeas expert, averred that, based on DPS's 2017 recalculation, "Herod was excluded as a contributor to [the] DNA profile" from "item 3(b)," which was the blindfold. *See* Dkt. 49-9, at 22, ¶ 9. The state habeas court found that Herod was excluded. *See* Dkt. 49-10, at 21-22, ¶ 11 (DPS's report in 2017 concluded that the DNA mixture on the blindfold had three contributors and that Herod was excluded from the mixture); *id.* at 44-45, ¶ 57 (the DNA results obtained by DPS "changed in 2017 after a reanalysis of the evidence by [DPS] using a different method of mixture interpretation").

As the state habeas court found, DPS adopted the CPI method as its protocol for analysis of evidence from DNA mixtures in 1999 and retained the protocol through 2015. *Id.* at 43, ¶¶ 52-53. The court further found, based on Dr. Budowle's affidavit, that CPI "is a valid statistical method conveying the portion

of the population that cannot be excluded as a potential contributor of the mixture." *Id.* ¶ 54. However, Dr. Budowle explains that, with the CPI method, using a "known reference profile" of a suspect to drive the data interpretation is known as "suspect-driven bias":

> The CPI was used to interpret the mixture evidence in the 2011 report [in Herod's case]. One must be aware of the limitations of any method to apply it correctly. The primary requirement of using the CPI is that it can only be applied to genetic markers (or loci) in which it is highly unlikely that allele drop out has occurred (i.e. there are no missing data). Most laboratories using the CPI did not appreciate this limitation and selected loci for the CPI calculation relying on the known reference profile(s) of person(s) of interest. An approach that uses the known reference profile(s) to drive the interpretation of the evidentiary data is commonly referred to as "suspect-driven bias" and should be avoided.

Dkt. 49-9, at 22, ¶ 10. He states that Browder's analysis was tainted by suspect-driven bias because, when testing the DNA mixture from the blindfold, she used three different CPI calculations:

> In this case, the DPS analyst provided three different CPI calculations for the same mixture profile from [the blindfold] in the 2011 report—one for each of the victims (Alissia Gallagher and Ronald Gallagher) and one associated with the suspect (Richard Herod). Only one CPI can be generated for a mixture profile. The generation of three CPIs indicates that the DPS analyst was aware of the possibility of allele drop out as different loci were selected for each CPI statistic. Calculating three CPIs is an indication of "suspect-driven bias" (using reference profiles to select loci for statistical calculations).

*Id.* at 22-23, ¶ 11.

Browder's suspect-driven bias led her to wrongly assume that the DNA mixture from the blindfold had four contributors rather than three. *Id.* at 23,

¶ 12. Dr. Budowle states that this erroneous assumption permitted inclusion of Herod as a contributor to the mixture:

> Annotation on the [blindfold] electropherogram (i.e. the print out of the DNA profile) indicates that the DPS analyst assumed there were four contributors to the mixture. The likely explanation for deriving four contributors is that the DPS analyst used the data from the known reference samples to drive the mixture interpretation. As an example, the STR locus THOl displayed 5 alleles. If one were to assume that Richard Herod, Alissia Gallagher and Ronald Gallagher were in fact contributors, their combined DNA profiles explain 4 of the 5 alleles observed. Thus, the one remaining allele (allele 8) would have had to come from another (unknown) person. Instead, the DPS analyst should have evaluated the mixture prior to referring to the reference samples of the victims and suspect and determined the most plausible explanation of the number of contributors.

*Id.* He avers that, based on his interpretation of the mixture, "the most plausible explanation is the mixture is comprised of three individuals (not four)" and that, "[u]nder the three-person scenario," the data "support the conclusion that Richard Herod is excluded as a potential contributor." *Id.* ¶¶ 13-14. The state habeas court found, based on Dr. Budowle's affidavit, that suspect-driven bias was present in Browder's interpretation of the DNA mixture and her assumption of four contributors, although it also found that Browder's approach was based on a "common misunderstanding of the application of the CPI methodology by many practitioners in the field." Dkt. 49-10, at 44, ¶ 56.[14]

Dr. Budowle further states that, setting aside Browder's suspect-driven assumption of four contributors, Browder still misapplied the CPI method in her

---

[14] *See id.* ("Browder's DNA mixture interpretation indicated the presence of 'suspect-driven bias' (using reference profiles to select loci for statistical calculations)").

testing and thus erred. Even when four contributors were assumed, the testing should have excluded Herod from the DNA sample because he carried an allele that was not in the mixture:

> Indeed, Richard Herod should have been excluded even considering four contributors. At the D3S1358 locus Richard Herod carries a 13 allele which was not detected in the mixture and at the D19S433 locus Richard Herod carries a 13 allele which was not detected in the mixture. These two markers support the exclusion of Richard Herod even under a four-person scenario.

Dkt. 49-9, at 23, ¶ 15.

Dr. Collins, Herod's state habeas expert, agrees with Dr. Budowle regarding Browder's multi-layered errors:

> I completely agree with Dr. Budowle's analysis of the interpretation done by the DPS analyst in paragraphs 11-16 of [Dr. Budowle's] affidavit. Not only did Clare Browder improperly use a CPI approach in the analysis, she somehow improperly combined its use (which produces one statistic) with a method that produces a statistic for each individual included in the mixture. She improperly used CPI in the analysis even though she followed DPS protocols. In addition, she used the CPI approach incorrectly. Dr. Budowle points out that not only is Mr. Herod excluded if the analysis is done properly based on 3 contributors, he would also be excluded if the analyst would have correctly done the analysis using the mistaken 4 contributor assumption that she did use.

*Id.* at 71, at ¶ 29. In other words, the expert testimony in the record shows consensus that Browder's testimony was false because she improperly used a known reference profile from Herod to drive her analysis, leading to her conclusion that there were four contributors to the mixture and that Herod could not be excluded. The experts also agree that, even based on the biased

assumption that the mixture had four contributors, Herod should have been excluded.

Finally, Browder testified falsely when she testified that there was no difficulty with her probability statistics in Herod's case. After she testified that Herod could not be excluded from the DNA mixture on the blindfold, and that the statistical probability of selecting an unrelated Caucasian person was "1 in 87," Herod's trial counsel asked her about uncertainties with the statistical probabilities she had generated through the CPI method. In response, Browder testified, "There's no difficulty with the statistics." Dkt. 19-17, at 232. She then explained, "I calculate statistics based on at what location is the known sample included in this profile." *Id.* In fact, as recounted above, and as Dr. Budowle and Dr. Collins explained in their affidavits, Browder's reference to known samples resulted in her erroneous, suspect-driven assumption that the mixture had four contributors.[15]

Although Browder testified that Herod could not be excluded and that the statistical probability of selecting an unrelated Caucasian person was "1 in 87," in fact Herod was excluded from the DNA evidence on the blindfold. Browder's conclusion and statistics, and her certainty about her statistics, were wrong. This

---

[15] *See* Dkt. 49-9, at 23, ¶ 16 (Dr. Budowle explains that "A core [principle] of interpretation using the CPI statistic is that the analyst must perform an *a priori* evaluation of the data before comparing it with a known reference profile," and that Browder erred because she employed a "suspect-driven approach (using the reference profile data to guide decision-making)").

holding is supported by Dr. Budowle's affidavit and by the state habeas court's findings, as set out above. To the extent any state habeas findings could be construed to conflict with a holding that Browder's testimony was false,[16] the consensus of Dr. Budowle and Dr. Collins is "clear and convincing evidence" that sufficiently rebuts the findings under 28 U.S.C. § 2254(e).

Therefore, the first *Giglio* element is satisfied.

### b.    Knowledge

Herod claims that DPS knew or should have known that Browder's testimony regarding Herod's non-exclusion from the DNA mixture, or her certainty regarding the reliability of her statistics based on CPI methods and known reference profiles, was false.[17] He presents evidence that DPS was aware, before his trial in 2012, of uncertainties and potential inaccuracies when using of the CPI method for DNA mixtures, but that DPS did not implement changes to its protocol until 2015. *See* Dkt. 41-2, at 42-47 (Appendix 9) (DPS documents

---

[16] For example, in the context of Herod's *Brady* claim, the state habeas court found that DPS' delay in implementation of the SWGDAM guidelines until 2015 "would not justify, excuse, or clear [Herod] from fault in the instant offenses and would not dispute, disparage, deny or contradict other evidence presented by the State—including the DNA evidence—in [Herod's] trial." Dkt. 49-10, at 49, ¶ 80. This determination is partially a conclusion regarding materiality, which is a mixed question of fact and law for which no deference is due under § 2254(e)(1). *See Uvukansi,* 126 F.4th at 387; *Neal*, 78 F.4th at 783; *Austin*, 876 F.3d at 778. The underlying findings are rebutted by the clear and convincing evidence in the affidavits of Dr. Budowle and Dr. Collins.

[17] DPS is a state agency and Browder was, at all relevant times, a DPS analyst. Browder and DPS are members of the prosecution team in this case. *See Avila v. Quarterman*, 560 F.3d 299, 307-08 (5th Cir. 2009); *United States v. Antone,* 603 F.2d 566, 569 (5th Cir. 1979).

regarding its 2015 protocol change).

The state habeas court addressed the changes in DPS protocols and found that, in 2010, the Scientific Working Group on DNA Analysis Methods (SWGDAM) published guidelines regarding "DNA mixture interpretations" that were "available to the public." Dkt. 49-10, at 47, ¶ 71. After the publication, DPS "began to evaluate and implement recommendations from the SWGDAM guidelines." *Id.* at 21, ¶ 8. Between 2010 and 2014, DPS conducted studies to address the guidelines but, "due to a lack of consensus in the forensic DNA community," did not implement changes to its protocols until 2015:

> From 2011 to 2014, [DPS] conducted multiple validation studies to address the SWGDAM recommendations. However, due to a lack of consensus in the forensic DNA community, [DPS] did not implement final changes to its DNA mixture interpretation guidelines until August 10, 2015.

*Id.* at 21, ¶ 9. The state habeas court found that "[t]he [DPS] protocol change in DNA mixture interpretation based upon the SWGDAM guidance would produce more reliable results and more conservative statistics." *Id.*

The documents submitted by Herod, which are cited and credited in the state habeas court's ruling, reflect that DPS's 2015 protocol change was based on "concerns" regarding the use of the CPI method for interpretation of DNA mixtures, like the mixture collected from the blindfold in this case. The Texas Forensic Science Commission (TFSC), a state agency, issued an announcement to "the Texas Criminal Justice Community" dated August 21, 2015, discussing the concerns:

> This letter provides notification to the community regarding an issue of potential concern to judges, criminal prosecutors, criminal defense lawyers, victims and defendants in the Texas criminal justice system. The concerns involve the interpretation of DNA results where multiple contributors may be present, commonly referred to as DNA mixture interpretation. The attached document details the origin and scope of the concerns.

Dkt. 41-2, at 45. TFSC's announcement recommended that prosecutors or defendants with cases involving a DNA mixture "consider requesting confirmation" that CPI had been calculated "using current and proper mixture interpretation protocols" and that, if such confirmation were unavailable, consider requesting recalculation of the data. *Id.* The attached document, referenced above, stated that mixture interpretation had evolved "over the last 5-10 years," due in part to the SWGDAM guidelines in 2010. *Id.* at 47. It also acknowledged that, "since at least 2005" when the National Institute of Standards and Technology (NIST) published the "MIX05 study," the "forensic DNA community ha[d] been aware of substantial variance in mixture interpretation among laboratories." *Id.*[18]

DPS issued a letter dated September 10, 2015, attributing the five-year delay in its protocol change to a "lack of consensus" or "clear instruction" regarding the use of CPI for DNA mixtures:

> Due to a lack of consensus in the forensic DNA testing community about the direction of the changes or clear instruction on the

---

[18] The attached document also stated that NIST "did not expressly flag which interpretation approaches were considered scientifically acceptable and which were not." *Id.*

application of CPI, final changes to our interpretation guidelines were not implemented until that clear instruction was provided. . .

*Id.* at 43. The state habeas court cited these documents, finding that DPS delayed its protocol change until 2015 "due to a lack of consensus in the forensic DNA community." Dkt. 49-10, at 21, ¶ 9.[19]

DPS used the 1999 protocol when testing the data in Herod's case, and Browder testified that there was "no difficulty" with the statistics she generated based on CPI. Based on the documents presented by Herod, which are cited and credited by the state habeas court, DPS was aware in 2012 of concerns regarding potential inaccuracies when using the CPI method on DNA mixtures. Therefore, the State knew or should have known at Herod's trial that Browder's expressed certainty in her statistics was false. [20] Additionally, the State knew or should have known that Browder erred in her application of the 1999 protocol because, as stated above, Dr. Budowle explains that Herod "carrie[d] a 13 allele which was

_____

[19] Dr. Collins provides additional background regarding Texas's delay between 2010 and 2015, explaining that all DNA labs in the United States were required to adopt the SWGDAM guidelines in order not to lose accreditation and that DPS's lab was scheduled to lose accreditation in 2015. *See* Dkt. 49-9, at 64-65, ¶¶ 16-18; *id.* at 71, ¶ 31. He also states that DPS's adoption of the guidelines on August 10, 2015, was only 21 days before its accreditation would have been lost. *Id.* ¶ 33.

[20] Dr. Budowle stated in his affidavit that Browder's generation of three different CPI calculations for the DNA mixture on the blindfold "indicates that the DPS analyst was *aware* of the possibility of allele drop out" and thus indicated "suspect-driven bias." Dkt. 49-9 at 22-23, ¶ 11 (emphasis added). The state habeas court found that suspect-driven bias tainted Browder's analysis of the data. Dkt. 49-10, at 44, ¶ 56.

not detected in the mixture" and thus should have been excluded even if four contributors were assumed. *See* Dkt. 49-9, at 23, ¶ 15.

The respondent argues that Herod's *Giglio* claim based on Browder's false testimony lacks merit because Browder "testified in accordance with the DNA mixture protocols in effect at the time of trial, which were scientifically acceptable and used by most laboratories in the United States." Dkt. 58, at 12; *see id.* at 81; Dkt. 64, at 3. The state habeas court found that the CPI method was "not scientifically unacceptable" in 2012 and that Browder's approach to mixture interpretation was "a common historical misunderstanding." Dkt. 49-10, at 43, ¶ 54; *id.* at 44, ¶ 56.[21] The court also found that DPS had "self-corrected" its protocol for interpretation of DNA mixtures and that the self-correction occurred after Herod's trial, Dkt. 49-10, at 45, ¶¶ 58-59,[22] and that DPS's five-year delay in adopting the 2010 SWGDAM guidelines was not improper, erroneous, or negligent. Dkt. 49-10, at 48, ¶ 76. All of these findings are presumed correct under 28 U.S.C. § 2254(e)(1). They do not conflict with this court's conclusion that the State knew or should have known in 2012 that its certainty expressed through Browder, *i.e.*, that there was no difficulty with her conclusion that Herod

---

[21] *See* Dkt. 49-9, at 23-24, ¶ 16 (Dr. Budowle averred that Browder's "suspect-driven approach" was "based on a common misunderstanding of the application of the CPI methodology by many practitioners the field").

[22] *See* Dkt. 49-9, at 24, ¶ 17 (Dr. Budowle described DPS's adoption of a new protocol as "self-correction" and stated that the self-correction "is one example of a broader evolution among forensic DNA laboratories nationwide with respect to DNA mixture interpretation").

could not be excluded based on CPI statistics and known reference profiles, was false. They also are irrelevant to the experts' consensus that, even based on the 1999 protocol, Browder erred and Herod should have been excluded because he carried an allele that was not detected in the mixture. *See* Dkt. 49-9, at 23, ¶ 15; Dkt. 49-9, at 71, ¶ 29.[23]

Therefore, the second *Giglio* element is satisfied.

### c.    Materiality

The prosecution relied heavily on Browder's testimony that Herod could not be excluded from the DNA evidence collected from the blindfold. At closing argument, the prosecutor told the jury that the DNA evidence was "better than a fingerprint" and that Herod's DNA was "absolutely on that blindfold," placing Herod at the crime scene. In fact, however, Herod was excluded from all DNA evidence from the crime scene.

This court already has concluded that the false DNA evidence at Herod's trial was material under *Brady* standards. For the same reasons, and again presuming under § 2254(e)(1) that all of the state habeas court's findings of fact

---

[23] The state habeas court found that Herod "does not present any allegation or evidence reflecting that Browder intentionally attempted to implicate [Herod] or negligently failed to adhere to [DPS's] DNA[-]mixture protocols." Dkt. 49-10, at 45, ¶ 61. Because Herod's claim does not rely on Browder's personal intent or negligence, this finding is irrelevant to the *Giglio* issue before the court. To the extent the finding conflicts with Dr. Budowle's statement that Herod should have been excluded from the DNA mixture on the blindfold even allowing for Browder's assumption that the mixture had four contributors, the finding is sufficiently rebutted by clear and convincing evidence, which is the explicit consensus of state habeas experts for the State and Herod. *See* Dkt. 49-9, at 23, ¶ 15; *id.* at 71, ¶ 29.

relevant to materiality are correct, there is a reasonable likelihood that the false DNA evidence "could have affected the judgment of the jury" in Herod's case. *Canales*, 754 F.3d at 573. Therefore, the third element under *Giglio* is satisfied.

Herod is entitled to habeas relief under *Giglio* on Claim 1.

### 3.    Conclusion for Claim 1

On *de novo* review under 28 U.S.C. § 2254(d), and having deferred to the state-court findings as required by 28 U.S.C. § 2254(e)(1), the court concludes that Herod's due-process rights were violated. Additionally, based on a careful examination of all matters of record, under the facts and circumstances of this case, the court concludes that both the law and justice demand relief. 28 U.S.C. § 2243; *Brown v. Davenport*, 596 U.S. 118, 134 (2022); *Neal*, 78 F.4th at 796.

The court will conditionally grant the writ to afford the State an opportunity to correct the constitutional infirmity of Herod's confinement. *See Smith v. Lucas*, 9 F.3d 359, 366-367 (5th Cir. 1993) (citing *Richmond v. Lewis*, 506 U.S. 40 (1992)); *Burdine v. Johnson*, 87 F. Supp. 2d 711, 715-16 (S.D. Tex. 2000). Because no just reason exists for delay, the court will enter final judgment. *See* FED. R. CIV. P. 54(b).

The court does not grant habeas relief lightly. The great writ of habeas corpus exists only for extreme malfunctions of the criminal process. Congress has confined federal habeas relief to narrow parameters, deferential to the State that invested significant resources into its criminal prosecution. The law places primary emphasis on the criminal trial, respecting the jury's role in resolving

evidentiary conflicts and determining a defendant's fate. Only extreme errors justify federal intrusion into the state criminal process.

Extreme errors infect this case. The system failed Herod at several critical points in the process. The trial evidence against Herod was contradictory, some of it was tainted, and much of it was challenged by the defense. The jury had to resolve difficult credibility questions about unsympathetic witnesses and unreliable evidence. Within that sea of uncertain facts, the State presented the DNA evidence as sure and unimpeachable. The State relied on science as a failsafe, arguing that DNA evidence was as dependable as a fingerprint. Time has proven that—in this case—it wasn't. Aside from the DNA evidence, the State's case against Herod was made up of disputed facts and the testimony of untrustworthy witnesses. Seen in that light, there is a reasonable likelihood that the State's presentation of DNA evidence affected the jury's verdict.

The falsity of the DNA evidence was not the only trial error. Herod has raised several compelling habeas claims worthy of serious consideration. The court reserves judgment on the remaining claims in Herod's petition, but only out of judicial economy. While not addressing their merits at this time, the court observes that full development of Herod's remaining claims would pose significant additional concerns about the integrity of his conviction.

## IV.    **<u>CONCLUSION</u>**.

For the reasons stated above, the court now orders as follows:

1. The petition for habeas corpus under 28 U.S.C. § 2254 is **CONDITIONALLY GRANTED** as to Claim 1. The respondent must release Herod from custody unless, within 90 days of the final judgment in this case, the State initiates retrial proceedings against him. The 90-day period will not begin until the conclusion of any appeal from this order, either by the exhaustion of appellate remedies or the expiration of the time period in which to seek those appellate remedies.

2. The court will enter final judgment on Claim 1.

The Clerk will provide a copy of this order to the parties.

Signed on Galveston Island this  _3rd_  day of April, 2025.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE